# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION
#### No. 4:19-CV-00111

| | | |
|---|---|---|
| **WILLIAM HARRIS and PHYLLIS HARRIS,** | ) ) ) | **PLAINTIFFS' ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANT** |
| **Plaintiffs,** | ) ) | **MARY JANE VANDERBURG'S MOTION FOR SUMMARY** |
| **vs.** | ) ) | **JUDGMENT [Doc. 94] AND DEFENDANTS REMCO EAST,** |
| **MARY JANE VANDERBURG, DOUGLAS MATTHEW** | ) ) | **INC. AND MARY GRACE BISHOP'S MOTION FOR** |
| **GURKINS, REMCO EAST, INC., and MARY GRACE BISHOP,** | ) ) | **SUMMARY JUDGMENT [Doc. 98]** |
| | ) | |
| **Defendants.** | ) ) | |

Pursuant to LR 56.1(a)(2), plaintiffs William Harris and Phyllis Harris submit the following additional material facts in dispute in opposition to the motions for summary judgment filed by defendant Mary Jane Vanderburg (Doc. 94) and defendants Remco East, Inc. and Mary Grace Bishop (Doc. 98). The evidence cited herein is contained in Plaintiffs' Appendix to Local Civil Rule 56.1 Statement of Material Facts filed herewith ("Plaintiffs' Appendix").

//

//

//

//

# TABLE OF CONTENTS

Page

A.  The Harrises Apply to Rent 559B Huntingridge Road (Fact 1) . . . . . . . . . . 4

B.  The Harrises' Rental Agreement (Facts 2-22) . . . . . . . . . . . . . . . . . . . . . . . 4

C.  The Duplex at 559 Huntingridge Road (Facts 23-24) . . . . . . . . . . . . . . . 13

D.  Gurkins Harasses the Harrises (Facts 25-36) . . . . . . . . . . . . . . . . . . . . . . . 13

E.  The Harrises Communicate with Remco Regarding Gurkins'
    Harassment (Facts 37-75) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

F.  The Harrises' Complaints Raise Remco's Owner's Concern
    (Facts 76-87) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

G.  The Run up to Eviction (Facts 88-97) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

H.  Vanderburg and Remco Decide to Evict the Harrises (Facts 98-120) . . . . 36

I.  Defendants' Contradictory Statements Regarding the Eviction
    (Facts 121-126) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

J.  The Harrises Attempt to Negotiate a Resolution and Defendants
    Refuse to Renew the Lease (Facts 127-140) . . . . . . . . . . . . . . . . . . . . . . . 42

K.  The Harrises Decide to Move from 559B Huntingridge Road and
    Endure Further Abuse from Gurkins (Facts 141-144) . . . . . . . . . . . . . . . . 46

L.  Vanderburg's Testimony is Not Worthy of Belief (Facts 145-157) . . . . . . 47

M.  Agency Relationship between the Vanderburg, Remco and Bishop
    (Facts 158-165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

N.  Vanderburg Had Control Over Gurkins (Facts 166-172) . . . . . . . . . . . . . . 52

Case 4:19-cv-00111-D   Document 106   Filed 04/28/21   Page 2 of 67

O.     Gurkins' Harassment Interfered with the Harrises' Enjoyment of their
Unit (Facts 173-182) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

P.     Vanderburg, Remco, and Bishop Had Actual Notice of Gurkins' Prior
Racist Attacks on Vanderburg's Tenants (Facts 183-196) . . . . . . . . . . . . 57

     (a)  2017 Attack on Kierra Roberson (Facts 183-190) . . . . . . . . . . . . . . . 57

     (b)  2014 Attack on Kathy Williams (Facts 191-196) . . . . . . . . . . . . . . . . 59

Q.     Remco Failed to Respond Adequately to Address the Harrises'
Complaints (Facts 197-203) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

R.     Fed. R. Civ. P. 30(b)(6) designee testimony (Facts 204-206 . . . . . . . . . . 65

## PLAINTIFFS' ADDITIONAL MATERIAL FACTS

### A.   The Harrises Apply to Rent 559B Huntingridge Road

1.      On February 7, 2017, William and  Phyllis Harris, an older Black American married couple, applied to Remco for the rental of the subject dwelling, located at 559B Huntingridge Road, Greenville, NC 27834 (the "Subject Dwelling"). (Depo. Exh. 11 [William Harris aged 73; Phyllis Harris aged 61], attached to Plaintiffs' Appendix;[1] Declaration of Phyllis Harris attached as Exh. 22 to Plaintiffs' Appendix ["Harris Dec."] ¶ 2.)  Remco admits that the Harrises provided no inaccurate information in that rental application.  (Deposition of Mary Grace Bishop, Vol. 1, attached as Exh. 2 to Plaintiffs' Appendix ["Bishop Depo."] 77:7-11.)

### B.   The Harrises' Rental Agreement

2.      On February 24, 2017, Remco and the Harrises executed a rental agreement ("Residential Rental Contract") for the rental of the Subject Dwelling. (Depo. Exh. 13 at 11.)

3.      The Residential Rental Contract executed by the Harrises was the standard rental agreement used by Remco before and after the Harrises's tenancy

---

[1]All Deposition Exhibits cited in this Statement are submitted as part of the set of Deposition Exhibits included with Plaintiffs' Appendix, Volume 2, and may be found therein at Exhibit 27.

at the Subject Dwelling. The Residential Rental Contract reflects Standard From 410-T, which is issued by the North Carolina Association of Realtors and was last revised in July 2015. (Depo. Exh. 13 at 1.)

4. The Residential Rental Contract identified "Phyllis Harris, William Harris" as "Tenant," "Vanderburg" as "Owner" and "Landlord," and "Remco East, Inc." as "Agent." (Depo. Exh. 13 at 1.)

5. The Residential Rental Contract provided that the Harrises would rent the Subject Dwelling for a "lease term" of one year, between March 1, 2017 and February 28, 2018, in exchange for the payment of rent in the sum of $550 per month. (Depo. Exh. 13 at 1.) The lease further provided that "[a]t the end of your lease, you will have the option of going month to month with a monthly increase of $20.00, a 6-month lease renewal for $10.00 monthly increase, or renewing your lease for another year at the current market rate." (Depo. Exh. 13, p. 12.) That was an automatic renewal unless the tenant sought to terminate. (Deposition of Mary Grace Bishop, Volume 2, attached as Exh. 3 to Plaintiffs' Appendix ["Bishop Depo. Vol 2"] 377:3-14.)

6. The Residential Rental Contract disclosed Remco as Vanderburg's agent:

"If there is an Agent involved in this transaction, Agent hereby discloses to

Tenant that Agent is acting for and represents Landlord." (Depo. Exh. 13, ¶ 28(a).)

7.       The Residential Rental Contract stated Remco's authority as

Vanderburg's agent:

> Landlord and the Tenant acknowledge that the Landlord may, from time to time in his discretion, engage a third party ("the Agent'') to manage, supervise and operate the Premises or the complex, if any, of which they are a part. If such an Agent is managing, supervising and operating the Premises at the time this lease is executed, his name will be shown as "Agent'' on the first page hereof. With respect to any Agent engaged pursuant to this paragraph, the Landlord and the Tenant hereby agree that: (1) Agent acts for and represents Landlord in this transaction; (2) Agent shall have only such authority as provided in the management contract existing between the Landlord and Agent; (3) Agent may perform without objection from the Tenant, any obligation or exercise any right of the Landlord imposed or given herein or by law and such performance shall be valid and binding, if authorized by the Landlord, as if performed by the Landlord; (4) the Tenant shall pay all rentals to the Agent if directed to do so by the Landlord; (5) except as otherwise provided by law, the Agent shall not be liable to the Tenant for the nonperformance of the obligations or promises of the Landlord contained herein; (6) nothing contained herein shall modify the management contract existing between the Landlord and the Agent; however, the Landlord and the Agent may from time to time modify the management agreement in any manner which they deem appropriate; (7) the Landlord, may, in his discretion and in accordance with any management agreement, remove without replacing or remove and replace any agent engaged to manage, supervise and operate the Premises. (Depo. Exh. 13, ¶ 21.)

8.       The Residential Rental Contract bound Vanderburg as landlord and

the Harrises as tenants to specific terms and conditions. (Depo. Exh. 13 at 1.)

9.       The Residential Rental Contract specified conduct by the Harrises as

tenants that constituted a breach of the Residential Rental Contract:

It shall constitute a breach of this Agreement if Tenant fails to:

(i)  pay the full amount of rent herein reserved as and when it shall become due hereunder; or

(ii)  perform any other promise, duty or obligation herein agreed to by him or imposed upon him by law and such failure shall continue for a period of five (5) days from the date the Landlord provides Tenant with written notice of such failure.  (Depo. Exh. 13, ¶ 17(a).)

10.    Pursuant to ¶ 13(ii) of Residential Rental Contract, it was Remco's practice to always provide any tenant deemed to be in breach of any provision of the Residential Rental Contract with written notice of Remco's intention to file an eviction action against the tenants. (Deposition of Sherry Franks attached as Exh. 7 to Plaintiffs' Appendix ["Franks Depo."] 14:10-21 ["We would send them a letter letting them know they were in breach of the lease and to either, depending on what it was, correct it or they could risk eviction. Okay. So that's your usual practice? Yes, sir."]

11.    If a tenant was accused of disruptive conduct, Remco sent "a letter out as a complaint to who they're complaining about." (Franks Depo. 62:15-63:13.)

12.    The Residential Rental Contract imposed the following obligations on Vanderburg as landlord as follows (Depo. Exh. 13, ¶ 6.):

-7-

| ¶¶ | Landlord's Obligation |
|------|------------------------|
| 5(a) | comply with the applicable building and housing codes to the extent required by such building and housing codes |
| 5(b) | make all repairs to the Premises as may be necessary to keep the Premises in a fit and habitable condition; provided, however, in accordance with paragraph 10, the Tenant shall be liable to the Landlord for any repairs necessitated by the Tenant's intentional or negligent misuse of the Premises |
| 5(c) | keep all common areas, if any, used in conjunction with the Premises in a clean and safe condition |
| 5(d) | promptly repair all facilities and appliances, if any, as may be furnished by the Landlord as part of the Premises, including electrical, plumbing, sanitary, beating, ventilating, and air conditioning systems, provided that the Landlord, except in emergency situations, actually receives notification from the Tenant in writing of the needed repairs |
| 5(e) | within a reasonable period of time based upon the severity of the condition, repair or remedy any imminently dangerous condition on the Premises after acquiring actual knowledge or receiving notice of the condition. Notwithstanding Landlord's repair or remedy of any imminently dangerous condition, Landlord may recover from Tenant the actual and reasonable costs of repairs that are the fault of Tenant. |

13.     Vanderburg acknowledges that there is at least one common area at the 559 dwelling subject to ¶ 5(c) consisting of the front porch that served as the entrance way for both 559A (Gurkins) and 559B (Harris).  (Deposition of Mary Jane Vanderburg attached as Exh. 1 to Plaintiffs' Appendix ["Vanderburg Depo."] 89:7-18.)

