**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**No. 4:19-CV-00111**

| | | |
|---|---|---|
| **WILLIAM HARRIS and** | ) | **PLAINTIFFS' OPPOSITION TO** |
| **PHYLLIS HARRIS,** | ) | **DEFENDANTS REMCO EAST, INC. AND** |
| | ) | **MARY GRACE BISHOP'S MOTION FOR** |
| **Plaintiffs,** | ) | **SUMMARY JUDGMENT** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **MARY JANE VANDERBURG,** | ) | |
| **DOUGLAS MATTHEW** | ) | |
| **GURKINS, REMCO EAST, INC.,** | ) | |
| **and MARY GRACE BISHOP,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## I.  NATURE OF CASE

Plaintiffs Phyllis Harris and William Harris, an older, Black American, married couple, filed this action under the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.* and related state laws against the owner of a duplex located in Greenville, North Carolina, and the real estate company and agent responsible for operating the property.  (First Amended Complaint, ECF 33.) Plaintiffs alleged that defendants discriminated against them on the basis of race when they failed to take action to remedy violent, racial harassment by Matthew Gurkins, the Harrises' nextdoor neighbor and nephew of owner Mary Jane Vanderburg.  The owner and management defendants have separately moved for summary judgment, both arguing that they cannot be held vicariously liable for Gurkins' misconduct as they had no ability to exercise control over his actions.  (ECF 95, 100.)  For all of the reasons set forth below, the Court should deny both motions.

## II.  STATEMENT OF FACTS

Plaintiffs have filed a lengthy Statement of Additional Material Facts and voluminous

evidence in opposition to both motions. (See Plaintiffs' Additional Material Facts in Opposition to Defendants' Motions for Summary Judgment filed herewith, ECF 106 ("Plaintiffs' Additional Material Facts" or "PAMF") and Appendices to that Statement, Volume 1-3, ECF 107-109 ("Plaintiffs' Appendix").) That evidence is much too lengthy to recount in detail in the space allowed for this opposition. A brief summary follows.

In February 2017, the Harrises rented Unit B of the duplex located at 559 Huntingridge Road in Greenville. (PAMF 1-22.) Unit B was owned by defendant Mary Jane Vanderburg and managed by defendant Remco East, Inc. and its broker-in-charge, defendant Grace Bishop. (PAMF 158-164.) Unbeknownst to the Harrises, their nextdoor neighbor in the duplex – with whom they shared a common wall and a common porch entrance – was the nephew of Vanderburg. (PAMF 23-24.) Had they known of Gurkins' history of violent, racist behavior, they would never have moved in. (PAMF 178.) That behavior was well-known to defendants, however.

Just the month before the Harrises signed their lease, Gurkins had attacked Kierra Roberson, the tenant of another Remco-managed Vanderburg property, calling her a "n—" and threatening to kill her, her boyfriend, and her mother. (PAMF 183-190.) Robinson informed Bishop of the racial nature of Gurkins' attack from her hospital room the very next morning after she had delivered her baby a week early. (Id.) Roberson's mother also notified Bishop of the attack and its racial nature. (Id.)

In December 2014, prior to Remco's involvement in Vanderburg's properties, Gurkins had violently attacked the home of Kathy Williams, another one of Vanderburg's tenants, calling her a "n—", threatening to kill her and her family, and demanding that she pay the rent she owed

Vanderburg. (PAMF 191-196.) Vanderburg called the next day and asked Williams to forgive Gurkins, saying that he was not taking his medication. (Id.) When Williams said she had already filed charges, Vanderburg retaliated by cutting the power to Williams' home and serving her with eviction papers. (Id.) In 2020, Gurkins would plead guilty to criminal violations of the Fair Housing Act with respect to his attack on Williams. (PAMF 196.)

Knowing none of this, the Harrises moved into 559 Huntingridge Road in March 2017. It was not long before they began experiencing problems with Gurkins. (PAMF 25-36.) Over the course of the ensuing months, Gurkins subjected the Harrises to racial harassment, including repeated use of racial slurs and threats of physical violence. Defendant Gurkins often referred to then as "n—s," "motherfucking n—s," "ignorant black n—s," and "dumbass n—." (PAMF 26.) He shouted profanities and racial epithets from inside his unit through the common wall. (PAMF 32, 79-80.) He repeatedly drove his truck across their front yard. (PAMF 30.) The Harrises called the Pitt County sheriff on multiple occasions. (PAMF 25-36.)

The Harrises complained repeated of Gurkins' racially harassing conduct repeatedly, speaking directly with Grace Bishop and notifying her that Gurkins was using racial slurs. (PAMF 37-75.) Bishop told the Harrises to call the police. (PAMF 37-38.) Bishop claims that she was unaware of the racial nature of Gurkins' harassment, but the evidence submitted by plaintiffs contradicts that claim. (PAMF 37-87.) After Gurkins threatened Mrs. Harris with physical harm, claiming that he would kick her "black ass," the Harrises filed criminal charges. (PAMF 88-97.) The Harrises continued to complain to Bishop and Remco and to beg for help. (Id.) After consulting with owner Vanderburg, however, Bishop and Remco decided to evict the Harrises for disturbing Gurkins's quiet enjoyment. (PAMF 88-126.) Remco's summary eviction

-3-

action was an unusual one and it did not follow its usual protocols.  (PAMF 105-120.)
Fortunately for the Harrises, the Pitt County district court found that Remco had failed to make
its case and dismissed the action with prejudice.  (PAMF 119.)  Not fazed, Remco advised the
Harrises on October 26, 2017, that Vanderburg would not be renewing their lease.  (PAMF 120,
127-140, 145-147.)

The Harrises gave notice and vacated their unit one month early.  (PAMF 141.)  The
harassment and defendants' failure to remedy it had interfered with their enjoyment of the home.
(PAMF 173-182.)  Gurkins continued to racially harass them until they drove away.  (PAMF
142-144.)

The undisputed evidence shows that all the conduct of Bishop – including filing the
summary ejectment action against the Harrises – was undertaken as Remco's agent in the scope
of her agency, and on behalf of Vanderburg in the scope of Remco's agency.  (PAMF 158-166.)
The evidence also shows that Vanderburg had control over Gurkins, who lived free of change in
various Vanderburg rental units.  (PAMF 166-172.)  The evidence also shows that Remco and
Bishop failed to respond adequately to address the Harrises' complaints.  (PAMF 197-203.)