-8-

14.     The Residential Rental Contract stated the Harrises' obligations as tenants, which Remco and Bishop admits they fully complied with as follows (Depo. Exh. 13, ¶ 5):

| ¶¶ | Tenant's Obligation | Bishop and Remco admit that the Harrises complied |
|---|---|---|
| 5(a) | use the Premises for residential purposes only | Bishop Depo. 102:1-5 |
| 5(b) | not use the Premises for any unlawful or immoral purposes or occupy them in such a way as to constitute a nuisance | Bishop Depo. 102:1-5 |
| 5(c) | keep the Premises, including but not limited to all plumbing fixtures, facilities and appliances, in a clean and safe condition | Bishop Depo. 103:3-7 |
| 5(d) | cause no unsafe or unsanitary condition in the common area and remainder of the Premises used by him | Bishop Depo. 103:8-10 |
| 5(e) | comply with any and all obligations imposed upon tenants by applicable building and housing codes | Bishop Depo. 103:17-20 |
| 5(f) | dispose of all ashes, rubbish, garbage, and other waste in a clean and safe manner and comply with all applicable ordinances concerning garbage collection, waste and other refuse | Bishop Depo. 103:21-104:3 |
| 5(g) | use in a proper and reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appliances, if any, furnished as a part of the Premises | Bishop Depo. 104:4-9 |

-9-

| | , | ¶¶ | |
|---|---|---|---|
| 5(h) | not deliberately or negligently destroy, deface, damage or remove any part of the Premises (including all facilities, appliances and fixtures) or permit any person, known or unknown to the Tenant, to do so | | Bishop Depo. 104:10-13 |
| 5(i) | pay the costs of all utility services to the Premises which are billed directly to the Tenant and not included as a part of the rentals, including, but not limited to, water, electric, telephone, and gas services | | Bishop Depo. 104:14-19 |
| 5(j) | conduct himself and require all other persons on the Premises with his consent to conduct themselves in a reasonable manner and so as not to disturb other tenants' peaceful enjoyment of the Premises | | |
| 5(k) | not abandon or vacate the Premises during the Initial Term or any renewals or extensions thereof. Tenant shall be deemed to have abandoned or vacated the Premises if Tenant removes substantially all of his possessions from the Premises | | Bishop Depo. 105:6-8 |

15.     The Harrises paid their rent in full and on time throughout their tenancy.  (Bishop Depo. 111:1-4.)

16.     The obligation under ¶5(j) of the Residential Rental Contract barring conduct that "disturb other tenants' peaceful enjoyment of the Premises," has only been enforced by Remco for the benefit of persons who are, in fact, Remco

-10-

tenants.  (Franks Depo. 42:1-10.)

17.     The Residential Rental Contract imposed penalties for late payment

of rent and "fees for complaint for summary ejectment" (eviction).  (Depo. Exh. 13

at 1.)

18.     The Residential Rental Contract provided for the removal or

resignation of the Remco as agent for Vanderburg and the effect of that removal or

resignation on the obligations of the parties under the Residential Rental Contract.

(Depo. Exh. 13, ¶¶  4, 21.)

19.     The Residential Rental Contract added a Crime Free Lease

Addendum incorporated into the terms and conditions of the Residential Rental

Contract binding the parties.   (Depo. Exh. 13, ¶ 28(b).)

20.     The Crime Free Addendum provided:

1.      Resident and Resident's Occupants whether on or off of the property;
and Resident's and Resident's Occupant's guests and invitees, are
prohibited from:
        a.      Engaging in any criminal activity . . .
        b.      Engaging in any act intended to facilitate criminal activity or
        permitting the dwelling unit to be sued for criminal activity.
        . . .
        d.      Engaging in any criminal activity including but not limited to .
        . .  communicating threats as, **assaults as prohibited in N.C.G.S.
        Chapter 14, Article 8, . . .  or any** breach of the lease agreement that
        otherwise jeopardize the health, safety and welfare of the landlord. his
        agent, or other tenant . . .

-11-

2. VIOLATION OF ANY ABOVE PROVISIONS SHALL BE A
MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND
GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY. A
single violation of any of the provisions of this addendum shall be deemed a
serious, material and irreparable non-compliance. It is understood that a
single violation shall be good cause for immediate termination of the lease
under N.C.G.S. Chapter 42, Article 8. Proof of such a violation shall not
re1uire a criminal conviction but shall only require a preponderance of the
evidence.

3. Resident hereby authorizes property management/owner to use police
generated reports against Resident for any such violation as reliable direct
evidence, and/or as business records as a hearsay exemption, in all
eviction hearings.

4. In case of conflict between the provisions of this addendum and any
provision of the lease, the provisions of this addendum shall govern.

5. Resident also agrees to be responsible for the actions of Resident's
occupants, Resident's guests and invitees, and Resident's occupant's guests
and invitees, regardless of whether Resident knew or should have known
about any such actions. A guest or invitee shall be anyone who Resident or
Resident's occupant gives access to or allows on the premises or in the
rental unit.

6. This Lease Addendum is incorporated into the lease or renewal thereof;
executed or renewed at any time between Landlord/Manager and
Resident/Lessee. (Depo. Exh. 13 at 15.)

21.    To verify the criminal activity warranting eviction, Remco "would get

reports off the Pitt County – I don't remember the name of the website, but you

could pull up criminal activity on people," according to Bishop.  (Bishop Depo.

118:11-19). Remco has access the Pitt County site to obtain a list of charges or

-12-

convictions against person. (Id. 121:8-11.)

22.     Bishop never checked the Pitt county website for information about Gurkins following the Harrises' repeated disclosure that the police had been call and a warrant issue based on Gurkins' harassment of the Harrises. (Bishop Depo. 123:11-16.)

**C.     The Duplex at 559 Huntingridge Road**

23.     The Subject Dwelling is part of a duplex that is located at 559 Huntingridge Road.  This duplex had two driveways on either side of the dwelling, and each driveway served one of separate dwelling units, 559A (Gurkins) and 559B (Harris), as depicted in Exhibit B of the Declaration of Phyllis Harris (Plaintiffs' Appendix Exh. 4).  (P.Harris Dec. ¶ 4 and Exh. B thereto.)

24.     Dwelling 559A and 559B shares a small common area, consisting of a front porch that must be accessed to enter each dwelling through its front door. (Each dwelling unit also had a side entrance where each side's drive way end near the duplex.  (P.Harris Dec. ¶ 4 and Exh. B thereto; Deposition of William Harris attached as Exh. 9 to Plaintiffs' Appendix ["W.Harris Depo."] 20:16-21.)

**D.     Gurkins Harasses the Harrises**

25.     Shortly after moving into the Huntingridge unit, Phyllis Harris met

-13-

Vanderburg for the only time. (Deposition of Phyllis Harris attached as Exh. 8 to Plaintiffs' Appendix ["P.Harris Depo."] 111:11-24.) After introductions, Vanderburg asked, 'My nephew ain't giving you no problems, is he?" (P.Harris Depo. 111:11-24.) Ms. Harris later realized what Vanderburg meant. (Id.)

26.    Not long afterwards, Gurkins's behavior toward the Harrises changed. (P.Harris Dec. ¶ 5; W.Harris Depo. 13:20-17:12.) Over the course of the ensuing months, Gurkins subjected the Harrises to racial harassment, including repeated use of racial slurs and threats of physical violence. Defendant Gurkins often referred to then as "niggers," "motherfucking niggers," "ignorant black niggers," and "dumbass nigger." (P.Harris Dec. ¶ 5.)

27.    In April 2017, the window of the Harrises' van was smashed. The Harrises suspected that Gurkins had something to do with the broken window in their van because they had heard a crash the night before when Gurkins had been having an argument with his wife and saw the damage the next day. (W.Harris Depo. 13:20-17:12.)

28.    On April 24, 2017, Pitt County Deputy Sheriff Kuenzi responded to William Harris's call for assistance at 559 Huntingridge Road regarding damages to an automobile parked in the 599B driveway. (Plaintiffs' Appendix, Exh. 29.)

29.    The Harrises complained to Remco about the damage to the vehicle.

-14-

(W.Harris Depo. 25:4-26:4.)

30.     To exit his premises (559A) by car, Gurkins routinely drove from his driveway, across the front yard of the Harrises' premises (599B), onto the Harrises' driveway, and then onto Huntingridge Road, as depicted in the videos produced in this action by plaintiffs to defendants.  Sometimes Gurkins would park on the lawn directly in front of the Harrises' dwelling.  (W.Harris Depo.20:9-24; P.Harris Dec. ¶18.) (Lodged separately herewith on CD Rom are copies of those videos, produced in discovery as PLT 101-108.)

31.     When Phyllis Harris broached the subject of driving across their law with Gurkins, he called her an "Alzheimer nigger."  (W.Harris Depo. 18:4-15, 30:3-14; P.Harris Dec. ¶ 5.)

32.     On several occasions, starting in the Summer of 2017, Gurkins yelled at the Harrises from inside his own unit through the common wall.  Through the wall Gurkins called them "niggers" and other racist insults.  (P.Harris Dec. ¶¶ 7, 11.)  On one occasion, Gurkins yelled to us from inside his dwelling: "Hey niggers, can I come over and suck your dick?"  On another occasion, he yelled from his dwelling that they were "ignorant black niggers" after a sheriff's deputy served him with court papers.  (Id. ¶¶ 9-10.)

33.     On August 4, 2017, Pitt County Deputy Sheriff Kuenzi responded to

William Harris's call for assistance at 559 Huntingridge Road regarding Gurkins.

Kuenzi reported:

> I responded to the listed address in reference to an ongoing dispute between neighbors over excessive noise. I made contact with William Harris who stated that his neighbor, Douglas Gurkins used abusive language towards him while he was looking out his window. Mr. Harris went onto to say that there is excessive noise coming from Mr. Gurkins side of the duplex on a daily basis. (Depo. Exh. 18.)

34.     Starting in August 2017, Gurkins increased the frequency with which he drove from his driveway, over the yard in front of the Harrises' home, and then onto the Harrises' driveway to exit onto Huntingridge Road.  (W.Harris Depo. 20-9-24.

35.     To document this harassment, Mrs. Harris videotaped Gurkins's driving across their front yard and onto their driveway to exit the premises on August 8, August 10, August 15, August 16, August 17, August 18 (three times.) (Lodged separately herewith on CD Rom are copies of those videos, produced in discovery as PLT 101-108.)

36.     On August 17, 2017, the  Harrises called the Pitt County Sheriff to the property because of Gurkins' conduct.  (Depo. Exh. 19.)  Pitt County Deputy Sheriff Eubanks responded and wrote in his report 2017-04870 the following:

> On Thursday August 17, 2017 at approximately 0619 hours I responded to 559-B HuntingRidge Rd. in reference to a dispute with the neighbor in Apt

-16-

A.

Upon arrival I made contact with Phyllis Harris and her husband William Harris who lived at Apt B. Ms. Harris advised that they moved in the Apt., on March of this year and has nothing but trouble from the neighbor in Apt A. She informed me that they constantly drive on the grass in front of her Apt. Phyllis stated law enforcement had been called before (201704621) because of issues with the neighbor.

She informed me that on multiple occasions when she and her husband have tried to be civil with the neighbor, they have been met with anger and raciest comments. Phyllis stated that the neighbor had called them "Niggers" on several occasions. She also informed me that they have also found minor damage to their vehicles but couldn't prove it was the neighbor so didn't call and report it. She stated that they found there porch light bulb broken this morning and suspect the neighbor because they have complained about it coming on when they walk past.