### III.  <u>SUMMARY JUDGMENT STANDARDS</u>

The Court must view the facts in the light most favorable to plaintiffs, drawing all
reasonable inferences in their favor.  *Dean v. Jones*, 984 F.3d 295 (4th Cir. 2021).  Any conflicts
in the evidence must be resolved in favor of plaintiffs or left for the jury to decide.  *See, e.g., id.*
at 306-08.  "In general, if 'an issue as to a material fact cannot be resolved without observation of
the demeanor of witnesses in order to evaluate their credibility, summary judgment is not
appropriate.'"  *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)

-4-

(quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment).

## IV.  FAIR HOUSING ACT LEGAL FRAMEWORK

**A.     The Discriminatory Housing Practices at Issue.**   The Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* (FHA), outlaws racial discrimination in all aspects of the sale or rental of housing.  As applicable here, it prohibits "discriminatory housing practices," defined as acts in violation of 42 U.S.C. §§ 3604 and 3617.  42 U.S.C. § 3602(f).  Plaintiffs may bring suit as "aggrieved persons" under the FHA because they allege that they have been injured by a discriminatory housing practice. 42 U.S.C. §§ 3602(i); 3613(a).  The United States Department of Housing and Urban Development (HUD), the federal agency charged with implementing and administering the FHA, has issued rules interpreting the FHA, codified at 24 C.F.R. Part 100. Those regulations are accorded deference.  *Meyer v. Holley*, 537 U.S. 280, 281 (2003).  The evidence in this case establishes that the Harrises were subjected to a number of discriminatory housing practices during their tenancy at Huntingridge Road, including violations of 42 U.S.C. §§ 3604(a), (b), (c) and 3617.

Section 3604(a) makes it a discriminatory housing practice to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling" because of race.  42 U.S.C. §3604(a).  HUD regulations interpret § 3604(a) to prohibit a number of actions, including: "[s]ubjecting a person to harassment because of race . . . that causes the person to vacate a dwelling," 24 C.F.R. § 100.60(b)(7), and "[e]victing tenants because of their race," 24 C.F.R. § 100.60(b)(5).

Section 3604(b) makes it a discriminatory housing practice "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of

-5-

services or facilities in connection therewith because of race."  42 U.S.C. § 3604(b).  HUD regulations provide that unlawful acts include "[s]ubjecting a person to harassment because of race . . . that has the effect of imposing different terms, conditions, or privileges relating to the . . . rental of a dwelling or denying or limiting services or facilities in connection with the sale or rental of a dwelling."  24 C.F.R. § 100.65(b)(7).

Section 3604(c) prohibits making a statement, or causing the making of a statement, "with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race . . . or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).  It prohibits both oral and written statements and is not limited to advertisements.  24 C.F.R. § 100.75(b).

Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" any right protected by § 3604.  42 U.S.C. § 3617.  That section prohibits both "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling," and "[r]etaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority."  24 C.F.R. § 100.400(c)(2) and (c)(6).

HUD regulations define the scope of harassment under the FHA.  42 U.S.C. § 100.600.  As applicable here, hostile environmental harassment "refers to unwelcome conduct that is sufficiently severe or pervasive as to interfere with . . .  use or enjoyment of a dwelling [and] the terms, conditions, or privileges of rental [of a dwelling]."  *Id.*, § 100.600(a)(2).   Whether conduct rises to the level of hostile environment "depends on the totality of the circumstance."  Factors to be considered include "the nature of the conduct, the context in which the incidents

-6-

occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved." *Id.*, § 100.600(a)(2)(i)(A). Whether "unwelcome conduct is sufficiently severe or pervasive as to create a hostile environment is evaluated from the perspective of a reasonable person in the [plaintiffs'] position." Here, that perspective is one of an elderly black couple, living alone on a modest, fixed income. The harassment "can be written, verbal, or other conduct, and does not require physical contact." *Id.*, § 100.600(b). Here, plaintiffs present several incidents of harassment, but all they need to provide is a "single incident of harassment because of race" . . . that "is sufficiently severe to create a hostile environment." *Id.*, § 100.600(c).

      **B.**     **Scope of Liability.** Unlike other civil rights statutes, the FHA focuses on prohibited acts – it does not specify who may be held liable for those acts. *Meyer v. Holley*, 537 U.S. 280, 285 (2003). *Cf.* 42 U.S.C. § 2000e-2 (Title VII limits liability for unlawful employment practices to "employers"). Thus, when determining who may be liable for the commission of a discriminatory housing practice, the Supreme Court has held that the rules of ordinary tort liability must apply. This is because the FHA is, in effect, a statutory tort action. *Meyer*, 537 U.S. at 285 (2003); *Curtis v. Loether*, 415 U.S. 189, 195-196 (1974); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) (§ 1983 interpreted in light of the "background of tort liability").

      Importantly, the ordinary tort principle governing the imputation of liability under the FHA is matter of federal law, not state law. To determine the scope of liability, federal courts apply a federal standard derived from the purpose and text of the FHA statute and its affiliated regulations in light of ordinary tort principles governing the scope of liability. *Harris v. Itzhaki*,

-7-

183 F.3d 1043, 1054 (9th Cir. 1999) ("The policy reason underlying the application of federal law is to avoid predicating liability for Fair Housing Act violations on the vagaries of state law." [citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 n.13 (2d Cir. 1994)]).

To identify those ordinary tort rules and principles in civil rights cases, the Supreme Court frequently turns to the Restatements of Law. *See*, *e.g., Meyer*, 537 U.S. at 286 (Restatement (Second) of Agency); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999) (Restatement (Second) of Torts). *See also Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105-06 (2014) (relying on Restatement (Third) of Property to determine common law principles). In turn, those rules and principles established in each Restatement must be construed in light of the statutory text, purpose, and implementing regulations at issue in each action.