I advised Phyllis and William that they should speak to a magistrate in reference to the racial slurs because if the slurs were used in a manner to provoke a fight they could be charged with disorderly conduct. She also informed me that Remco manages the property however the neighbors Aunt owns it so she has got no where with speaking to Remco. Phyllis requested that I ask the neighbors to stay off her side of the property.

I then made contact with the neighbors at Apt. A, Douglas Gurkins and Krystyna Grzybek. Both parties denied causing any trouble with the neighbors. However Douglas became angry when I asked about them driving on the grass in front of the neighbors Apt. Douglas said his Aunt owned the property and he could drive circles around the home if he wanted too. He even went so far as to state in my presents that "those niggers will be out kicked out next month". I advised Douglas that he was wrong and that if he goes on the neighbors side of the property again he is subject to be charged with trespassing whether his Aunt owned the property or not. I advised him that as renters they have rights and not to go back on their side of the property.

-17-

I filled out a victim information sheet, gave Phyllis a copy and strongly advised her to speak with a magistrate. Phyllis stated that she was going to wait and she if the neighbors behavior changed after I spoke with them.

(Depo. Exh. 19).

## E.    The Harrises Communicate with Remco Regarding Gurkins' Harassment

37.    Phyllis Harris followed a practice of personally delivering her monthly rent to Remco's office.  Harris traveled to Remco's office to pay her rent on or about the following dates:  June 6, 2017, July 5, 2017, August 7, 2017, and September 5, 2017.  (Depo. Exh. 60.)  During these visits to the Remco office, Harris communicated her complaints regarding Gurkins's harassment directly to Bishop.  (P.Harris Depo. 42:11-43:1, 47:10-48:9; Bishop Depo. 158:12-159:9; Depo. Exh. 20, 21 [Entry 8/21/2017].)  Bishop informed the Harrises that Vanderburg had instructed them to call the police if they had any problems with Gurkins.  (P.Harris Depo. 18-20.)

38.    According to Bishop, the Harrises complained to her, to other Remco employees by "emailing, calling, coming in daily." (Bishop Depo. 27:9-19.) Whenever the Harrises called Bishop with a complaint regarding Gurkins, she told them to call the Pitt County Sheriff, and they assured her that they were doing so. (Bishop Depo. 174:3-175:8; 185:9-186:2.)

-18-

39.     Bishop admits that the Harrises advised her, repeatedly, of Gurkins' harassment by way of visits, emails and phone call. Bishop 156:3-23 Each of these communications by the Harrises to Bishop was about Gurkins' harassment. (Bishop Depo. 157:13-158:7.)

40.     Prior to August 21, 2017, Bishop recalls that the Harrises stated they could not put up with Gurkins' harassment:

> They were not going to put up with the vulgarities that he was shouting through the wall at them and out in the yard and on the porch. And they specifically told me – the only thing they told me specifically that he said was that he wished she would come over there and suck his dick. That's what I remember.

(Bishop Depo. 158:12-159:9.)

41.     Bishop informed Vanderburg of the HArrises's complaints, and Vanderburg stated that "she would talk with [Gurkins]." (Bishop Depo. 159:13-160:1.)

42.     Bishop had never before experienced complaints of such vulgarity directed at a Remco tenant as described by the Harrises about Gurkins. (Bishop Depo. 160:14-21.)

43.     Bishop documented that before August 21, 2017, that the Harrises had reported to Bishop that the Sheriff Office had been called on several several times by Harrises in response to Gurkins' harassment, but Bishop did

-19-

nothing to ascertain what those deputies had observed.  (Bishop Depo. 161:14-24.)

44.     Bishop called Vanderburg on August 18 and ask that Vanderburg refund part of the rent paid and the security deposit paid by the Harrises, a proposal Bishop had never before made to any Remco owner. (Bishop Depo. 163:3-23.)

45.     Vanderburg initially agreed to Bishop's proposal. (Bishop Depo. 163:3-23 but called the following Monday and withdrew her acceptance, saying to Bishop, "You can't live anywhere for free." (Bishop Depo. 165:12-166:19.)

46.     Bishop asked Branch to intervene with Vanderburg, which Branch agreed to do. (Bishop Depo. 166:20-168:4)

47.     Remco never offered to pay the Harrises to help them moved based solely on the belief that "that could have been admitting guilt." (Bishop Depo. 170:23-171-11.)  Remco never considered offering the Harris to move to a better rental.  ((Bishop Depo. Depo. 171:23-172:2.)

48.     Bishop never considered advising Vanderburg that Remco was going to terminate its management agreement with Vanderburg unless she resolved the Harrises' complaint or restrained Gurkins' harassment. (Bishop Depo. 172:17-173:4.)

49.     Bishop never discussed with Vanderburg the possibility that Gurkins

-20-

could be relocated from the 559A unit. (Bishop Depo. 173:22-174:2.)

50.    Bishop acknowledged that Gurkins' conduct was "wrong," but cannot recall if Bishop ever made that statement to Vanderburg.  (Bishop Depo. 174:3-12.)

51.    Bishop never considered filing her own report with the police to investigate based on the Harrises's complaint. (Bishop Depo. 174:20-175:14.) According to Bishop, she did not need to investigate to get to the truth of the situation between the Harrises and Gurkins because she "believed every word" the Harrises had said to her.  (Bishop Depo. 270:21-271:4.)

52.    Bishop acknowledges that the Harrises were elderly and that moving would be a hardship for them. (Bishop Depo. 175:22-176:7.)

53.    Bishop told Branch after the August 21 call with Vanderburg: "Just what you were just talking about with these elderly tenants and having to uproot and move again. It was not their fault. I did everything I could to help them. I couldn't solve the problem." (Bishop Depo. 177:5-9.)

54.    Bishop never considered or proposed to Branch that Remco's agreement with Vanderburg should be terminated. (Bishop Depo. 177:10-20.)

55.    Bishop never consulted with the North Carolina Real Estate Commission (NCREC)  nor any NCREC litierature for direction on how to handle

-21-

Gurkins' harassment and Vanderburg's order to evict the Harrises. (Bishop Depo. 179:10-182:1.)

56.    Bishop's email received Phyllis Harris's emails in September (Exhibit 24-29), but Bishop has no recollection of those emails. (Bishop Depo. 186:17-195:17.)

57.    Upon reviewing the emails, Bishop stated, "I mean I'm not saying that I didn't see them. Where is my response? Because I always responded to my emails. Why is that not on there?" (Bishop Depo. 195:21-24.)

58.    Remco's counsel stated, "If there were responses, they were produced. And based on my memory of this production there aren't any responses going back, and I don't believe you've found any, or there would be probably an exhibit here today." (Bishop Depo. 196:9-13.)

59.    As for Gurkins' statement to Deputy Eubanks in August 2017, "those niggers are going to be out in a month," Bishop claims she does not know the basis of Gurkins' statement, but acknowledges that, in fact, an eviction was filed against the Harrises within one month of Gurkins stating, "those niggers are going to be out in a month." (Bishop Depo. 201:23 - 202:17; 204:10-24.)

60.    The trespassing charge against Gurkins for crossing Harrises' yard was the result of a call for help by the Harrises to the Sheriff, which the Harris

-22-

made in accordance with Bishop's instructions to them. (Bishop Depo. 203:18-204:4.)

61.     Bishop discussed filing the eviction complaint against the Harris with Branch, but Bishop cannot recall what Branch said. (Bishop Depo. 205:4-19.)

62.     Vanderburg instructed Bishop to file the eviction against the Harrises because they were depriving Gurkins' of a peaceful environment.  (Bishop Depo. 208:2-209:1.)

63.     Bishop asserts that Vanderburg identified actions by the Harrises that denied Gurkins' a peaceful environment:

> And she went over again how many complaints Matthew had called and given her, had been yelling back and forth and accusing him every time he walked across the yard and the situation with the pizza guy. We went over all of that.

(Bishop Depo. 209:6:12.)

64.     To that list of reasons justify the Harrises' eviction, Bishop added the pesticide placed by the Harrises outside their home:

> Q: So the disturbances then that fit within disturbing other tenants, the other tenant is Gurkins, and the disturbances are the placement of a substance around the home that Vanderburg thought was poison, the complaint of trespassing upon Gurkins entering some portion of the dwelling area that was rented by the – was rented by the Harrises, and their complaint about a pizza delivery; is that correct? A: Those three situations, yes. Q: Other –-and are those the three situations that you identified then as being the source of disturbance [by the Harrises]?

A. Yes.

(Bishop Depo. 101:12-24.)

65.     The complaint was signed by Bishop on September 26 and filed on September 29, 2017. Bishop acknowledges that the Harrises use of pesticides could not have been a basis for the eviction, because that report was not received until September 28, two days after Bishop had prepared the eviction complaint. (Compare Depo. Exhs. 30 and 32.)

66.     The only records of the Harris complaining about a pizza delivery was documented in a police report, dated October 19, 2017, more than two weeks after Bishop signed and filed the eviction against the Harris.  (Depo. Exh. 99; Exh. 28 to Plaintiffs' Appendix.)

67.     Bishop never told Vanderburg that it was Bishop who instructed the Harris to call the police in response to Gurkins' harassment (Bishop Depo. 216:3-12) and that pursuant to those instructions, the Harris had called the Sheriff who decided to charge Gurkins' with trespass (Depo. Exh. 64; Bishop Depo. 203:8-204:8) for which the Harrises disturbed Gurkins' peaceful enjoyment.

68.     Bishop wanted to help the Harrises because: "They were upstanding, good people, and I just really thought a lot of them and they know that. I did everything I could to help them. This person that lived next to them did make them

miserable. I understand that. And I wanted to help them move. It's what they wanted, and that's what I wanted to help them do." (Bishop Depo. 164:5-11.)

69.    Before and after the events recorded in Sheriff Deputy Eubanks's report (Depo. Exh. 19), William and Phyllis Harris had traveled to the Remco office to re-raise their complaints about Gurkins' harassment directly to Bishop (P.Harris 42:11-43:1, 47:10-48:9; W.Harris Depo. 25:4-26:4) and David Bradley, Remco maintenance supervisor. (W.Harris Depo. 27:1-6; P.Harris 18:22-19:10.)

70.    Mrs. Harris told Grace Bishop in person at the Remco office that Gurkins was using racial slurs towards them. (P.Harris Depo. 51:24-52:19.) That meeting occurred when the Harrises had become fed up and tired of the harassment and racial slurs and were ready to move and wanted half their rent back. (Id.) There were several people from Remco present, including a male. (52:17-53:8.)

71.    On August 21, 2017, Bishop wrote a log entry into the Remco's property management program, summarizing the frequency and seriousness of the Harrises' complaints to Remco about Gurkins:

> This tenant [the Harrises] has called and come into my office several times over the last two months and complained about Matt, Mary Jane's nephew causing disturbances in the unit beside them. The Harris's indicated to me that they wanted to move that would not put up with this anymore. (Depo. Exh. 20, 21 [Entry 8/21/2017].)

-25-

72.     Bishop also acknowledged that the Harrises had also called the sheriff's department in response to Gurkins's harassment and that the sheriff's deputies had responded to those calls for service. ["They called the sherriff's office several times and they came out." (Depo. Exh. 20, 21 [Entry 8/21/2017])].)