Here, HUD provides guidance for fitting tort principles to the FHA's text and objectives. The HUD rule, Liability for Discriminatory Housing Practices, 24 C.F.R. § 100.7, provides:

> A person is directly liable for (i) The person's own conduct that results in a discriminatory housing practice; (ii) Failing to take prompt action to correct and end a discriminatory housing practice by that person's . . . agent, where the person knew or should have known of the discriminatory conduct; and (iii) Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. Id., § 100.7(a)(1).

Especially apposite here, HUD also directs that "prompt action to correct and end the discriminatory housing practice may not include any action that penalizes or harms the [plaintiffs], such as eviction of [plaintiffs]." *Id.*, § 100.7(a)(2).

The Court should rely upon this guidance while considering the case at bar. But no matter whether the Court relies in whole or in part on HUD's liability rule or whether it cabins its

-8-

analysis to the traditional tort principles found in the applicable Restatements, the outcome is the same. Vanderburg, Remco, and Bishop are all directly liable to plaintiffs for their own conduct and for the conduct of their agents acting within the scope of their authority.

## V.  THE COURT SHOULD DENY SUMMARY JUDGMENT ON PLAINTIFFS' FAIR HOUSING ACT CLAIMS.

### A.      The FHA applies to the post-rental discriminatory conduct alleged in this case.

Remco and Bishop assert that neither may be held liable under the FHA for violation of §§ 3604(a), (b), or (c) because "these sections address pre-rental behavior."  ECF 100, p. 6.  That assertion is unfounded based on the FHA's text, regulation, and more than fifty years of federal cases applying each of these provisions to prohibit discrimination in connection with a dwelling after that dwelling has been rented.

The text of the FHA defeats this assertion.  The FHA, in general, and the discriminatory housing practices codified as §§ 3604(a), (b), or (c), in particular, bar discrimination in dwellings, 42 U.S.C. §§ 3602(b).  Housing is much more than the simple acquisition of a property right.  Nothing in the text of §§ 3604(a), (b), or (c) suggest that the FHA's protections end once a lease is signed; in fact, the opposite is true.  The FHA does not contain any language limiting its application to discriminatory conduct that occurs prior to or at the moment of the sale or rental.  To ascribe to the statute the limited applicability the defendants urge, we would have to read an otherwise absent temporal limitation into the language of the statute, which we cannot do. *Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 632 (11th Cir. 2019) (§ 3604(b)).  *See also The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d

-9-

690, 714 (9th Cir. 2009) ("In our view, the FHA does apply to post-acquisition discrimination.").

Under § 3604(a), a dwelling is made "otherwise unavailable" where, as here, a landlord or her agent "evicts a existing tenant because race," 24 C.F.R. § 100.60(b)(5), or subjects an existing tenant to harassment causing that tenant to quit their rental dwelling, 24 C.F.R. § 100.60(b)(7). In each instance, as in the case at bar, a dwelling that a plaintiff occupied (post-rental) is made "unavailable" due to discriminatory eviction or harassment.   Accordingly, the federal courts have uniformly held that discriminatory eviction, unregulated under defendants' theory, does in fact violate § 3604(a). *See, e.g., Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1224 (11th Cir. 2016); *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) (en banc) (§ 3604(a) prohibits conduct that makes housing unavailable in ways that are similar to constructive eviction); *see also Sanborn v. Wagner*, 354 F. Supp. 291, 295 (D. Md. 1973) (a defendant's liability under the FHA is not dependent upon the success of their unlawful conduct).   *Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005), is no help . ECF 100, p. 11.  While the Fifth Circuit is an outlier in its construction of § 3604(a), it does not stray enough from the FHA's text, regulations, and case law to help defendants here.  The Fifth Circuit limited the scope of its holding:  "We hold only that § 3604(a) gives no right of action to current owners claiming that the value or "habitability" of their property has decreased due to discrimination in the delivery of protective city services."  *Cox*, 430 F.3d at 742-43.  Indeed, the Court in *Cox* explicitly stated that it was not holding that a current renter "evicted or constructively evicted from house" does not have a claim under § 3604(a).  *Id.* at 742.

Defendants' application of a post-rental cutoff to § 3604(b) is even more unfounded. The purpose of § 3604(b) is not only to protect homeseekers in their efforts to secure housing,

-10-

but also to guarantee their right to equal treatment once they obtain it. The text of § 3604(b) provides no support for defendants' assertion to the contrary; rather, it explicitly covers post-rental conduct barring discrimination "in the provision of services or facilities in connection therewith (a dwelling)." If defendants' interpretation prevails, absurd results follow. Landlords may charge blacks more rent than whites; landlord's agents may sexually harass tenants; landlords may perform repairs for male tenants, but refuse them for female tenants. Defendants' proposal not only contradicts HUD's regulations construing § 3604(b) (which bar tenant harassment, 24 C.F.R. § 100.65(b)(5)-(7), discriminatory repairs, *Id.*, § 100.65(b)(2), and the imposition of different rental charges, *Id.*, § 100.65(b)(1)), it has been rejected, repeatedly, by the circuit courts. *See, e.g., Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) (threats to evict white tenants for having Black guests violated § 3604(b)); *Bloch*, 587 F.3d at 779 (§ 3604(b) encompasses claim for constructive eviction); *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856, 866-67 (7th Cir. 2018) (§ 3604(b) applies in cases of tenant-on-tenant harassment). Moreover, *Cox* offers defendants no help here either. The Court in *Cox* never construed the scope of § 3604(b) in dismissing plaintiff's case; instead, it simply held that the challenged conduct -- the city's placement of garbage dump -- was too attenuated to affect the terms and conditions of their post-rental occupancy of dwellings. 430 F.3d at 746; *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) (en banc).

Finally, § 3604(c) has also never been construed to be limited to pre-rental transactions. *See, e.g.*, *Haynes v. Wilder Corp. of Delaware*, 721 F. Supp. 2d 1218, 1227 (M.D. Fla. 2010) (apartment manager yelling at disabled tenant that she did not need assistance with door because she was not actually disabled could violate § 3604(c)); *Wentworth v. Hedson*, 493 F. Supp. 2d

-11-

559, 567 (E.D.N.Y. 2007) (landlord's harassing statements made to white tenants' Black visitors could violate § 3604(c)); *Blomgren v. Ogle*, 850 F. Supp. 1427, 1440 (E.D. Wash. 1993) (mobile home park's discriminatory notices distributed to residents violated § 3604(c)).  Harassment typically targets tenants; if that harassment includes discriminatory statements, as in the case at bar, then § 3604(c) is violated.