73.     Bishop and Remco were aware that the Harrises had made complaints to both them and to the police. (Bishop Depo. 161:24-163:14; 215:10-216:5.) Bishop made Vanderburg aware that the Harrises had made complaints to Remco and to the police. (Bishop Depo. 161:24-163:14; 215:10-216:5.)

74.     In response to the Harrises' desire to move because of Gurkins's harassment, Bishop called Vanderburg on August 18, 2017 to report the Harrises' complaints and Harrises' request for a partial rent refund and release from their lease so that they could move away from Gurkins. Bishop summarized the contents of those communications with Vanderburg in her August 21 log entry as follows:

> I called the owner and on Friday 8/18/17 Mary Jane agreed to give them $1650.00 back of the rent and s/d [security deposit] they had paid so they would move. On Monday, today, 8/21/17 Mary Jane called me back and said that she had changed her mind and she was only willing to let them out of their lease and give them their s/d back and 30 days to vacate.

(Depo. Exh. 20, 21 [Entry 8/21/2017].)

75.     Later, on August 21, Bishop reported to the Harrises Vanderburg's

-26-

response to Bishop's report of their complaints to Vanderburg and their desire for a partial refund to enable them to move. Bishop summarized the contents of those communications with the Harrises in her August 21 log entry as follows:

> The Harris's called me and I told them and they still will not let me know what they are going to do. They argue with me about what they want and will not commit to anything. I told them they had two options, 1 to move out and we would give them their s/d back or [2] *because they had not violated their lease they could stay till the end of their lease.* I told them to let me know and get back to me and hung up.

(Depo. Exh. 20, 21; emphasis added.)

## F.  The Harrises' Complaints Raise Remco's Owner's Concern

76.     Following these and other communications by the Harrises, Bishop asked Connolly Branch, Remco's owner, to hear directly from Phyllis and William Harris about their complaints of harassment by Gurkins. Before meeting with Phyllis and William Harris in person, Branch was aware that the Harrises had complained to Bishop about Gurkins's harassment. Prior to their meeting, Branch understood that Bishop had notified Vanderburg of the Harrises' complaints about Gurkins's harassment a "couple of times." (Deposition of Connolly Brancart attached as Exh. 5 to Plaintiffs' Appendix ["Branch Depo."] 78: 11-21.)

77.     Branch also understood that Bishop had directed the Harrises to call the police if Gurkins intimidated them.

"Grace [Bishop] told [Phyllis Harris] this because she told me. [Bishop] said if these issues come up, call the police, you know. We can't – we're not the police and we're not the sheriff. But you [Phyllis Harris] don't need to hesitate to call the sheriff if something is really bothering you or you feel like you're being intimidated or whatever. I mean, I know that [Bishop] did tell [the Harrises] that. Or at least Grace [Bishop] told me she had suggested that to [the Harrises]."

(Branch Depo. 75: 16-24.)

78.    Branch wanted to hear directly from Phyllis and William Harris about Gurkins's harassment. Phyllis and William Harris "were in talking with Grace about some of these issues that we're talking about. And I came in to listen. Because I said, Grace, I'd like to hear what they have to say. Because, you know, sometimes things get exaggerated, you know. You have an issue or something and people exaggerate it. And they mentioned the conflicts that **they'd had with him yelling through the wall**." (Branch Depo. 69:14-21 [emphasis added])

79.    Branch's reference to "yelling through the wall," reflects one method employed by Gurkins to harass Phyllis and William Harris throughout their tenancy. Units 559A and 559B share a thin common wall through which sound traveled. To intimidate and harass Phyllis and William Harris, Gurkins would scream profanity and racial slurs at them through that thin, common wall. (P.Harris Depo. 73:3-75:7; 106:4-110:12; P.Harris Dec. ¶¶ 7-11.)

33.    A typical example of Gurkins "yelling through the wall," was

recorded by Phyllis Harris on January 26, 2018, the day before Phyllis and

William Harris vacated the 559B unit:

> Ain't no goddamn (inaudible) if that's what you're thinking, get the fuck out of your head because we don't fuck niggers. We don't have sex with niggers.. We don't kiss niggers.· We damn sure don't bow down to niggers. Do you hear me?· That's the way I was raised. Fuck a nigger.(inaudible) you better not (inaudible) fucking excuse. A nigger ain't nothing but a goddamn coward. They ain't no fucking nigger (inaudible) in my mother fucking family (inaudible) goddamn (inaudible) to raise they kids in my mother fucking house. You take my (inaudible). And I hope you mother fucking niggers next door fucking heard every goddamn bit of that shit because I ain't got no room for you niggers in my life. And they ain't no white mother fuckers in this house scared of a nigger (inaudible) that other nigger because all these mother fucking is a goddamn coward. Y'all some coward ass mother fucking honkey niggers. Go back to goddamn cotton fields you came out of, nigger. Never mind. Not nigga. Nigger. I'll rephrase that, not nigga, that's (inaudible). Not nigga, nigger. I call you nigga. Nigger. (inaudible) I will lay your mother fucking fat ass out. I will lay that bitch – whew! (inaudible)

(P.Harris Dec., Exhibit A [Transcript] of audio recording.)

80.    Branch joined Bishop and the Harrises in Bishop's office at Remco. There, Branch heard the Harris's complain about Gurkins' harassment. (Branch Depo. 71:3-10.) Though Branch claims limited recollection of the statement made during that meeting, he heard enough to cause him to act in a way he had never acted before.(Branch Depo. 28:3-22,99:14-100:2)

81.    Branch says he cannot recall details from that meeting, but left with the impression, "it didn't sound good. I mean, I can't say what it was. And I

don't remember really.  I mean I wish I did.  It was enough that I knew they wanted to move." (Branch Depo. 71:20-22.)  Branch recalls that the Harrises stated that the harassment had occurred "couple of times," that they were "frustrated," and that they wanted to move because "it wasn't going to get any better." (Branch Depo. 71:15-24.)  Branch remembers the Harrises complaining, **"Matthew [Gurkins] had been yelling stuff through the wall at them."** (Branch Depo. 75:1-3 [emphasis added].)  "I can't remember if [the Harrises] said it happened once or twice.  But it had upset them enough that they weren't comfortable staying there.  I mean they said, you know, it bothered us.  And, you know, we'd like to move if you'd let us move." (Branch Depo. 75:4-10.)

82.    For Branch, the statements by the Harris were serious.  "Anyway, it was obviously some things that went on that the tenant next door [Gurkins] . . . was being disrespectful, you know, I mean as far as their [the Harrises'] quietness and enjoyment." (Branch Depo. 74:5-9.)  "It was enough that I realized . . . we've had [Gurkins's harassment] happen before.  It's not the first time that [the Harrises had] a problem like that." (Branch Depo. 74:12-15.)

83.    At that meeting, Branch agreed to speak with Vanderburg, but opined to the Harrises that Remco's leverage was limited:  "And so I said, well, you know, all I can do is tell you that I'll ask [Vanderburg],  You know,  she's the

owner. [Vanderburg] has to let you out of your lease. You're in a lease, you know." (Branch Depo. 75:12-15.)

84. The following day, Branch telephoned Vanderburg. "I called Ms. Vanderburg and we talked about that briefly." (Branch Depo. 76:1-23) "I asked her to refund them that, whatever month that was. I said let's, you know, [Phyllis Harris is] having issues with the neighbor next door, and so and so." (Branch Depo. 77:17-19.) Vanderburg replied, "yes, I know who that is." Branch claimed not to know Gurkins, stating that Vanderburg " rented it to him, so I mean obviously I didn't know him." (But Bishop obviously did.) (See Depo. Exh. 20.) (Branch Depo. 77:18-21.) Branch stated to Vanderburg, "apparently these things are happening. Would you consider letting her (Phyllis Harris) out of her lease? I think we can probably re-rent the place again pretty quickly." (Branch Depo. 77:23-78:1.)

85. Branch recalls, Vanderburg asked, "are you sure this happened. And I said, well, no, I wasn't there, but [the Harrises] seemed pretty sincere, and they've talked to Grace about this. And I think it probably did." (Branch Depo. 78:2-8.) Vanderburg replied, "she would think about it," but Branch thought, "well, you know, she didn't respond positively when I asked her about doing it." (Branch Depo. 76:1-23.) Since Vanderburg "wouldn't commit to doing anything,"

-31-

Branch felt that Vanderburg "didn't want to talk to me long about it," and Branch decided, "I didn't want to browbeat her or try to push her, so I didn't." (Branch Depo. 78:7-10.) Branch reported the content of his call with Vanderburg to Bishop. (Branch Depo. 78:11-21.)

86.     Vanderburg flatly contradicts Branch, testifying that Branch never communicated with Vanderburg about the Harrises or Gurkins. (Deposition of Mary Jane Vanderburg attached as Exh. 1 to Plaintiffs' Appendix ["Vanderberg Depo."] 104:12-18 ["What about Mr. Connally Branch, do you know him? Yeah, I know him, but I was not seeing him at that time. So you didn't have any conversation with him about the Harrises? No."])

87.     Apart from this call to Vanderburg conveying the Harrises' harassment complaints about Gurkins, Branch cannot recall any other time that he has contacted an owner on behalf of a tenant. (Branch Depo. 28:3-22,99:14-100:2) Branch felt the need to break from practice in this case because "[Vanderburg] needed to be aware of it and some action maybe needed to happen." (Branch Depo. 100:19-20.)

## G.     The Run up to Eviction

88.     On September 1, 2017, Gurkins assaulted Phyllis Harris on the front porch of 559 Huntingridge Road, a common area shared by both the 559A and

-32-

559B dwelling units. As Phyllis Harris entered her home, Gurkins charged at her, yelling profanity and threatening to "beat [her] black ass." (Depo. Exh. 22.) Terrified, Phyllis Harris entered her dwelling, locked the door and sat in the living room with her husband's shotgun until William Harris arrived home from work.

89. The Harrises then drove to the courthouse in Greenville and filed an Affidavit for Criminal Charge against Gurkins with the magistrate. (Depo. Exh. 22, pp. 1-2.) The magistrate issued a criminal complaint against Gurkins in Case 17CR 056073 for Criminal Threats and a arrest warrant the following day. (Depo. Exh. 39.)

90. On September 15, 2017, at 8:10pm, Phyllis Harris emailed Bishop:

Ms. Grace, of Remco East & Ms. Vanderburgh, Owner of the Property@ 559- B Huntingridge Road, Greenville, Ne 27834. We have had to take out a warrant on Matthew Douglas Gurkins for Threatening me. I was afraid that he, Matt was going to harm me. You may already know this. We have had to endure so much since moving at this address that Remco East manage March 2017. We wll be in touch.

(Depo. Exh. 24 [A copy of this email was produced to plaintiffs by Remco from Bishop's email, grace@remcoeast.com].) Bishop did not respond to this email. (P.Harris Depo. 48:10-14; Bishop Depo. 187:19-189:16.) x .)

91. On September 21, 2017, at 7:23pm, Phyllis Harris emailed Bishop:

This has been a nightmare. Definitely, not a safe environment living beside of Douglas Matthew Gurkins, and Krystyna Victoria Grzybek living next

-33-

door in the Duplex at 559-A Huntingridge Road, Greenville, NC. We understand now that Mr. David Bradley in charge of the Maintenance Dept. at Remco East is not in charge of other issue[s] that was happening at 559-B Huntingridge Rd., where we had to call the Sheriff's Office for about 5 (five) times. Anything else that comes up on this property in question, will be directed to Ms. Grace who in turn will inform the Owner, Ms. Vanderburg, who is Aunt too, Douglas Matthew Gurkins.