> **B.      Bishop and Remco are directly liable under traditional tort and agency principles for their violations of the FHA.**

There is no dispute that the defendants in this action are bound together by traditional tort and agency principles.

- •      Bishop acted as the agent of Remco and Vanderburg, her principals;

- •      Remco acted as the agent for Vanderburg, its principal; and

- •      Bishop's dealing with the Harrises on behalf of Remco and Vanderburg were within the scope of her actual authority conferred by both principals.  (PAMF 158-165.)

Based on these admissions, there is no dispute

- •      that Remco and Vanderburg are "directly liable to [the Harrises] for harm caused by [Bishop's] violations of the FHA." *Restatement (Third) of Agency*, §§ 7.03, 7.04;

- •      that the notice of facts[1] – material to Bishop's duties –  that Bishop knew or had reason to know is imputed to her principals, Remco and Vanderburg. *Id.*, §§ 5.01(4), 5.03;

- •      that neither Bishop nor Remco had any duty to comply with the instructions of

---

[1] "A person has notice of a fact if the person knows the fact, has reason to know the fact, has received an effective notification of the fact, or should know the fact to fulfill a duty owed to another person. Notice of a fact that an agent knows or has reason to know is imputed to the principal as stated in §§ 5.03 and 5.04." Restatement (Third) Of Agency § 1.04 (2006)

-12-

their principal, Vanderburg, that they knew or should have known were unlawful or tortious, *Id.*, § 8.09, cmt c[2]; and,

• that even though Remco and Bishop acted within their actual authority in performing their principal Vanderburg's instructions regarding Gurkins and the Harrises, Remco and Bishop are subject to liability for the harm that their tortious conduct caused the Harrises. *Id.*, §7.01.

### 1. Bishop and Remco are liable for their role in attempting to evict and terminating the Harrises' tenancy.

Bishop and Remco filed the summary ejectment proceeding against the Harries and later gave written notice that their lease would not be renewed. That those acts were taken in their role as agent for Vanderburg does not relieve Bishop or Remco of liability. *Young v. AAA Realty Co. of Greensboro*, 350 F. Supp. 1382, 1387 (M.D.N.C. 1972) Moreover, although those two actions may have been taken by Bishop and Remco at the direction of their principal Vanderburg, they are directly liable for their own participation in the unlawful conduct. *Dillon v. AFBIC Dev. Corp.*, 597 F.2d 556, 562 (5th Cir. 1979). An agent "has no obligation to carry out his principal's order to do an illegal act," and the fact that he commits such an act at the command of his principal does not relieve him of liability. *Dillon*, 497 F.2d at 562 (quoting Restatement (Second) of Agency §§ 411, 353 (1958)). In *Dillon* a real estate agent conveyed an owner's

---

[2] "An agent has no duty to comply with instructions that may subject the agent to criminal, civil, or administrative sanctions or that exceed legal limits on the principal's right to direct action taken by the agent. Thus, an agent has no duty to comply with a directive to commit a crime or an act the agent has reason to know will be tortious. An agent who is a member of a profession does not have a duty to follow instructions given by the principal that expose the agent to discipline for violating professional rules. Restatement (Third) Of Agency § 8.09, Cmt C (2006)

refusal to sell property despite being aware that the refusal was based on race. His participation in the refusal rendered both him and his real estate firm liable under the FHA. *Id.*, 497 F.2d at 562. *See also Sams v. U.S. Dep't of Hous. & Urb. Dev.*, 76 F.3d 375 (4th Cir. 1996) (per curiam) (unpublished) (agent liable under FHA where he complied with owners direction to deny housing to family based on familial status).

Here, Bishop and Remco had actual notice based on numerous complaints lodged by Phyllis Harris or William Harris or both, conveyed verbally – in person and by telephone – and in writing directly to Bishop, Remco's broker in charge, and Branch, Remco's owner:

- That Gurkins engaged in repeated harassment;

- That Gurkins' harassment was frequent and severe;

- That Gurkins' harassment occurred on the premises rented by the Harris from Remco acting as Vanderburg's agent;

- That Gurkins' harassment reached the Harrises' inside their home (Gurkins yelling through walls), in the common area of the rented dwelling (Gurkins' threatening to beat Phyllis Harris's black ass while she stood in the common area), and immediately outside their rented dwelling in the yard they rented as part of their dwelling (Gurkins' driving over yard in front of Harrises' dwelling);

- That the nature of Gurkins' verbal harassment was particularly humiliating and threatening, involving profanity and sexual slur;

- That the nature of Gurkins' physical harassment was especially threatening;

- That Gurkins' harassment had been reported to the police;

- That the police had documented Gurkins' harassment in police reports;

-14-

- That criminal charges were filed against Gurkins' because of his harassment;

- That Branch, Remco's owner, believed the harassment was "disrespectful" and "intimidating" and stated to Vanderburg that he believed the Harrises' complaints were credible;

- That Phyllis Harris had told Bishop that Gurkins' harassment was racial in nature;

- That Bishop in spite of the transparent pretexts offered by Bishop to justify her conduct, Bishop admitted that she believed that the Harrises were truthful;

- That both Bishop and Branch told Vanderburg to refund the Harrises a portion of their rental payment to enable them to locate, actions neither had taken before; and,

- That Bishop and Remco had received direct reports from a black tenant (Roberson) and her mother that Gurkins had engaged in similar harassment of them and that Gurkins' harassment was expressed in overtly racist language.

(PAMF 25-36, 37-75, 76-87, 98-120, 183-190.)

These facts are sufficient to generate a genuine issue of material fact viewing the evidence in a light most favorable to plaintiffs. Moreover, these circumstances permit the jury to draw an inference that Bishop and Brand knew that Gurkins' harassment was racially motivated in light of the nature of his harassment of the Harrises and the prior complaint communicated by Roberson about Gurkins' racial assault and threaten made shortly before the Harrises rented 559B Huntingridge. (PAMF 183-190.) *See Strothers v. City of Laurel*, 895 F.3d 317, 336 (4th Cir. 2018) (employer knew or should have known that the harassment complained of was racial based on its knowledge of and experience with the harasser).