(Depo. Exh. 25 [A copy of this email was produced to plaintiffs by Remco from

Bishop's email, grace@remcoeast.com].)  Bishop did not respond to this email.

(P.Harris Depo. 48:10-14.)

      92.    On September 22, 2017, at 10:14am, Phyllis Harris emailed Bishop:

So that you will understand why I'm texting this early in the morning to you. Instead of our daughter having to bring our grandchildren for me to drop off at school, I meet her now. I don't want them subjected to Douglas Matthew Gurkins profane mouth. So, I leave when my husband leaves in the morning for fear of this individual, I just spoke of.

(Depo. Exh. 26 [A copy of this email was produced to plaintiffs by Remco from

Bishop's email, grace@remcoeast.com].)  Bishop did not respond to this email.

(P.Harris Depo. 48:10-14.)

      93.    On September 24, 2017,  Mrs. Harris called the sheriff after Gurkins

had walked across their yard in violation of the direction of the sheriff's office.

(Exh. 64.)  At 7:31pm, Sheriff Deputy Eubanks respond to Phyllis Harris's call for

service at the Subject Dwelling.   Deputy Eubanks wrote in Report 2017-05709

about the call:

On Sunday September 24, 2017 at approximately 1931 hours I responded to 559 B Hunting Ridge Rd., in reference to trespassing.  Upon arrival I made contact with Phyllis Harris who stated her neighbor, Douglas Gurkins came onto her property.  She informed me that Douglas walked across her backyard with a water hose. Douglas has been told not to be on the property(20 1704870) by the Pitt County Sheriffs Office. There has been on going issues with Douglas since Ms. Harris moved in. I filled out a crime victim information sheet and gave Ms. Harris a copy. I also advised and explained the warrant process to her. Ms. Harris stated that she was going to the magistrate now.

I contacted Magistrate Hall and explained the situation and on going issues between the neighbors. Magistrate Hall issued a warrant for 2nd degree trespassing.

Douglas was taken into custody without incident, transported to PCDC and turned over to the jail staff. Douglas also stated that he knew not to be on the property but didn't think walking across the backyard was an issue. I again explained to Douglas that no trespassing means that he can't be on Ms. Harris's property.

(Depo. Exh. 64.)

94.     On September 24, 20217, a state magistrate issued an arrest warrant for Gurkins for trespass in criminal case 17CR056769.  (Depo. Exh. 49.)  Pursuant to Eubanks's instructions, Phyllis Harris submitted a Affidavit for Criminal Charges, submitted on October 17, 2017, attesting to Gurkins's trespass.  (Depo. Exh. 42.)

95.     On September 24, 2017, at 10:45pm, Phyllis Harris emailed Bishop:

The Sheriff Office said that they were trespassing. Krystyna keeps walking through our yard, going over to the 4 bdrm., empty brickhouse, Matthew

-35-

Gurkins says is his. That is how the window was broken out of Van.

(Depo. Exh. 27 [A copy of this email was produced to plaintiffs by Remco from Bishop's email, grace@remcoeast.com].)  Bishop did not respond to this email. (P.Harris Depo. 48:10-14; Bishop Depo. x .)

96.     On September 24, 2017, at 11:02pm, Phyllis Harris emailed Bishop:

We pay rent at 559-B Huntingridge Rd., Greenville, NC. So, who is responsible, Remco East with you as the Manager or the owner, Ms. Vanderburg.

(Depo. Exh. 28 [A copy of this email was produced to plaintiffs by Remco from Bishop's email, grace@remcoeast.com].)  Bishop did not respond to this email. (P.Harris Depo. 48:10-14; Bishop Depo. x .)

97.     On September 25, 2017, at 12:22am, Phyllis Harris emailed Bishop:

Now, Matthew Gurkins has pulled a water-hose across our backyard to the brick house that he says is his. Trespassing through our backyard. I'm afraid Matt will do harm to me or destroy something on our side of the property. They set up piles like a barn-fire

(Depo. Exh. 29 [A copy of this email was produced to plaintiffs by Remco from Bishop's email, grace@remcoeast.com].)  Bishop did not respond to this email. (P.Harris Depo. 48:10-14; Bishop Depo. x .)

**H.     Vanderburg and Remco Decide to Evict the Harrises**

98.     On Tuesday, September 26, 2017, Bishop prepared and executed a

-36-

complaint of summary ejectment in *Remco v. William Harris and Phyllis Harris* to evict Phyllis and William Harris from their home at 559B Huntingridge. (Depo. Exh. 30.) The complaint was filed on Friday, September 26, 2017, in civil case 17CV004461 (Depo. Exh. 31).

99. Although the lease provides that the landlord may terminate the lease or the tenant's right to possession for failure to perform the obligations under the lease if such failure continues for a period of five (5) days from the date the landlord provides the tenant with written notice of such failure, (Depo. Exh. 13, p. 5, ¶ 17), Remco never gave the Harrises written notice of a violation. (P.Harris Dec. ¶ 19.)

100. Bishop executed the eviction complaint as an Agent. She executed a separate certification, attesting: "I certify that I am an agent of the plaintiff and have actual knowledge of the facts alleged in this Complaint." (Depo. Exh. 30, 31.)

101. The complaint form had check boxes as the basis for the summary ejectment: nonpayment of rent, criminal activity, and breach of lease condition. Bishop checked the box: "The defendant breached the condition of the lease described below for which re-entry is specified." (Depo. Exh. 30, 31.)

102. Bishop wrote under "Description of Breach/Criminal Activity (give

-37-

names, dates, place, and illegal activity)" the following:

> Tenant's failure to maintain a peaceful environment so as not to disturb other tenants' peaceful enjoyment of the Premises. (Per their Residential Rental Contract Section 5 item (j).

(Depo. Exh. 30, 31.)

103. Under the form's boxes for "Amount of Damage" and "Amount of Rent Past Due," Bishop wrote: "$0.00" (Id.)

104. Bishop served the writ of eviction on the Harrises at the direction of Vanderburg because "the Harrises are no longer providing a peaceful environment for my tenants living in 559A." (Bishop Depo. 208:11-17.)

105. Remco failed to provide HH with any written notice that they were in violation of this lease agreement because they were disturbing another tenant, as required under the under the Residential Rental Contracts, (Exh. 13, ¶ 17(a)), and consist with Remco's practice. (Bishop Depo. 112:12-17.)

106. Contrary to Remco practice of sending prefiling notice, there was no discussion within REmco about the need to compliance with Remco's practice or Residential Rental Contracts, (Exh. 13, ¶ 17(a)) to provide the Harrises notice of the basis for the complaint to evict them. (Bishop Depo. 113: 1-6.)

107. Remco never alerted Vanderburg to the requirement under ¶ 17 of the Residential Rental Contracts to provide the Harrises with written notice of their

breach of the contract before filing an eviction. (Bishop Depo. 113:7-10.)

108. Remco had at least one police report regarding Gurkins in the Harris tenant files, but chose not to gather additional information about that report or any others. (Bishop Depo. 146:7-147:20;148:23-149:3.)

109. Neither Vanderburg nor Gurkins ever provided the Harrises with any written notice of HH's alleged breach of their lease, as required under ¶ 17 of the Residential Rental Contracts. (Bishop Depo. 113:11-19.)

110. Bishop has no recollection of evictions based on disturbance of other tenants other than the Harrises' eviction. (Bishop Depo. 125:18-126:18.)

111. Before Gurkins' harassment, Bishop had never encountered a situation were an owner's relative referred to a Remco tenant as a nigger or threatened to evict a Remco tenant. (Bishop Depo. 151:20-153:17.)

112. The only eviction action that Remco has ever lost was against the Harrises. (Bishop Depo. 130:17-24; Franks Depo. 86:9-11.)

113. Other than maintenance calls, no Remco employee ever visited 559 Huntingridge to investigate the Harrises' complaints. (Bishop Depo. 124:18-22.)

114. Remco employee Sherry Franks claims no knowledge of the basis for the eviction filed against the Harrises. (Franks Depo. 94:16-24.) Remco's practice was to always search for alternatives to the eviction of tenants. (Franks

Depo. 96:22-97:4.)

115.    Bishop did not "see any reason not to" follow Vanderburg's directions, despite her knowledge of the Harrises' complaints and herself having "hear[d] how Matthew acts." (Bishop Depo. 210:4-8, 211:6-13.)

116.    Bishop took Vanderburg's word that the Harrises were disturbing Gurkins' peaceful enjoyment of unit A and filed the eviction papers. (Bishop 217:14-22.) This is despite the fact that she certified to the district court that she had "actual knowledge" of the facts supporting the eviction complaint. (Depo. Exh. 31.)

117.    The eviction of tenants who were not in default on the rent was highly unusual for Remco. Although Bishop claims that Remco had previously filed an eviction against a tenant solely on the basis that the tenant was creating a disturbance affecting the peaceful enjoyment of other tenants, she has no recollection of any of the circumstances. (Bishop Depo. 125:18-126:7, 128;1-13.) The only source to determine that information would be to go through the tenant files in storage in the attic at Remco. (Bishop Depo. 128:14-22.)

118.    Other than Vanderburg, no owner had ever directed Remco to evict a tenant for reasons other than nonpayment of rent. (Franks Depo. 68:4-17.)

119.    The Pitt County district court entered judgment in favor of the

-40-

Harrises on October 10, 2017, finding that Remco had failed to prove its case. (Depo. Exh. 40.)

120.    Separately, Vanderburg authorized Remco to send a letter to the Harrises on October 26, 2017, providing them with "official notice" that their lease would not be renewed when it expired in February 2018, and that Vanderburg expected them to move on or before that date.  (Depo. Exh. 44; Vanderburg Depo. 98:12-99:17.)

I.    **Defendants' Contradictory Statements Regarding the Eviction**

121.    According to grace Bishop, Vanderburg instructed Remco to evict the Harrises.  (Bishop Depo. 207:21-208:20.)

122.    Vanderburg testified that she did not instruct Bishop or Remco to file the complaint to evict Phyllis and William Harris and that she had no knowledge that the complaint was going to filed or was filed.  (Vanderburg Depo. 130:6-19.) Vanderburg says that she never saw a copy of Bishop's eviction complaint (Depo. Exh. 21, 22) prior to her deposition (Vanderburg Depo. 87:11-14.)

123.    In fact, Vanderburg testified, "I don't know why the eviction was filed." (Vanderburg 130:17.)  Vanderburg denies contacting Bishop "complaining on behalf of Mr. Gurkins."   (Vanderburg Depo. 131:6-13)

124.    Regarding the allegation in the Bishop's complaint that the Harrises

-41-

"disturb other tenants' peaceful enjoyment of the Premises," Vanderburg assumes other tenants refers to Gurkins because "[t]hat's the only ones that were living there." (Vanderburg Depo. 88:10-20.)

125. Vanderburg asserts that The Harrises were causing problems because "they were always calling the law and they were always doing things. And that is a common stoop. So when you come out either door you've got to come on each other's porch. So complaining about one or the other of them being on the porch, that's a dumb thing because they both have to come out on that porch to get out the door." (Vanderburg Depo. 89:7-18.)

126. Vanderburg then testified, "I didn't say they were doing things to Matt (Gurkins). They were writing letters to Remco about moving and asking money of me to move." (Vanderburg Depo. 90:10-12.)