-15-

Bishop's contemporary writings support a finding the Remco and Bishop understood that Gurkins' harassment was racially motivated. On August 21, 2017, Bishop made a note in the Remco file regarding the Harrises, stating:

> This tenant has called and come into my office several times over the last two months and complained about Matt, Mary Jane's neph[ew] causing disturbances in the unit beside them. The Harris's indicated to me that they wanted to move that would not put up with this anymore. They called the sheriff's office several times and they came out. I called the owner and on Friday 8/18/17 Mary Jane agreed to give them $1650.00 back of the rent and s/d they had paid so they would move. On Monday, today, 8/21/17 Mary Jane called me back and said that she had changed her mind and she was only willing to let them out of their lease and give them their s/d back and 30 days to vacate. [T]he Harris's called me and I told them and they still will not let me know what they are going to do. They argue with me about what they want and will not commit to anything. I told them they had two options, 1 to move out and we would give them their s/d back or because they had not violated their lease they could stay till the end of their lease. I told them to let me know and get back to me and hung up.

(Exh. 21; 71. See also Harris emails to Bishop (Exh. 24 ["stating that they had taken a "warrant on Matthew Douglas Gurkins for threatening me. I was afraid that he, Matt, was going to harm me."]) Although Remco produced the email in discovery, Bishop claims not to remember seeing it. (PAMF 37-75 [Bishop Depo. 187:19-189:16].)

Finally, the excuses offered by Bishop to justify the attempted eviction of the Harrises were transparently pretextual. Such clearly incredible statements, largely recanted by Bishop in his deposition, weight in favor of finding issues for trial. (See, e.g., PAMF 63-66, 156.)

## 2. Bishop and Remco are liable for their role in failing to act to protect the Harrises from Gurkins' racial harassment.

Defendants argue that plaintiffs unfairly seek to hold them liable for conduct they had no ability to control. ECF 100, p. 7. That is inaccurate. The evidence submitted by plaintiffs creates a question for the jury whether Bishop and Remco had the power to correct the racially

-16-

hostile environment to which their tenants the Harrises were subjected.

The general rule is that a landlord may not interfere with her tenant's permissible use of the property. Restatement (Second) of Property, Landlord and Tenant § 6.1 (1977). Thus, there is a breach of the landlord's obligations if, during a tenancy, "the landlord, or someone whose conduct is attributable to him, interferes with a permissible use of the leased property by the tenant." *Id.* Pertinent here, "[t]he conduct of a third person outside of the leased property that is performed on property in which the landlord has an interest, which conduct could be legally controlled by him, is attributable to the landlord." Those common law principles inform plaintiffs' FHA claims.

"Discrimination" under the federal civil rights statutes includes "deliberate indifference to known harassment based on protected class. *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (student on student sexual harassment under Title IX); *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 864 (7th Cir. 2018) (tenant on tenant harassment under FHA); *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 75 (4th Cir. 2016) (student on student disability harassment under § 504). In such cases the defendant is not held liable for the misconduct of the third party, but for their *own* decision to remain idle in the face of known harassment. *Davis*, 526 U.S. at 631. To trigger that liability, a showing a deliberate indifference requires evidence that the defendant has some control over the alleged harassment. *Id.*, at 644.

To prove discrimination based on deliberate indifference here, the Harrises must show that they were harassed by Gurkins based on race, *S.B.*, 819 F.3d at 76, that the harassment was sufficiently "severe or pervasive" to objectively interfere with their enjoyment of their dwelling,

-17-

*Wetzel*, 901 F.3d at 862; *S.B.*, 819 F.3d at 76; and that Bishop (and thus Remco) knew of the

racial harassment and were deliberately indifferent to it, *S.B.*, 819 F.3d at 76. Plaintiffs have

submitted evidence establishing each of these elements.

To prove discrimination based on deliberate indifference here, the Harrises must show

that they were harassed by Gurkins based on race, *S.B.*, 819 F.3d at 76, that the harassment was

sufficiently "severe or pervasive" to objectively interfere with their enjoyment of their dwelling,

*Wetzel*, 901 F.3d at 862; *S.B.*, 819 F.3d at 76; and that Vanderburg knew of the racial harassment

and was deliberately indifferent to it, *S.B.*, 819 F.3d at 76. Plaintiffs have submitted evidence

establishing triable issues on each of these elements.

### a. Gurkins harassed the Harrises on the basis of race.

As the facts above establish, Gurkins waged a campaign of harassment against the

Harrises. (PAMF 25-75, 99-97, 173-182.) That evidence establishes that the harassment was

because of race because Gurkins' use of the term "n— " was "the essence of despicable racial

animus." *Bernard v. Calhoon Meba Eng'g Sch.*, 309 F. Supp. 2d 732, 738 (D. Md. 2004).

### b. Gurkins's harassment was severe and pervasive.

Gurkins repeatedly targeted the Harrises with the use of the word "n— ." The use of that

word, coupled with threats of violence, is the type of conduct that easily qualifies as being

sufficiently severe and pervasive as to create a hostile environment. *See Pryor v. United Air*

*Lines, Inc.*, 791 F.3d 488, 496-97 (4th Cir. 2015) (discussing use of the word "n— " in creating

hostile environment). Gurkins, moreover, told the Harrises that he was the nephew of the owner

and "can drive all around the house if I want," rendering his conduct even more oppressive and

disturbing and directly related to their tenancy. (PAMF 25-36; [W.Harris Depo. 64:14-22;

-18-

W.Harris Depo. 70:13-24 (Gurkins continued to enter their yard after being charged with trespass.]) A reasonable person in the position of the Harrises would have felt the same way.