## J. The Harrises Attempt to Negotiate a Resolution and Defendants Refuse to Renew the Lease

127. On October 18, 2017, the Harrises sent a letter to Remco stating:

We have tried to contact you a number of times and have even contacted an attorney about potential representation. We have been having a steady problem with our rented residence at 559 Huntingridge Rd., Apartment B.

The police have been called to the residence in reference to the resident in 559 Huntingridge Rd., Apartment A numerous times. Among his other charges, it appears that Mr. Matthew Gurkins, the tenant in 559

-42-

Huntingridge Rd., Apartment A, has been charged with trespassing and communicating threats against us. The addendum to our lease requires a crime free zone. As well as being bound by the crime free agreement, we are also entitled by reference to the crime free enjoyment of our apartment. We expect the response to criminal behavior by your nephew to be as severe as our lease indicates in the Crime Free Lease Addendum.

We will voluntarily vacate the premises if you agree to refund us half of the rent that we have paid to date in the amount of $1,925.00. Once you have had an opportunity to review our proposal, please let us know.

(Depo. Exh. 43; P.Harris Depo. 59:7-21.)

128.   Bishop contacted Vanderburg and alerted her to the receipt of the letter.  (Bishop Depo. 251:2-11.)  Vanderburg remembers that Bishop called Vanderburg to Bishop's office and read the Harrises' October 18, 2017 letter (Depo. Exh. 43) to Vanderburg.  (Vanderburg Depo. 93:15-94:24.)

129.   Vanderburg testified that she was unaware of Gurkins's harassment until Remco received a letter from Phyllis and Williams Harris.  (Vanderburg Depo. 65:1-7 ).  Vanderburg testified that Bishop never advised Vanderburg of any problems between Gurkins and the Harrises until Remco received a letter.  (Id.)  (The first letter sent by Phyllis or William Harris -- or anybody on their behalf – was dated October 18, 2017, and stamped received by Remco on October 23, 2017.  Depo. Exh. 43.)

130.   Vanderburg made no effort to contact the police to determine the

basis for the Harrises' allegations against Gurkins. (Vanderburg Depo. 95:1-7)

131. Instead, Vanderburg instructed Bishop to send the following reply, dated October 26, 2017 (Depo. Exh. 44):

> In response to your letter received 10/23/17 regarding the refunding of 1/2 of the rent you have paid; I have talked with the Owner and have shared the letter with her. She is NOT in agreement to refund the 1/2 of the rent you have paid.
>
> She has also asked me to let you know and to give you official notice that when your lease expires on February 28, 2018 it will not be renewed and she expects you to move on, or before if you choose, that date.

(Vanderburg Depo. 98:12-99:17; Bishop Depo. 253:3-254:9, 255:13-15.)

132. Vanderburg directed Bishop to indicated that the Harrises' lease would not be renewed because, "I just did. I chose not to renew the lease." Asked the reasons for her choice, Vanderburg testified, "I don't remember." (Vanderburg Depo. 100:4-23

133. Bishop wrote and sent the letter and did not attempt to contradict Vanderburg's decision to refuse to renew the lease. (Bishop Depo. 253:19-255:24.)

134. Vanderburg testified that even if Bishop had told Vanderburg that non-renewal of the Harrises' lease violated state or federal law, Vanderburg was adamant: "I would have said just what I said, I'm not renewing the lease."

(Vanderburg Depo. 100:24-102:5.)

135.   On November 1, 2017, local attorney Marc Haggard faxed and mailed a demand letter on behalf of the Harrises to Remco and Bishop.  (Declaration of Marc Haggard attached as Exh. 23 to Plaintiffs' Appendix ["Haggard Dec."] ¶¶ 1-5; Depo. Ex. 46; P.Harris Depo. 61:2-10.)  Remco stamped it received on stamped as received on November 3, 2017. (Depo. Ex. 48.)

136.   In his letter, Haggard not only informed Remco and Bishop of the racial harassment and racial slurs Gurkins had subjected the Harrises to, but he explained how trying to evict the Harrises and not renewing their lease, all of it violated federal and state fair housing laws. Haggard demanded by way of the letter that they return all of the rent the Harries paid to them. Haggard concluded the letter by requesting that Remco and Bishop contact him with a response. (Depo Exh. 46, 48.)

137.   Haggard did not receive any response to his letter from Bishop, Remco, or Vanderburg (who was also mentioned in the demand letter) (Haggard Declaration ¶ 6). Nor did the Harrises.  (P.Harris Depo. 118:18-119:13; Depo. Exh. 63, pp. 8-9.)

138.   Neither plaintiffs nor their attorney Marc Haggard ever received a copy of the November 1, 2017 letter Bishop claims she mailed which contained an

-45-

offer from Vanderburg, (Depo. Exh. 47).  (P.Harris Depo. 118:18-119:13; Depo.

Exh. 63, pp. 8-9; Haggard Dec. ¶ 7.)  Indeed, Bishop admits she did not even send

a copy to Haggard despite his request.  (Bishop Depo. 277:15-278:22.)

139.   Shortly after Bishop mailed the November 1 letter (Depo. Exh. 47),

Vanderburg had called and told Bishop that she was "not paying them anything" –

in other words, she had retracted all offers, which Bishop did not challenge.

(Bishop Depo. 277:3-278:22.)

140.   Meanwhile, on October 30, 2017, Bishop was served with a subpoena

to appear testify in Gurkins' criminal case on November 3, 2017.  (Depo. Exh. 45.)

**K.**   **The Harrises Decide to Move from 559B Huntingridge Road and Endure Further Abuse from Gurkins**

141.   The Harrises vacated the home a month early on January 27, 2018.

Depo. Exh. 21.

142.   On they day before they moved out, Mrs. Harris recorded Gurkins

yelling racist threats and epithets through their units' common wall.  (P.Harris

Dec. ¶¶ 6-7 and Exh. A.)  Gurkins said they should go back to the cotton fields

where they came from and yelled something to the effect that Gurkinses don't

"fuck niggers."  (Id.)  The Harrises' minor grandchildren were with them inside

the house.  (P.Harris Dec. ¶ 6.)

-46-

143. On the day of the move, the Harrises were joined by their friends Loren Speight and Jeff Tyson, who are also Black Americans. (Speight Dec. ¶¶ 2-3, 9.) While Speight was in the front room of the Harrises' unit with the door open, Krystyna Grzybek, Douglas Matthew Gurkins's then girlfriend and also resident of 559A Huntingridge, came up the front steps, looked in at 559B Huntingridge, and said, "I am so glad those n*ggers are getting out of here!" (Id. ¶ 11.)

144. Later that day, Speight observed Gurkins in the front yard, swinging a galvanized pipe and looking directly at the Harrises' unit. (Id. ¶ 12.) Jeff Tyson almost got into an altercation with Gurkins, who called Tyson a n*gger. (Id. ¶¶ 13-15.) After Speight and Tyson drove away ahead of the Harrises, Gurkins and Grzybek drove passed them on the road, yelling and gesturing with their middle fingers. (Id. ¶ 16.)

**L.** **Vanderburg's Testimony is Not Worthy of Belief**

145. Weeks after the complaint to evict The Harrises was drafted (09/25/2017), filed (09/29/2017), and dismissed (10/10/2017), Vanderburg formed the impression that The Harrises had been "disruptive" because [1] they call the police because Gurkins had threatened Phyllis Harris for which he was prosecuted (Depo. Exh. 39) and for trespass for which he was prosecuted (Depo. Exh. 49); [2]

they sent a letter, dated October 18, 2017, demanding a rent refund so that they could move away from Gurkins; and [3] they complained on October 19, 2017, about a pizza man who delivered a pizza using the wrong driveway (Depo. Exh. 99). (Vanderburg Depo. 127:8- 129:17.)

146. Vanderburg testified that Gurkins never complained to Vanderburg about the Harrises "constantly watching him," as recorded in the PCSD report, dated August 4 (Depo. Exh. 18). (Vanderburg Depo. 70:7-10)

147. Vanderburg testified that Gurkins never complained to Vanderburg about the Harrises following Deputy Eubanks responding to Phyllis Harris's call for assistance on August 17, 2019 (Depo. Exh. 19.) (Vanderburg Depo. 73:10-20.)

148. Vanderburg testified that she was unaware of the Gurkins's criminal threats, committed on September 1, 2017, when Gurkins lunged at Phyllis Harris and threatening to beat her black ass (Depo. Exh. 22.) (Vanderburg Depo. 77:1-19.)

149. Vanderburg was not surprised that Remco, according to her testimony, failed to advise Vanderburg about Gurkins's harassment. (Vanderburg Depo. 78:1-18 ["Q. Upon a complaint like this that the Harrises have against Matt, reporting that to Remco, what would you have expected Remco to do, if anything?

-48-

A. Nothing.  That's what I'm saying."])

150.   Vanderburg testified that Remco neither advised Vanderburg nor provide her with copies Phyllis Harris's emails to Bishop, dated September 15-25, 2017, reporting Gurkins's harassment (Depo. Exh. 23-29.)  (Vanderburg Depo. 80:10-16, 81:18-82:9)

151.   Although Vanderburg disclaims that Remco ever advised her of Gurkins's harassment before receipt of the Harrises' October 18 letter, she "guesses" that Remco should have alerted Vanderburg because "Well, I mean if you're the landlord, I mean if you're the owner of the property and they're running the property then you should know what's going on."  (Vanderburg Depo. 82:15-22.)

152.   Vanderburg claims that she has no recall of speaking to Gurkins's about the Harrises' allegations and if she did, she has no recollection about what Gurkins said.  (Vanderburg Depo. 95:14-18 ["Did you think you needed to go talk to Matt about what was going on?  I might have talked to Matt about what was going on and asked him, but I don't remember what he  said."]

153.   Vanderburg testified that she does not remember Bishop advising Vanderburg to pay money to Harrises to enable them to move away from Gurkins. (Vanderburg Depo. 104: 5-11.)

-49-

154.   Vanderburg testified that she has no recollection, documented in

Exhibit 32, that on September 28, 2017:

> Owner (Vanderburg) called David (Bradley) this morning and said that The
> Harris's had put some poison out for bugs. Owner said that there are
> children next door and to call them and ask them to remove the poison. She
> was afraid that the child would pick them up and get poisoned. I (Bishop)
> called Mr. and Mrs. Harris and told them to pick them up.

(Vanderburg Depo. 83:1-12.)

155.   Because Vanderburg asserts, "I've never heard about it [Harrises

using pesticides], she speculates, "Like I said if it was some kind of poison that

was going to harm animals or children I would ask them to remove it"

(Vanderburg Depo. 83:13-17), though admits that she had used pesticide against

ants (Vanderburg Depo. 83:18-23).

156.   As for the assertion made (then abandoned) by Bishop in her

deposition that Vanderburg had indicated that the Harrises deliberately deployed

pesticide for the purpose of harming children, Vanderburg testified, "I don't

remember all that.  I really don't. I really don't remember all that."  (Vanderburg

Depo. 86:5-15.)

157.   Vanderburg admits that communicating threats is a crime and scary

"[b]ecause I would be afraid myself if somebody did it to me. (Vanderburg Depo.

137:11-16.)