Gurkins' harassment interfered with the Harrises' use and enjoyment of their home during the time they lived at Huntingridge Road and causing them to terminate their tenancy a month early. (PAMF 173-182.) As a result of the threats and harassment, Mrs. Harris no longer wanted their grandchildren or friends to come to their home. (PAMF 174; P.Harris Depo. 109:3-6.) She left the house when her husband went to work rather than stay at home. (P.Harris Depo. 108:17-20; 109:3-5.) Mrs. Harris was fearful and suffered from head and stomach aches and loss of sleep. (P.Harris Depo. 126:4-17.) She was afraid her husband might get into an altercation with Gurkins and end up in jail or losing his job. (Id.) Mr. Harris hardly got any rest with all Gurkins' cussing, door slamming, throwing things, and calling them "n—s." (W.Harris Depo. 69:13-70:3.) He would not want to put his dogs through the situation they lived through. (Id. 70:2-3.) Had they not suffered the harassment, the Harrises would have wanted to stay at the Huntingridge Road property and would have sought to renew their lease. (PAMF 177; P.Harris Depo. 150:19-151:3.) These fact establish that Gurkins' conduct caused the Harrises to vacate their home early and substantially interfered with the use and enjoyment of the home while they still lived there.

### c. Bishop and Remco knew of the racial harassment.

As set forth above, Bishop and Remco were aware of the racial nature of Gurkins' harassment of the Harrises.

### d. Bishop and Remco could have stopped the harassment.

Bishop and Remco could have stopped the harassment. (See PAMF 183-190, 197-203.)

-19-

Instead, Bishop and Remco followed Vanderburg's instructions and sought to evict the Harrises and, and after that was unsuccessful, gave notice that the lease would not be renewed. (See PAMF 88-140.)

Remco and Bishop enjoy a special privilege pursuant to North Carolina's real estate laws: They are entitled to profit richly from the management of other people's rental properties solely because they are licensed and thus subject to the state's real estate regulations. Those regulation become meaningless if a real estate profession can, as Remco and Bishop contend, avoid liability asserting that they were just following the owner's instructions. (PAMF 201-203; Declaration of Janet Thoren, ¶¶ 8-9 and Exh. 1; Depo. Exh. 134, 135.)

Based on all of these facts, the Court must reject defendants's arguments that they cannot be held liable for their failure to protect their tenants, the Harrises, from Gurkins' ongoing racial harassment.

### 3. Gurkins made discriminatory statements in violation of § 3604(c).

An unlawful statement made with respect to the sale or rental of a dwelling includes those made to "agents, brokers, employees, prospective sellers or renters or *any other persons*." 24 C.F.R. § 100.75(c)(2) (emphasis added). Here, on August 17, 2017, Gurkins told Pitt County Sheriff's Officer Eubanks that "his Aunt owned the property and he could drive circles around the home if he wanted" and that "'those niggers' will be out [sic] kicked out next month." (Depo. Exh. 19 , p. 3.) The following month, at the direction of Vanderburg, Remco filed an eviction action against the Harrises. (Bishop Depo. 207:21-208:20; Exh. 30.) This evidence is sufficient to raise a genuine issue whether Gurkins' racial epithets were made in connection with the sale or rental of a dwelling. *See Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999)

(summary judgment on § 3604(c) inappropriate where plaintiff submitted evidence showing that a discriminatory statement was made by a person who "filtered" applicants and made tenant recommendations to landlord). Vanderburg had a history of choosing Gurkins over her tenants, effectively allowing him power to decide whom she would evict. (PAMF 191-196.)

Bishop and Remco's failure to take action to stop Gurkins' harassment, as described above, also directly led to the Harrises being subjected to repeated verbal assaults by Gurkins based on their race. For that reason, as well, defendants should be held liable for discriminatory statements and the Court should deny their motion on plaintiffs' § 3604(c) claims.

### 4. Plaintiffs need not prove the element of the *McDonnell Douglas* framework.

Remco and Bishop contend that since plaintiffs have no direct evidence that they intended to discriminate, plaintiffs must proceed by proof of all of the elements set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (ECF 100 at 12.) That is not true. A plaintiff may prove an FHA violation by showing "that a defendant had a discriminatory intent either directly, through *direct or circumstantial* evidence, *or* indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test." *Corey v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013) (emphasis added). Here, based on the evidence set forth above, plaintiffs can establish discriminatory intent through circumstantial evidence, making reliance on *McDonnell Douglas* unnecessary.

### 5. Remco and Bishop are liable for retaliation.

Plaintiffs have a separate FHA claim for retaliation under § 3617. Section 3617 provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the

exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Practices prohibited by § 3617 include, but are not limited to, "[r]etaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority." 24 C.F.R. § 100.400(c)(6). Covered discriminatory housing practices include acts of interference and intimidation by third parties against others in the enjoyment of housing because of their race. *See United States v. Pospisil*, 127 F. Supp. 2d 1059, 1063 (W.D. Mo. 2000) (burning cross on neighbor's lawn violated § 3617).

To state a claim for retaliation under 42 U.S.C. § 3617 of the FHA, the Harrises must establish that (1) they were engaged in protected activity; (2) defendants were aware of that activity; (3) defendants took adverse action against them; and (4) a causal connection existed between the protected activity and the asserted adverse action. *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 98 (4th Cir. 2016) (unpublished) (citing *King v. Rumsfeld*, 328 F.3d 145, 150–51 (4th Cir.2003)). Section 3617 does not require separate proof of an intent to discriminate, but "rather it broadly protects against interference with the exercise of rights granted by the FHA." *Bryant v. City of Norfolk*, No. 2:20CV26 (RCY), 2021 WL 765405, at *4 (E.D. Va. Feb. 26, 2021) (noting that the Fourth Circuit's most recent articulation of the § 3617 test in *Hall v. Greystar Management Services, L.P.*, albeit unpublished, did not incorporate a discriminatory intent requirement). The evidence submitted by plaintiffs establishes each of the

-22-

necessary elements.[3]

### a. The Harrises were engaged in protected activity.

Here, the Harrises made reports of Gurkins' intimidating and frightening acts of violence and racial epithets to the police, as well as to Remco. (PAMF 25-97.) Those were reports of discriminatory housing practices made to a housing provider or other authority and protected under the FHA. 24 C.F.R. § 100.400(c)(6); *see also Neudecker v. Boisclair Corp.*, 351 F.3d 361, 363-64 (8th Cir. 2003) (allegation that landlord threatened to evict tenant after he complained to it regarding disability harassment by tenants stated claim for retaliation claim under the FHA).