**M.** **Agency Relationship between the Vanderburg, Remco and Bishop**

158.   Each dwelling managed by Remco East, Inc. ("Remco") on behalf of Mary Jane Vanderburg ("Vanderburg") was managed pursuant to the terms set forth in the Exclusive Property Management Agreement, Deposition Exhibit 80, page 1-7.  (Vanderburg Response to Request for Admissions [RFA] 7 [Set 1-44], attached as Exh. 12 to Plaintiffs' Appendix.)

159.   Between March 22, 2016 and at least April 1, 2020, Remco received compensation for providing Vanderburg property management services pursuant to its Exclusive Property Management Agreement with Vanderburg.  (Vanderburg Response to RFA 14 [Set 1-44]; Remco Response to RFA 36 [Set 19-68], attached as Exhibit 15 to Plaintiffs' Appendix.)

160.   While serving as Remco's broker-in-charge, defendant Mary Grace Bishop was responsible for ensuring that Remco's property management activities complied with the Fair Housing Act.  (Remco's Response to RFA 31 [Set 19-68], attached as Exhibit 15 to Plaintiffs' Appendix.)

161.   Bishop has been a licensed North Carolina real estate professional since 1993.  (Bishop Depo. 58:16-59:1.)  She joined Remco as a leasing agent in 2015, and then became broker-in-charge  (Bishop Depo. 66:16-21; Bishop Deposition conducted July 8, 2020, attached as Exh. 3 to Plaintiffs' Appendix at

7:6-24; 15:22-16:6.)

162. Since at least March 22, 2016, Remco provided property management services in accordance with the National Association of Realtor's Code of Ethics. (Remco's Response to RFA 32 [Set 19-68], attached as Exhibit 15 to Plaintiffs' Appendix.)

163. In each interaction between Bishop and Phyllis and William Harris, Bishop acted as the agent of Remco within the scope of her agency. (Remco's Response to RFA 1, 2, 3, 4 [Set 1-12], attached as Exh. 13 to Plaintiffs' Appendix.)

164. In each interaction between Bishop and Vanderburg, Bishop acted as the agent of Remco within the scope of her agency. (Remco's Response to RFA 5, 6 [Set 1-12], attached as Exh. 13 to Plaintiffs' Appendix.)

165. In executing and filing the summary ejectment action against the Harrises, Bishop acted within the scope of the Exclusive Property Management Agreement between Remco and Vanderburg and in the course and scope of her agency as Remco's agent and in the course and scope of her agency as Vanderburg's agent. (Remco's Response to RFA 8, 10, 11, 12 [Set 1-12], 18 [Set 13-18], attached as Exhibit 14 to Plaintiffs' Appendix )

//

N.    **Vanderburg Had Control Over Gurkins**

166.   Vanderburg has permitted Gurkins to live, rent free, at her properties on Greenville, including in the units at 509, 559, and 569 Huntingridge Road. (Vanderburg's Response to Interrogatory No. 5, attached as Exhibit 16 to Plaintiffs' Appendix.)  He has never paid for occupancy by monetary means or any in-kind services to Vanderburg.  (Id.; Defendant Douglas Gurkins' Response to Plaintiffs' Second Set of Interrogatories, No. 5,  attached hereto as Exh. 18 of Plaintiffs' Appendix.)

167.   Vanderburg admits that if she had told Gurkins to move out of Unit 559A and stay away from the property, he would have listened to her. (Vanderburg Depo. 98:3-11.)

168.   Except for a short period of time, Vanderburg has provided Gurkins with a home to live in since he turned 18 and moved out of her house. (Vanderburg Depo. 44:20-45:5.)  Vanderburg never charged Gurkins any rent when he lived at one of her homes, nor did she have any written lease agreements with him.  (Vanderburg Depo. 44:20-45:20; 138:10-16; Vanderburg Supplemental Response to Request for Production of Documents 6, attached as Exh. 19 to Plaintiffs' Appendix.)  The utilities for the homes he used remained in Vanderburg's name and sometimes he paid her for those bills.  (Vanderburg Depo.

-53-

45:16-20.)

169.   In her deposition, Vanderburg admitted that she was not surprised to learn that Gurkins had pled guilty to racially harassing Kathy Williams. (Vanderburg Depo. 54:6-23.)  She admitted that Gurkins used racial slurs when he was angry, although claimed he "didn't mean it."  (Vanderburg Depo. 54:16-20; 53:7-24.)

170.   Vanderburg paid for Gurkins to be released on bond after he was charged with racially harassing Vanderburg's tenant Kathy Williams in 2014. (Vanderburg Depo. 58:5-60:4; Exh. 153, p. CRT 000136.)  Vanderburg paid for multiple attorneys to representing Gurkins in his various criminal matters. (Vanderburg Depo. 61:12-15; Vanderburg's First Supplemental Responses to Plaintiffs' Interrogatories, No. 7, attached as Exh. 17 of Plaintiffs' Appendix.) She has also paid for fines, penalties and fees owed by Gurkins in his criminal cases.  (Vanderburg's Supplement Response to Interrogatory No. 7.)  She has been present and observed court proceedings in Gurkins' criminal cases. (Vanderburg Depo. 61:21-22; Supp. Interrogatory Response 7.)

171.   Mrs. Harris saw Vanderburg at multiple court hearings on Gurkins' criminal charges during 2017 and 2018.  (P.Harris Dec. ¶ 21.)

172.   Gurkins told the Harrises that he was the nephew of the owner and

-54-

"can drive all around the house if I want."  Even after being charged with trespass,

Gurkins continued to enter their yard.  (W.Harris Depo. 64:14-22; W.Harris Depo.

70:13-24 (Gurkins continued to enter their yard after being charged with trespass.)

## O.    Gurkins' Harassment Interfered with the Harrises' Enjoyment of their Unit

173.   As a result of Gurkins' threats and harassment, Mrs. Harris was afraid

to go outside their unit.  (P.Harris Dec. ¶ 17.)  She was afraid to use her front

porch – the only way in and out of the house.  (P.Harris Dec. ¶ 17.) Although

Gurkins could have used his side door, the Harrises did not have a similar

opportunity to avoid the front porch. Their back door was not functional and

remained locked from the inside.  (P.Harris Dec. ¶ 18.)

174.   Mrs. Harris did not want to be at home when her husband was at

work. She started leaving with him when he left for work and either stayed in the

parking lot in their car or go to a friend's house.  (Id.; P.Harris Depo. 108:17-20;

109:3-5).  She no longer wanted their daughter or grandchildren or friends to come

to their home.  (P.Harris Dec. ¶ 17; P.Harris Depo. 109:3-6.)  Mrs. Harris was

fearful and suffered from head and stomach aches and loss of sleep.  (P.Harris

Depo. 126:4-17.)  She was afraid her husband might get into an altercation with

Gurkins and end up in jail or losing his job.  (Id.)

-55-

175.   Mrs. Harris told her friend Loren Speight about Gurkins' conduct. Speight could tell how scared Mrs.  Harris was by the incident.  (Declaration of Loren Speight attached as Exh. 25 to Plaintiffs' Appendix ["Speight Dec."] ¶ 5.) Speight subsequently observed that Mrs. Harris changed her daily routine due to her fear of Gurkins.  (Id. ¶¶ 7-8.)

176.   Mr. Harris hardly got any rest with all Gurkins' cussing, door slamming, throwing things, and calling them "N----s."  (W.Harris Depo. 69:1-70:3.)  He would not want to put his dogs through the situation they lived through. (Id. 70:2-3.)

177.   Had they not suffered the harassment, the Harrises would have wanted to stay at the Huntingridge Road property and would have sought to renew their lease.  (P.Harris Depo. 150:19-151:3.)

178.   Had they known of Gurkins' history of violence and racist behavior, they never would have moved into the unit.  (P.Harris Dec. ¶ 20.)

179.   Despite the Harrises' repeated pleas for help, Bishop and Remco did not intervene. They only recommended that the Harrises call law enforcement or move. They did not give them any lists of other rental properties Remco managed, talk to them about moving to any of these properties, or offer top pay any moving expenses.  (P.Harris Dec. ¶ 15.)

180.  After the Harrises had complained repeatedly about Gurkins'

harassment and racial slurs, Remco filed a summary ejectment complaint.

(P.Harris Dec. ¶ 16.)

181.  Mrs. Harris was shocked when Remco filed the eviction complaint –

she and her husband had nothing wrong and had paid their rent on time. She felt

that by filing the eviction, Remco, Bishop, and Vanderburg were protecting

Gurkins over them, leaving the Harrises on our own.  (P.Harris Dec. ¶ 19.)

182.  Although the standard procedure at Remco is to send written notice of

a lease violation to the tenant, the Harrises never received a letter from Remco

stating that they were in violation of the lease.  (Bishop Depo. Vol. 2 375:6-16;

P.Harris Dec. ¶ 19.)

## P.    **Vanderburg, Remco, and Bishop Had Actual Notice of Gurkins' Prior Racist Attacks on Vanderburg's Tenants**

### (a)  2017 Attack on Kierra Roberson

183.  After taking over management of Vanderburg's rentals, Remco rented

509-B Huntingridge Road to Kierra Roberson in December 2016.  (Deposition of

Kierra Roberson attached as Exh. 10 to Plaintiffs' Appendix ["Roberson Depo."]

7:5-23; Exh. 80, p. 9.)  Roberson was pregnant when she moved in, with a due

date of February 2, 2017.  (Roberson Depo. 7:5-23; 11:1-2.)

184.   On January 24, 2017, Gurkins confronted Kierra Roberson after she asked Gurkins family members not to throw metal scraps onto her yard from the adjacent Vanderburg-owned property.  (Roberson Depo. 12:4-30:6; Depo. Exhs. 161, 162.)  Gurkins came on Roberson's property and attacked and threatened her, her boyfriend, and her mother, calling them "niggers," spitting, and wielding a knife.  (Id.; Kimberly Roberson Declaration attached as Exh. 24 to Plaintiffs' Appendix ["Roberson Dec.] ¶¶ 4-8.)  During the course of the attack, Gurkins told Roberson she had "no right to come on our property."  (Roberson Depo. 11:24-17:2.)  Roberson began having contractions and later that evening delivered her baby one week early.  (Roberson Depo. 34:2-12; Roberson Dec. ¶¶ 4-7.)

185.   On January 25, Kierra Roberson called Remco from the hospital, and spoke with Grace Bishop, her usual contact at Remco.  (Roberson Depo. 8:19-23; 34:24-35:16; 42:9-43:2.)  Roberson told Bishop what had occurred – that Gurkins had called her a "–---," claimed that his aunt was the owner of the property, waved a knife and threatened to slash her tires, and that she had called the police. (Roberson Depo. 75:10-77; 96:6-97:13.)

186.   Roberson asked Bishop whether she could get her deposit back, since she did not feel safe in the home anymore.  Id.  Bishop responded that she would have to talk with Vanderburg about ending the tenancy and setting up an

inspection per protocol. Roberson Depo. 35:20-36:5, 37:4-11. If the inspection went well and they found no damage, Roberson would get her security deposit back and nothing would go on her credit report. Roberson Depo. 43:3-19.

187. Roberson was taken aback by Bishop's reaction. Bishop did not seem surprised and did not seem to care. Roberson Depo. 36:6-37:11. She appeared to take the attitude of "what am I supposed to say, what am I supposed to do" about the serious incident that occurred. Roberson Depo. 36:6-21.