### b. Bishop and Remco were aware of that activity.

Bishop and Remco were aware that the Harrises had made complaints to both them and to the police. (PAMF 73; Bishop Depo. 161:24-163:14; 215:10-216:5.) Plaintiffs have submitted evidence from which a reasonable jury could conclude that Bishop and Remco knew that those complaints concerned racial harassment by Gurkins. Part VI.B.1, supra.

### c. Bishop and Remco took adverse action against plaintiffs.

On September 26, 2017, at Vanderburg's direction, Bishop signed a Complaint in Summary Ejectment against the Harrises on behalf of Remco based on the "Tenant's failure to maintain a peaceful environment so as not to disturb other tenants' peaceful enjoyment of the Premises.". (Exh. 30; Bishop Depo. 207:21-208:1.) The complaint was filed September 29,

---

[3]Section 3617 does not require proof of discriminatory intent, but "rather it broadly protects against interference with the exercise of rights granted by the FHA." *Bryant v. City of Norfolk*, No. 2:20CV26 (RCY), 2021 WL 765405, at *4 (E.D. Va. Feb. 26, 2021) (noting that the Fourth Circuit's most recent articulation of the § 3617 test in *Hall v. Greystar Management Services, L.P.*, albeit unpublished, did not incorporate a discriminatory intent requirement).

-23-

2017.  (Exh. 31.)

Separately, following the instruction of Vanderburg, Bishop sent a letter to the Harrises on October 26, 2017, providing them with "official notice" that their lease would not be renewed when it expired in February 2018, and that the owner expected them to move on or before that date.  Exh. 44; Vanderburg Depo. 98:12-99:17.  The Harrises vacated the home a month early on January 27, 2018.  Exh. 21.

### d. There was a causal connection between the protected activity and the adverse action.

Grace Bishop testified that she served the writ of eviction on the Harrises at the direction of Vanderburg because "the Harrises are no longer providing a peaceful environment for my tenants living in 559A." (PAMF 104; Bishop Depo. 208:11-17.)  Bishop did not "see any reason not to" follow those directions, despite her knowledge of the Harrises' complaints and her having "hear[d] how Matthew acts." (Bishop Depo. 210:4-8, 211:6-13.) Vanderburg told Bishop that the Harrises had been filing complaints with the police regarding Gurkins.  (Bishop Depo. 215:10-216:5.)  But the Harrises had been informed by Bishop that Vanderburg had instructed them to call the police if they had any problems with Gurkins.  (P.Harris Depo. 18-20.)  Among the complaints filed by the Harrises regarding Gurkins was that he had "just walk[ed] out the front door," and that he had "walked across their yard."  (PAMF 73; Bishop Depo. 215:10-216:5.)

Phyllis Harris had indeed filed those complaints.  On September 1, 2017, she filed an affidavit for criminal charges, alleging that as she was entering her home through the front door off the front porch, Gurkins had been exiting his front door, and the incident occurred during

which he repeated that he was going to beat Harris's "black ass." (Exh. 22.) On September 24, 2017, Harris called the sheriff after Gurkins had walked across their yard in violation of the direction of the sheriff's office. (Exh. 64.) The sheriff obtained a warrant and Gurkins was arrested for second degree trespassing that same day. (Exh. 64.) The eviction papers were signed by Bishop within 48 hours of the September 24 police incident and the were filed just a few days later. Evidence of a close temporal proximity between protected activity and adverse action is sufficient to create a jury question on causation in a retaliation case. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015). "Close temporal proximity" for purposes of creating a jury question can mean a month or even longer. *Id.* (one month); *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (two and one-half months). The short time between the Harrises' police complaints and the eviction filing in this case easily creates a jury question on causation.

Bishop took Vanderburg's word that the Harrises were disturbing Gurkins' peaceful enjoyment of unit A and filed the eviction papers. (PAMF 116; Bishop 217:14-22.) This is despite the fact that she certified to the district court that she had "actual knowledge" of the facts supporting the eviction complaint. (Exh. 31; PAMF 98-120.)

The eviction of tenants who were not in default on the rent was highly unusual for Remco and the Harris eviction was filed contrary to usual procedures. (PAMF 10, 11, 16, 105-112, 117-118) Although Bishop claims that Remco had previously filed an eviction against a tenant solely on the basis that the tenant was creating a disturbance affecting the peaceful enjoyment of other tenants, she has no recollection of any of the circumstances. (Bishop Depo. 125:18-126:7, 128;1-13.) The only source to determine that information would be to go through the tenant files in

-25-

storage in the attic at Remco.  (Bishop Depo. 128:14-22.)[4]

## VI.  PLAINTIFFS' STATE CLAIMS SHOULD NOT BE DISMISSED PURSUANT TO 28 U.S.C. § 1367.

Since plaintiffs' FHA claims should not be adjudicated and dismissed, the Court should retain jurisdiction of plaintiffs' state law claims.

## VII.  SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DENIED.

Defendants erroneously argue that plaintiffs' state law claims are premised on imposing vicarious liability against Remco and Bishop for the conduct of Gurkins whom they could not control.  (ECF 100 at 13.)  But plaintiffs seek to hold Remco and Bishop for their own failures to act.

But under North Carolina law, a landlord is liable for the foreseeable acts of third parties on his properties that injure the plaintiff.  *Stricklin v. Stefani*, 358 F. Supp. 3d 516, 532 (W.D.N.C. 2018). " Foreseeability of 'physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons,' exists if the defendant 'know[s] or has reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the [plaintiff]." *Id.* (quoting *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 281 S.E.2d 36 (1981).  In the case of criminal misconduct, "[t]he most probative evidence on the question of whether a criminal act was foreseeable is evidence of prior criminal activity committed."  *Connelly v. Family Inns of Am.,*

---

[4]Magistrate Judge Swank denied plaintiffs' motion to compel production of those files. ECF 88 at pp. 9-10.

*Inc.*, 141 N.C. App. 583, 588, 540 S.E.2d 38, 41 (2000).

In this case, based on the same facts set forth above, Gurkins' conduct in Gurkins' conduct in (1) trespassing onto their property,[5] (2) invading their right to privacy,[6] and (3) assaulting Mrs. Harris,[7] were all forseeable to Bishop and Remco as they had just months before dealt with Gurkins' similar racially assaultive behavior against at the home of Kierra Roberson.