188. Soon after January 24, 2017, Roberson's mother Kimberly also had conversations with Bishop, on two occasions, regarding the details of the incident with Gurkins, including his calling them "niggers" and threatening them with a knife. (Roberson Dec. ¶ 8.)

189. Two or three days later after Kierra Roberson spoke with Bishop from the hospital, someone came to the property and did an inspection, Roberson Depo. 39:7-8, and Bishop informed Roberson that everything had checked out and she would talk it over with Vanderburg and that Roberson would get her security deposit if that is what they agree to. Roberson Depo. 70:19-23.

190. Roberson ended up not moving; having just moved in and having had a new baby she was simply too tired. Roberson Depo. 46:23-45:16. After the incident, Vanderburg sold the property in which Roberson resided and Remco

ceased managing it.  Roberson Depo. 78:6-22.

(b)  2014 Attack on Kathy Williams

191.   In 2014, prior to Remco's assumption of management duties, Gurkins had attacked another one of Vanderburg's tenants.  Williams lived at 559 Huntingridge Road.  On December 29, 2014, while Ms. Williams was at work, she received a call from her frightened daughters who told her that a man was beating on their door, trying to kick it in, calling them the N-word, and saying that they owed rent and needed to pay it to his aunt.  (Deposition of Kathy Williams attached as Exh. 11 to Plaintiffs' Appendix ["Williams Depo."] 14:6-16:19; 30:2-9.)  Williams left work and rushed home.  (Williams Depo. 15:23-16:4.)  When she arrived home she saw that the front door was somewhat kicked in.  (Williams Depo. 16:4-9.)

192.   Williams took her children into her room and watched television with the lights out.  (Id.16:10-14.)  Williams kept seeing lights flashing through her bedroom window.  When she got up to investigate she heard banging on the front door.  (Id. 16:13-23.)  The man at the door was saying "Open up you N's."  (Id.) Williams opened the side door and Gurkins came round, calling them monkeys and "N—s," telling them that they owed his aunt money, and that they should go back to where they came from.  (Williams Depo. 17:2-22.)  He asked if she was

ready to die and said he would kill her and her four kids in the house.  (Id.)  When

Gurkins went to his car and grabbed what appeared to be a metal rod, Williams

had her daughter call Williams' brother who lived down the street.  (Id. 19:2-23.)

Gurkins left before Williams' brother and a friend arrived.  (Id.)

193.   When Gurkins returned with something in his hand – which Williams

thought may be a gun because Gurkins had threatened to shoot them all –

Williams told her daughter to call the police.  (Id.)  By the time the police arrived,

Gurkins had left.  (Williams Depo. 20:3-6.)  Williams went to the magistrate's

office and filed charges.  (Id. 20:10-15.)  Williams had her brother stay with her

for a few days because she was afraid Gurkins would come back.  (Id.)  At the

time of Gurkins' attack, Williams owed December rent to Vanderburg.  (Id. 20:16-

24.)

194.   The day after Gurkins' December 2014 rampage through Kathy

Williams' property demanding payment of rent and threatening to kill the "n----s,"

Vanderburg called Williams and asked her to forgive Gurkins because he was off

his medication.  (Williams Depo. 21:22-22:17.)  Williams told Vanderburg she

had already filed charges.  (Id.)  Vanderburg later came to Williams' house and

turned off the power.  (Williams Depo. 22:19-23:23, 27:13-18.)

195.   Williams ran an extension cord to the vacant, neighboring unit (also

owned by Vanderburg) to get heat to keep her children warm. (Id.) Shortly thereafter, Vanderburg knocked on the door and served Williams with eviction papers. (Id.) Williams and her family moved within a few days. (Williams Depo. 25:5-18.)

196. On August 6, 2020, Gurkins entered a guilty plea to violating the criminal provisions of the FHA based on his 2014 racial attack on the family of his aunt's tenant Kathy Williams. (Plaintiffs' Appendix, Exhs. 28 and 29.)

**Q.    Remco Failed to Respond Adequately to Address the Harrises' Complaints**

197. Other than calling Vanderburg, Branch offered no other assistance to the Harrises.

• Remco had never terminated a management contract with an owner because of the owner's conduct or inaction. "We've never called an owner and said and said, you know, we can't work for you anymore. We don't want to represent you. We've never done that." (Branch Depo. 29:4-7.)

• Remco never settles with tenants. (Branch Depo. 35:17-24.)

• Branch believed that Remco had no authority to countermand a decision by an owner. "You know, we don't make those decisions. We try to give them a guideline of what they can and can't do. And then they go

from there. And, you know, the other guideline is basically the health and safety of our tenants." (Branch Depo. 42:6-10.)

• Branch never discussed with Bishop the possibility that Remco pay the Harrises the funds needed to relocated from the Subject Dwelling. Branch has no opinion whether making such a payment by Remco to the Harrises would constituted an admission of guilt, as Bishop testified. (Branch Depo. 113:10-22.)

• Remco has never moved a tenant from one rental dwelling to another to address a tenant complaint and Branch did not consider or discuss that possibility as a mean of resolving the Harrises' complaints about Gurkins's harassment. (Branch Depo. 118:13-22.)

198. Beyond listing to the Harris complaints of harassment and communicating with Vanderburg, Branch believes that Remco had no other duty to investigate and no other investigation was conduct to determine the appropriate course of action by Remco. (Branch Depo. 100:12-102:2.)

199. Remco retained discretion to terminate its Exclusive Property Management Agreement with Vanderburg in the event that Vanderburg took any action whose effect prevented Remco from complying with, or required Remco to violate, the Fair Housing Act. (Remco's Responses to RFAs 27, 28 [Set 19-68],

attached as Exhibit 15 to Plaintiffs' Appendix.)

200.   Between March 22, 2016 and at least April 1, 2020, Remco never terminated or threatened to terminate its Exclusive Property Management Agreement with Vanderburg.  (Vanderburg Response to RFAs 12-13 [Set 1-44], attached as Exhibit 14 to Plaintiffs' Appendix; Remco Response to RFA 34, 35 [Set 19-68], attached as Exhibit 15 to Plaintiffs' Appendix.)

201.   The standard of care required of real estate licensees who mange rental dwelling in North Carolina includes complying with fair housing laws and investigating complaints regarding unlawful conduct and conditions.  (Declaration of Janet Thoren, Director of Regulatory Affairs and Legal Counsel for the NCREC, attached as Exh. 26 to Plaintiffs' Appendix ["Thoren Dec."] ¶ 8.)

202.   If any such investigation substantiated the tenant's complaints and revealed any fair housing concerns, this same standard of care would require a real estate licensees to both follow up with the tenant who made the initial complaint and to take any remedial action that was available under the law.  (Id. ¶ 9.)

203.   The North Carolina Real Estate Commission's rules could not be clearer:

*Q: May a real estate agent discriminate at the direction of the owner?*

A: No. Even if a real estate agent has no discriminatory intent, the agent is

in violation of the fair housing laws when discriminating against persons from one of the protected categories at the direction of the owner or lessor. Likewise, an agent is in violation if he or she knows that members of protected categories may be unlawfully rejected by the owner or lessor.

*Q: What should a real estate agent do if he or she finds out that the seller or landlord intends to discriminate against a member of a protected category?*
A: The agent should immediately terminate the agency relationship with the seller or landlord. The agent should then send a letter to the seller or landlord stating that the relationship has been terminated and explaining why. Next, the agent should inform any other agents or other parties to the transaction that he or she no longer represents the seller or landlord.

(Thoren Dec., Exh. 1, *NCREC: Questions and Answers on Fair Housing* (REC 3.30 06/01/2014).

## R.    Fed. R. Civ. P. 30(b)(6) designee testimony

204.    Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Remco designated Connally Branch, Remco's owner, as Remco's designee for topics 24 and 25 in plaintiffs' notice of deposition to Remco.  (Depo. Exh. 7.) Exhibit CB01

205.    Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Remco designated David Bradley, Remco's maintenance supervisor, as Remco's designee for part of topic 9 (regarding the final five bullet points on the notice's page 4) and all of topic 12 in plaintiffs' notice of deposition to Remco.  (Depo. Exh. 6.) Exhibit CB01

-65-

206.   Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Remco designated Mary Grace Bishop, Remco's Broker in Charge (BIC), as Remco's designee for all remaining topics in plaintiffs' notice of deposition to Remco, except for topic 26 (financial condition), to which Remco objected and refused to designate a deponent.  (Depo. Exh. 5.) Exhibit CB01

Dated:  April 28, 2021.

Respectfully submitted,

BRANCART & BRANCART

*/s/ Christopher Brancart*
Christopher Brancart
Brancart & Brancart
P.O. Box 686
Pescadero, CA 94060
Tel:  (650) 879-0141
Fax:  (650) 879-1103
cbrancart@brancart.com
CA Bar 128475
[By Special Appearance]

LEGAL AID OF NORTH
CAROLINA
  Luis Juan Pinto
Legal Aid of North Carolina
P.O. Box 7283
Greenville, NC 27835
Tel: (252) 347-0135
luisp@legalaidnc.org
NC Bar 53823

LEGAL AID OF NORTH CAROLINA
  Kelly Anne Clarke
Legal Aid of North Carolina
2101 Angier Avenue, Suite 300
Durham, NC  27703
Tel:  (919) 865-3825
Fax: (919) 861-1887
kellyc@legalaidnc.org
NC Bar 28188

LEGAL AID OF NORTH CAROLINA
  Ayanda Dowtin Meachem
Legal Aid of North Carolina
P.O. Box 564
Ahoskie, NC 27910
Tel:  (252) 332-5124
Fax: (252) 332-3317
ayandam@legalaidnc.org
NC Bar 37714

Attorneys for Plaintiffs

-66-

## CERTIFICATE OF SERVICE

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on April 28, 2021, I served by email a copy of the attached document – **PLAINTIFFS' ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANT MARY JANE VANDERBURG'S MOTION FOR SUMMARY JUDGMENT [Doc. 94] AND DEFENDANTS REMCO EAST, INC. AND MARY GRACE BISHOP'S MOTION FOR SUMMARY JUDGMENT [Doc. 98]**– upon the following attorneys:

Kelly Anne Clarke
Legal Aid of North Carolina
2101 Angier Avenue, Suite 300
Durham, NC  27703
Fax: (919) 861-1887
kellyc@legalaidnc.org

Jay C. Salsman
A. Ruthie Sheets
Harris Creech Ward & Blackerby
325 Pollock Street
P.O. Drawer 1168
New Bern, NC 28560
ars@harriscreech.com
jcs@harriscreech.com
[For Vanderburg]

Ayanda Dowtin Meachem
Legal Aid of North Carolina
P.O. Box 564
Ahoskie, NC 27910
Fax: (252) 332-3317
ayandam@legalaidnc.org

Spencer Beard
Luke Dalton
McAngus Goudelock & Courie
Post Office Box 12327
Wilmington, NC 28405
spencer.beard@mgclaw.com
luke.dalton@mgclaw.com
[For Remco East and Bishop]

Luis Juan Pinto
Legal Aid of North Carolina
P.O. Box 7283
Greenville, NC 27835
Fax: (252) 758-1843
luisp@legalaidnc.org

Joseph Dupree
123 West Third Street
P.O. Box 1219
Fax: (252) 329-0444
jaybdupree@gmail.com
[For Gurkins]

*/s/ Christopher Brancart*