Similarly, because Gurkins is not some stranger third-party, but closely connected to the property owner Vanderburg, his interference with the use and enjoyment of the Harrises' home was forseeable and actionable. *See* Restatement (Second) of Property, Restatement (Second) of

---

[5]The elements of trespass to real property are: "(1) possession of the property by the plaintiff when the alleged trespass was committed; (2) an unauthorized entry by the defendant; and damage to the plaintiff from the trespass." *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 32, 588 S.E.2d 20, 29 (2003)).

[6]Under North Carolina law, intrusion (as an invasion of privacy) is a tort that includes "an intentional physical interference with, or prying into a person's solitude or seclusion or private affairs." *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 28, 588 S.E.2d 20, 27 (2003) (citing *Hall v Post*, 85 N.C. App. 610, 615, 355 S.E.2d 819, 823 (1987)). For this tort, the plaintiff must show that the behavior or conduct was "so egregious" that it would be considered "highly offensive" under a reasonable person standard. *Broughton,* 161 N.C. at 28, 588 S.E.2d at 28. "[T]he home [is] the one place where ordinary people have the right not to be assaulted by uninvited and offensive sights and sounds." *Federal Communication Commission v. Pacifica*, 438 U.S. 729, 759 (plurality decision) (Powell, J. concurring). Being subjected to racial epithets as a Black American by a White person should meet the level of egregiousness required for this tort. *In Re Spivey*, 345 N.C. 404, 414, 480 S.E.2d 693, 699 (1997) ("No fact is more generally known than that a white man who calls a black man a 'nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate. The trial court was free to judicially note this fact.").

[7]Under North Carolina law, the tort of assault requires a threat coupled with an offer or attempt to show violence to do some immediate physical injury to another. *See Dickens v. Puryear*, 302 N.C. 437, 444, 276 S.E.2d 325, 330 (1981). Gurkins' attack on Mrs. Harris on the front porch on September 1 satisfies those requirements.

Property, Landlord and Tenant § 6.1 (general rules is that a landlord may not interfere with her tenant's permissible use of the property and landlord may be liable for conduct by third party attributable to landlord).

Defendants are also liable for the unsafe condition that they failed to correct on the property Remco controlled – the common porch area shared by Gurkins and the Harrises where assaultive behavior took place. The landlord has a duty to keep the common area of their premises in a safe condition. G.S. 42–42(a)(3); *Lenz v. Ridgewood Assocs*., 55 N.C. App. 115, 121, 284 S.E.2d 702, 706 (1981). As discussed above, Remco failed to take any action to correct the dangerous condition that existed for the Harrises as a result of having to share the common areas with Gurkins.

As defendants correctly state, plaintiffs' unfair and deceptive trade practices theory arises out of the FHA claims. (ECF 100 at p.15.) Because plaintiffs' FHA claims are viable, so are their state law claims. See Part V above.

For the same reasons that defendants committed violations of the FHA for their attempted summary ejectment of the Harrises and subsequent termination of the Harrises' right to renew their lease, defendants are liable for wrongful eviction.

//

//

//

//

//

-28-

## VIII.  CONCLUSION

For all of the foregoing reasons, the Court should deny defendants' motion.

Dated:  April 28, 2021.

Respectfully submitted,

BRANCART & BRANCART

*/s/ Christopher Brancart*
Christopher Brancart
Brancart & Brancart
P.O. Box 686
Pescadero, CA 94060
Tel:  (650) 879-0141
Fax:  (650) 879-1103
cbrancart@brancart.com
CA Bar 128475
[By Special Appearance]

LEGAL AID OF NORTH CAROLINA
  Luis Juan Pinto
Legal Aid of North Carolina
P.O. Box 7283
Greenville, NC 27835
Tel: (252) 347-0135
luisp@legalaidnc.org
NC Bar 53823

LEGAL AID OF NORTH CAROLINA
  Kelly Anne Clarke
Legal Aid of North Carolina
2101 Angier Avenue, Suite 300
Durham, NC  27703
Tel:  (919) 865-3825
Fax: (919) 861-1887
kellyc@legalaidnc.org
NC Bar 28188

LEGAL AID OF NORTH CAROLINA
  Ayanda Dowtin Meachem
Legal Aid of North Carolina
P.O. Box 564
Ahoskie, NC 27910
Tel:  (252) 332-5124
Fax: (252) 332-3317
ayandam@legalaidnc.org
NC Bar 37714

Attorneys for Plaintiffs

-29-

## CERTIFICATE OF SERVICE

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on April 28, 2021, I served by email a copy of the attached document –**PLAINTIFFS' OPPOSITION TO  DEFENDANTS REMCO EAST, INC. AND MARY GRACE BISHOP'S MOTION FOR SUMMARY JUDGMENT**– upon the following attorneys:

Kelly Anne Clarke
Legal Aid of North Carolina
2101 Angier Avenue, Suite 300
Durham, NC  27703
Fax: (919) 861-1887
kellyc@legalaidnc.org

Jay C. Salsman
A. Ruthie Sheets
Harris Creech Ward & Blackerby
325 Pollock Street
P.O. Drawer 1168
New Bern, NC 28560
ars@harriscreech.com
jcs@harriscreech.com
[For Vanderburg]

Ayanda Dowtin Meachem
Legal Aid of North Carolina
P.O. Box 564
Ahoskie, NC 27910
Fax: (252) 332-3317
ayandam@legalaidnc.org

Spencer Beard
Luke Dalton
McAngus Goudelock & Courie
Post Office Box 12327
Wilmington, NC 28405
spencer.beard@mgclaw.com
luke.dalton@mgclaw.com
[For Remco East and Bishop]

Luis Juan Pinto
Legal Aid of North Carolina
P.O. Box 7283
Greenville, NC 27835
Fax: (252) 758-1843
luisp@legalaidnc.org

Joseph Dupree
123 West Third Street
P.O. Box 1219
Fax: (252) 329-0444
jaybdupree@gmail.com
[For Gurkins]

*/s/ Christopher Brancart*

-30-