IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:19-CV-111-D

WILLIAM HARRIS, and          )
PHYLLIS HARRIS,              )
                             )
            Plaintiffs,      )
                             )
      v.                     )          **ORDER**
                             )
MARY JANE VANDERBURG,        )
et al.,                      )
                             )
            Defendants.      )

On August 9, 2019, William and Phyllis Harris (the "Harrises" or "plaintiffs") filed suit

against Mary Jane Vanderburg ("Vanderburg"), Douglas Matthew Gurkins ("Gurkins"), Remco East,

Inc. ("Remco"), and Mary Grace Bishop ("Bishop") (collectively, "defendants") alleging claims

under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, et seq. and state law [D.E. 1, 33]. On

March 15, 2021, Vanderburg moved for summary judgment [D.E. 94] and filed a memorandum and

other documents in support [D.E. 95, 96]. The same day, Remco and Bishop moved for summary

judgment [D.E. 98] and filed a memorandum and documents in support [D.E. 99, 100]. On April

28, 2021, the Harrises responded in opposition to both motions for summary judgment and filed

documents in support [D.E. 106 through 113]. On June 23, 2021, Vanderburg, Remco, and Bishop

replied [D.E. 124, 125]. On June 30, 2021, the Harrises moved for leave to file a combined surreply

[D.E. 126]. As explained below, the court grants in part Remco and Bishop's motion for summary

judgment, grants in part Vanderburg's motion for summary judgment, and denies as moot the

Harrises' motion for leave to file a combined surreply.

# I.

In the 1980s, Vanderburg and her husband built several rental properties along Huntingridge Road in Greenville, North Carolina, including 559 Huntingridge Road. See [D.E. 96] ¶¶ 1–2; [D.E. 113] 1. 559 Huntingridge Road is a duplex with two units: 559A and 559B. See [D.E. 96] ¶ 2; [D.E. 113] 2. In 2016, after the death of her husband, Vanderburg hired Remco, a property management company, to manage some of her properties. See [D.E. 96] ¶ 5. Remco began to manage the 559B unit in 2017. See [D.E. 96] ¶ 5; [D.E. 99] ¶ 3; [D.E. 113] 9. During the relevant time period in this case, Remco did not manage the 559A unit. See [D.E. 96] ¶ 5; [D.E. 99] ¶ 3; [D.E. 113] 2–3; [D.E. 24-1] 9. Remco's duties included leasing and maintaining Vanderburg's properties. See [D.E. 96] ¶ 6; [D.E. 113] 3.

In February 2017, the Harrises signed a lease with Remco to rent the 559B unit. See [D.E. 96] ¶ 7; [D.E. 99] ¶ 4; [D.E. 99-2]; [D.E. 113] 4; [D.E. 108-1] 30–34. Bishop was the broker in charge at Remco during the Harrises' tenancy. See [D.E. 96] ¶ 10; [D.E. 113] 4. Although Vanderburg owned the property, the Harrises understood they were renting from Remco. See [D.E. 96] ¶ 8; [D.E. 113] 4. When the Harrises moved in to 559B, Gurkins, who is Vanderburg's nephew, was living in the 559A unit. See [D.E. 96] ¶ 9; [D.E. 113] 4. Because Remco did not manage the 559A unit, Gurkins was not one of Remco's tenants.

After the Harrises moved in, Gurkins began harassing the Harrises, including yelling racial slurs at them, threatening them, and repeatedly driving through the Harrises' front yard. See Compl. [D.E. 1] ¶¶ 26–42; [D.E. 114]. The Harrises also suspect Gurkins broke a light on their porch and damaged their cars. In response, the Harrises contacted Bishop and Remco multiple times, seeking help. See [D.E. 108-1] 86–90, 94–102. Bishop repeatedly advised the Harrises to call the police but otherwise did not intervene. See [D.E. 107-3] 11–12. The Harrises called the police, filed several

2

reports against Gurkins, filed criminal charges against him,[1] and sought and obtained a temporary restraining order. See [D.E. 108-1] 69–84, 92–93, 184–94, 199–202. At the same time, Gurkins complained to Vanderburg that the Harrises were creating disturbances at the duplex. See id. at 87, 135; Vanderburg Aff. [D.E. 96-2] ¶¶ 11–12. On September 26, 2017, at Vanderburg's urging, Remco initiated eviction proceedings against the Harrises because of the Harrises' supposed "failure to maintain a peaceful environment so as not to disturb other tenants' peaceful enjoyment of the Premises." [D.E. 99-3]. On October 10, 2017, the Pitt County District Court dismissed the eviction proceedings with prejudice. See [D.E. 99-4].

As the situation deteriorated, the Harrises attempted to terminate their lease. On October 18, 2017, the Harrises sent a letter to Remco asking for a refund of half the rent they had paid and early termination of the lease. See [D.E. 108-1] 145. Vanderburg refused, and Remco responded declining the Harrises' offer and stating the Harrises' lease would not be renewed. See id. at 147. On November 1, 2017, the Harrises, through counsel, renewed their request, asking instead for a full refund. See id. at 152–53. The same day, after consulting with Vanderburg, Remco responded that it would refund half the rent if the Harrises moved out by November 30, 2017. See id. at 156. The Harrises did not accept that offer. On December 29, 2017, the Harrises notified Remco that they would vacate the 559B unit within 30 days. See id. at 164–65. The Harrises moved out on January 29, 2018. See id. at 170–74. After the Harrises moved out, Remco refunded their $550 security deposit. See id. at 178–79.

---

[1] Based on the complaints the Harrises filed in state court, Gurkins was found guilty of communicating threats, trespassing, and stalking. See [D.E. 108-1] 140–41, 161–62. Gurkins is currently serving a federal sentence for criminal violations of the Fair Housing Act involving threats of force. See Judgment, United States v. Gurkins, No. 2:20-CR-31-BO (E.D.N.C. Nov. 23, 2020), [D.E. 28]. His harassment of the Harrises was not one of the counts of conviction, but the court considered it as relevant conduct at sentencing.

3

On August 9, 2019, the Harrises filed suit against Vanderburg, Gurkins, Remco, and Bishop, alleging claims under the Fair Housing Act and state law. See [D.E. 1, 33]. On March 15, 2021, Vanderburg, Remco, and Bishop moved for summary judgment. See [D.E. 94, 98]. The Harrises oppose the motions. See [D.E. 110, 112].

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot

4

create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

The Harrises allege that Vanderburg, Remco, and Bishop violated multiple sections of the Fair Housing Act—namely, 42 U.S.C. §§ 3604(a)–(c) and 3617. In seeking summary judgment, Vanderburg, Remco, and Bishop do not dispute that Gurkins racially harassed the Harrises. Instead, they focus on whether they violated the FHA or bear any civil liability under the FHA for Gurkins's conduct. Vanderburg, Remco, and Bishop argue they are not liable and are entitled to summary judgment on the Harrises' FHA claims either because the record does not demonstrate any violations of the Fair Housing Act under the provisions alleged or because Vanderburg, Remco, and Bishop are not directly or vicariously liable for Gurkins's conduct. The Harrises disagree.

"A plaintiff may establish a violation of the FHA either through direct evidence of discrimination," circumstantial evidence, or the McDonnell Douglas burden-shifting framework. Martin v. Brondum, 535 F. App'x 242, 244 (4th Cir. 2013) (per curiam) (unpublished); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Corey v. Secretary, U.S. Dep't. Hous. & Urb. Dev., 719 F.3d 322, 325 (4th Cir. 2013); Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1451 (4th Cir. 1990). Direct evidence includes "conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested [housing] decision." Martin, 535 F. App'x at 244 (quotation omitted); see Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013). As for their claims under section 3604(a)–(c), the Harrises do not rely on the McDonnell Douglas framework but instead make a disparate-treatment claim based on circumstantial evidence. See [D.E. 110] 21. In a disparate-treatment claim, "a plaintiff must establish that the defendant had a discriminatory intent or motive." Texas Dep't of Housing & Cmty.

5

Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 524 (2015) (quotation omitted); Ricci v. DeStefano, 557 U.S. 557, 577 (2009); Wadley v. Park at Landmark, LP, 264 F. App'x 279, 281 (4th Cir. 2008) (per curiam) (unpublished); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 986 (4th Cir. 1984). As for their claim under section 3617, the Harrises rely on the McDonnell Douglas framework. See [D.E. 110] 24–26; [D.E. 112] 19–22.

## A.

Initially, the court must determine whether Vanderburg, Remco, and Bishop bear any responsibility for Gurkins's conduct before examining whether any defendant's conduct violated the FHA. The Harrises contend that Vanderburg, Remco, and Bishop are either directly liable for failing to intervene to stop Gurkins's conduct or are vicariously liable for Gurkins's conduct. See [D.E. 110] 7–9; [D.E. 112] 7–9. Vanderburg, Remco, and Bishop disagree. See [D.E. 95] 17–18; [D.E. 100] 7–8.

The FHA creates a statutory tort action, and the FHA incorporates the "legal background of ordinary tort-related vicarious liability rules." Meyer v. Holley, 537 U.S. 280, 285 (2003). As for direct liability, the Department of Housing and Urban Development ("HUD") has promulgated regulations interpreting the FHA. These regulations took effect in October 2016, and the Fourth Circuit has not addressed them. The court assumes without deciding that these regulations are entitled to Chevron deference in FHA cases. See Brown v. Pfeiffer, No. 19-cv-3132 (WMW/KMM), 2020 WL 6146614, at *3 (D. Minn. Oct. 20, 2020) (unpublished); A.L.M. ex rel. Moore v. Bd. of Managers of Vireum Schoolhouse Condo., No. 17-cv-07385 (NSR), 2019 WL 3532178, at *7 n.7 (S.D.N.Y. Aug. 2, 2019) (unpublished), aff'd, 2021 WL 51211137 (2d Cir. 2021); see also Meyer, 537 U.S. at 287–88; Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 842–45 (1984); Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). No defendant has argued that the regulations

6

are not entitled to Chevron deference.[2] And "[t]he Supreme Court has nonetheless recognized that HUD's views about the meaning of the FHA are entitled to 'great weight.'" Bloch v. Frischholz, 587 F.3d 771, 781 (7th Cir. 2009) (en banc) (quoting Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 210 (1972)); Fair Hous. Ctr. of Central Ind., Inc. v. New, No. 1:20-cv-01176-TWP-DLP, 2021 WL 5988397, at *12 (S.D. Ind. Dec. 17, 2021) (unpublished).

One regulation makes a person directly liable for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct." 24 C.F.R. § 100.7(a)(1)(ii); cf. Restatement (Second) of Agency § 94 (Am. Law Inst. 1958); Restatement (Second) Torts § 284(b) (Am. Law Inst. 1965). HUD also interprets the FHA to make a person directly liable for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends on the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party." 24 C.F.R. § 100.7(a)(1)(iii). Section 100.7(a)(iii) extends the (a)(ii) liability to the acts of third parties in the context of quid pro quo or hostile environment harassment "if the housing provider has the power to correct the [third party's] discriminatory conduct." Brown, 2020 WL 6146614, at *3 (quotation omitted); cf. Neudecker v. Boisclair Corp., 351 F.3d 361, 364–65 (8th Cir. 2003); Henson v. City of Dundee, 682 F.2d 897, 910 (11th Cir. 1982).

---

[2] Vanderburg, Remco, and Bishop argue that no court has accepted section 100.7(a)(iii) wholesale. See [D.E. 95] 17–18; [D.E. 100] 7–8. However, that assertion is different than arguing that the HUD regulations are not entitled to Chevron deference.

"HUD's rule [in section 100.7(a)(iii)] mirrors the scope of employer liability under Title VII for employee-on-employee harassment." Wetzel v. Glen St. Andrew Living Cmty., 901 F.3d 856, 866 (7th Cir. 2018), cert. denied, 139 S. Ct. 1249 (2019). But even though Title VII and the FHA have similar "anti-discrimination objectives," Smith v. Town of Clarkton, 682 F.2d 1055, 1065 (4th Cir. 1982), "salient differences" exist between them. Wetzel, 901 F.3d at 866. The employer-employee relationship is different than the landlord-tenant relationship. The employer-employee relationship is a recognized agency relationship, but the landlord-tenant relationship is not. See, e.g., Midland Oil Co. v. Thigpen, 4 F.2d 85, 91 (8th Cir. 1924); Ohio Civ. Rights Comm. v. Akron Metro Hous. Auth., 119 Ohio St.3d 77, 81–82, 892 N.E.2d 415, 419–20 (2008). Landlords and tenants generally operate in an "arms-length relationship." Francis v. Kings Park Manor, Inc., 992 F.3d 67, 75 (2d Cir. 2021) (en banc). Thus, "landlords typically do not, and therefore cannot be presumed to, exercise the degree of control over tenants that would be necessary to impose liability under the FHA for tenant-on-tenant harassment." Id. at 70.

Under section 100.7(a)(iii), a person is liable to "the extent of person's control or other legal responsibility" for the third party's conduct. That phrase requires the defendant to have some relationship to the third party that empowers a defendant to stop the discriminatory conduct. For typical principal-agent relationships, this rule comports with "ordinary vicarious liability rules," Meyer, 537 U.S. at 287–88, given that ordinarily "there is a breach of the landlord's obligations if, during the period the tenant is entitled to possession of the leased property, the landlord, or someone whose conduct is attributable to him, interferes with a permissible use of the leased property by the tenant." Restatement (Second) of Property: Landlord & Tenant § 6.1 (Am. Law Inst. 1977) (emphasis added).

But section 100.7(a)(iii) purports to go farther, given that (a)(ii) already covers direct liability

8

for failure to act in typical agency relationships. Compare 24 C.F.R. § 100.7(a)(ii) with id. § 100.7(a)(iii). In light of the differences between the employer-employee and landlord-tenant relationships, while still giving "great weight" to HUD's regulation, liability for third-party conduct outside of a formal agency relationship exists only if the landlord has "substantial control over the context in which the harassment occurs and over the harasser." Francis, 992 F.3d at 75, 77 n.40; see, e.g., Wetzel, 901 F.3d at 860–65 (liability for tenant-on-tenant harassment when landlord had the ability to change tenants' dining room assignments, deny access to common areas listed in the lease, deny access to cleaning services, and ability to enter apartments without notice). In such a case, "[t]he typical powers of a landlord over a tenant—such as the power to evict"—does not suffice to establish a landlord's substantial control over the premises and the harasser. See Francis, 992 F.3d at 75. Stated differently, a mine-run landlord-tenant relationship will not suffice for liability under section 100.7(a)(iii).

As for vicarious liability, ordinary principles of vicarious liability apply under the FHA. See 24 C.F.R. § 100.7(b); Meyer, 537 U.S. at 287–88. "[T]raditional vicarious liability rules ordinarily make principals or employers vicariously liable for the acts of their agents or employees in the scope of their authority or employment." Meyer, 537 U.S. at 285 (quotation omitted); see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 756 (1998). Moreover, a principal may be liable "for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of." Meyer, 537 U.S. at 285–86 (quotation omitted); see R.R. Co. v. Hanning, 82 U.S. 649, 657 (1872); United States v. Pfeiffer, No. 20-cv-1974 (WMW/KMM), 2021 WL 2529948, at *6 (D. Minn. June 21, 2021) (unpublished). When a collective entity is involved, the FHA imposes liability on the collective entity but not on its officers or owners. See Meyer, 537 U.S. at 285–86; Wetzel, 901 F.3d at 864–65.

9

Remco and Bishop are not directly liable under section 100.7(a)(1)(ii) or vicariously liable for Gurkins's conduct. Gurkins did not work for Remco and was not otherwise Remco's agent. See [D.E. 99] ¶ 8; [D.E. 111] 4. And assuming Bishop as the broker in charge was one of Remco's officers, she is even further removed than Remco from any vicarious liability for Gurkins's conduct. See Meyer, 537 U.S. at 285–86; Wetzel, 901 F.3d at 864–65. Moreover, Remco and Bishop are not directly liable under section 100.7(a)(1)(iii) for Gurkins's conduct. Remco and Bishop did not manage the 559A unit for Vanderburg, and Gurkins was not Remco's tenant. See [D.E. 99] ¶¶ 5–7; [D.E. 111] 2–4. Thus, Remco and Bishop did not have the substantial control over Gurkins and the 559A unit necessary to establish liability under section 100.7(a)(1)(iii). Moreover, to the extent section 100.7(a)(1)(iii) primarily focuses on tenant-on-tenant harassment, Gurkins's racial harassment of the Harrises was not tenant-on-tenant harassment as to Remco and Bishop because Gurkins was not Remco's tenant. Furthermore, even if Remco and Bishop had terminated their relationship with Vanderburg and stopped managing the 559B unit, that would not have changed the Harrises' living situation and would not have prevented Gurkins's conduct.

As for Vanderburg, she is not directly liable under section 100.7(a)(1)(ii) or vicariously liable for Gurkins's conduct. Gurkins did not work for Vanderburg and nothing indicates Gurkins was otherwise Vanderburg's agent. See [D.E. 96] ¶¶ 41–43; [D.E. 114] 24–28.[3] However, Vanderburg may be directly liable for Gurkins's conduct under section 100.7(a)(1)(iii). Vanderburg managed the 559A unit herself and allowed Gurkins to live there without a lease and essentially rent free. See

---

[3] Although Gurkins may have occasionally contacted Remco about Vanderburg's properties, Gurkins never had authority to act on Vanderburg's behalf. Vanderburg always required Remco to seek her approval. See Bradley Depo. [D.E. 107-5] 8. Moreover, Gurkins did not contact Remco directly about the Harrises. Gurkins made complaints to Vanderburg, who in turn contacted Remco. See, e.g., [D.E. 96] ¶¶ 15–16; Bishop Depo. [D.E. 107-2] 9.

Vanderburg Depo. [D.E. 107-1] 12–13. At most, Gurkins was a tenant at will. See, e.g., Kent v. Humphries, 303 N.C. 675, 678–79, 281 S.E.2d 43, 45–46 (1981); Restatement (Second) Property: Landlord & Tenant § 1.6. Moreover, Vanderburg had substantial control over Gurkins as a tenant. She testified that if she had told Gurkins to move out of 559A and to move in with her or move somewhere else, Gurkins likely would have obeyed her directive. See Vanderburg Depo. [D.E. 107-1] 26.

Whether Vanderburg is entitled to summary judgment depends on whether she knew or should have known of Gurkins's racial harassment. The Harrises never directly told Vanderburg about Gurkins's racial harassment. See Vanderburg Aff. ¶¶ 15–20; P. Harris Depo. [D.E. 107-8] 29–30; W. Harris Depo. [D.E. 107-9] 17. And Vanderburg claims that Remco and Bishop never told her about Gurkins using racial slurs. See Vanderburg Aff. ¶ 21. Even if Remco and Bishop did not tell Vanderburg, their knowledge as Vanderburg's agents may be imputed to Vanderburg. See Restatement (Second) Agency §§ 275–77. However, Bishop maintains that the Harrises never told her about Gurkins using racial slurs. See Bishop Depo. [D.E. 107-3] 15. The Harrises say that they told Bishop and other Remco employees about Gurkins's racial harassment. See, e.g., P. Harris Decl. [D.E. 107-22] ¶ 14. Accordingly, a genuine issue of material fact exists concerning who knew what, and when, for purposes of determining whether Vanderburg knew or should have known (or is presumed to have known if Remco and Bishop's knowledge is imputed to her) about Gurkins's racial harassment.

## B.

Vanderburg, Remco, and Bishop first argue they are entitled to summary judgment on the Harrises' claim that Vanderburg, Remco, and Bishop violated section 3604(a) of the FHA. See [D.E. 95] 12–13; [D.E. 100] 10–13. Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the

11

making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of" that persons's protected characteristic, such as race. 42 U.S.C. § 3604(a). The provision "does not reach every event that might conceivably affect the availability of housing." Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 192 (4th Cir. 1999) (quotation omitted). Instead, the statute "ensure[s] that no one is denied the right to live where they choose for discriminatory reasons." Id. (quotation omitted); see Southend Neighborhood Improvement Ass'n v. Cnty. of St. Clair, 743 F.2d 1207, 1210 (7th Cir. 1984).

To demonstrate a section 3604(a) claim, a plaintiff must show (1) that the defendant "denied or made housing unavailable to" the plaintiff, and (2) that the defendant's actions were based on the plaintiff's protected characteristic. Edwards v. Johnston Cnty. Health Dep't, 885 F.2d 1215, 1221 (4th Cir. 1989). A defendant denies or makes housing unavailable when the defendant "refuse[s] to sell or rent" or "refuse[s] to negotiate for the sale or rental" of housing because of the plaintiff's race. 42 U.S.C. § 3604(a). A defendant also makes housing unavailable through discriminatory practices such as "mortgage 'redlining,' insurance redlining, racial steering, exclusionary zoning decisions, and other actions . . . which directly affect the availability of housing to minorities." Southend Neighborhood, 743 F.2d at 1209; see Bloch, 587 F.3d at 777. A defendant also makes housing unavailable by imposing "burdensome application procedures," employing delay tactics, and using other "various forms of discouragement." Corey, 719 F.3d at 326 (quotation omitted); see Williams v. Matthews Co., 499 F.2d 819, 825–26 (8th Cir. 1974); United States v. Youritan Constr. Co., 370 F. Supp. 643, 648 (N.D. Cal. 1973), aff'd in relevant part, 509 F.2d 623 (9th Cir. 1975).

Section 3604(a) generally prohibits pre-sale or pre-rental racially discriminatory conduct that inhibits a person's access to housing. See Cox v. City of Dallas, 430 F.3d 734, 741–43 (5th Cir.

12

2005); Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n (Halprin II), 388 F.3d 327, 329 (7th Cir. 2004) ("The Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but access to housing."), modified, Bloch, 587 F.3d at 776–77; Jersey Heights, 174 F.3d at 192 (noting the challenged action was too remote to the housing interests the FHA protects in part because the plaintiff did "not allege that anyone has for discriminatory reasons been evicted from his home or denied the right to purchase or rent housing"); Soules v. U.S. Dep't Hous. & Urb. Dev., 967 F.2d 817, 822 (2d Cir. 1992) (noting section 3604(a) relates to "discriminatory housing refusal"); Heights Cmty. Congress v. Hilltop Realty, Inc., 774 F.2d 135, 140 (6th Cir. 1985) ("[T]o violate § 3604(a), one looks to whether the statement or conduct would have an untoward effect on a reasonable person seeking housing, and behind the statement or conduct to the intent of the agent." (emphasis added)); Tigress Sydney Acute McDaniel v. VTT Mgmt, Inc., No. 3:16-cv-00826-RJC-DSC, 2018 WL 4494985, at *3 (W.D.N.C. Sept. 18, 2018) (unpublished), aff'd, 748 F. App'x 563 (4th Cir. 2019) (per curiam) (unpublished); Johns v. Stillwell, No. 3:07-CV-00063, 2009 WL 1408517, at *4 (W.D. Va. May 20, 2009) (unpublished).

The prima facie case required under the McDonnell Douglas framework bolsters this conclusion about section 3604(a). Under the McDonnell Douglas framework, plaintiffs "must show that: (1) they belong to a protected class, (2) they sought and were qualified for a dwelling, (3) they were denied the opportunity to buy [or rent] the dwelling, and (4) the dwelling remained available." Martin, 535 F. App'x at 244; cf. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004). By requiring plaintiffs to show they were denied the opportunity to buy or rent housing, the prima facie case to demonstrate a claim under section 3604(a) presupposes the statutory focus on the sale or rental of a dwelling, not conduct beyond the point of acquisition.

However, in a narrow class of cases, section 3604(a) also may reach discriminatory conduct

13

that results in something analogous to constructive eviction. See Bloch, 587 F.3d at 776–79; Halprin, 388 F.3d at 329; see also 24 C.F.R. § 100.60(b)(7) (interpreting section 3604(a) to prohibit "[s]ubjecting a person to harassment because of race . . . that causes the person to vacate a dwelling or abandon efforts to secure the dwelling"). Generally, a constructive eviction occurs when a landlord breaches the lease and thereby "deprives his tenant of that beneficial enjoyment of the premises to which he is entitled under his lease, causing the tenant to abandon them." Brennan Station 1671, LP v. Borovsky, 262 N.C. App. 1, 11, 821 S.E.2d 640, 647 (2018) (quotation omitted); see Bloch, 587 F.3d at 777; Marina Food Assocs., Inc. v. Marina Rest., Inc., 100 N.C. App. 82, 92, 394 S.E.2d 824, 830 (1990). To demonstrate a constructive eviction claim, the tenant must show that he "abandoned the premises within a reasonable time after the landlord's wrongful act." Gardner v. Ebenezer, LLC, 190 N.C. App. 432, 436, 660 S.E.2d 172, 175 (2008) (quotation omitted); see Bloch, 587 F.3d at 778; K & S Enters. v. Kennedy Office Supply Co., 135 N.C. App. 260, 266–67, 520 S.E.2d 122, 126 (1999), aff'd, 351 N.C. 470, 527 S.E.2d 644 (2000) (per curiam). The landlord's actions must have made the plaintiff's dwelling "truly unavailable." Radcliffe v. Avenel Homeowners Ass'n, Inc., No. 7:07-CV-48-F, 2013 WL 556380, at *5 (E.D.N.C. Feb. 12, 2013) (unpublished). Thus, conduct that makes a dwelling truly unavailable, in a manner analogous to constructive eviction, may demonstrate a violation of section 3604(a).

Bishop and Remco rented the 559B unit to the Harrises on behalf of Vanderburg. Moreover, neither Vanderburg, Remco, or Bishop prevented the Harrises from moving in. See [D.E. 99] ¶ 4; [D.E. 99-2]; [D.E. 113] 4. Thus, no defendant refused to rent to the Harrises and no defendant refused to negotiate a rental with the Harrises. Furthermore, nothing about the Harrises' negotiations with Bishop and Remco and the process of initially leasing the 559B unit indicates Vanderburg, Remco, or Bishop had discriminatory intent toward the Harrises. See Inclusive Cmtys., 576 U.S.

14

at 524; Betsey, 736 F.2d at 986.

As for whether Remco and Bishop made the 559B unit "truly unavailable" in a manner analogous to a constructive eviction, they did not.[4] Indeed, the Harrises continued living in the 559B unit until the end of January 2018. See [D.E. 99-9]; [D.E. 108-1] 170–74. Moreover, Gurkins, not Remco or Bishop, committed the offending racially discriminatory conduct that forced the Harrises ultimately to vacate the 559B unit. And, as explained, Remco and Bishop are not directly or vicariously liable for Gurkins's racially discriminatory behavior. Thus, the court grants Remco and Bishop summary judgment on that claim.

As for Vanderburg, she was not involved in initially renting the 559B unit to the Harrises; therefore, she did not refuse to rent or sell or refuse to negotiate the sale or rental of that unit to the Harrises. See [D.E. 96] ¶¶ 6–9; [D.E. 113] 3. However, as explained, a genuine issue of material fact exists concerning whether Vanderburg is liable for Gurkins's misconduct. Viewing the evidence in the light most favorable to the Harrises, Gurkins racially harassed the Harrises, and the Harrises vacated the premises because of that racial harassment. However, the Harrises waited months to vacate the premises, even after Vanderburg agreed to pay back half the rent to the Harrises if they moved out by November 30, 2017. See Gardner, 190 N.C. App. at 436, 660 S.E.2d at 175. Instead of taking that offer, the Harrises did not notify Remco of their intent to vacate until December 29, 2017, and did not move out until the end of January 2018. Whether that delay was unreasonable is an issue of fact for the jury. See McNamara v. Wilmington Mall Realty Corp., 121 N.C. App. 400, 405–06, 466 S.E.2d 324, 328 (1996). Genuine issues of material fact exist concerning Vanderburg's knowledge of Gurkins's racial harassment and whether the Harrises unreasonably delayed in

---

[4] The court considers separately whether Remco and Bishop's attempt to evict the Harrises violated section 3617.

15

vacating the premises. Accordingly, the court denies Vanderburg's motion for summary judgment concerning the Harrises' claim under section 3604(a).

## C.

Vanderburg, Remco, and Bishop seek summary judgment on the Harrises' claims under section 3604(b). See [D.E. 95] 14–18; [D.E. 100] 6–13. Section 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic, including race. 42 U.S.C. § 3604(b). By its plain language, section 3604(b) is broader than section 3604(a). Section 3604(b) prohibits including terms or conditions related to the sale or dwelling of housing that result in race discrimination. See, e.g., Cox, 430 F.3d at 745; Woods-Drake v. Lundy, 667 F.2d 1198, 1201–02 (5th Cir. 1982). Thus, even if a defendant did not outright refuse the sale or rental of a dwelling (or outright refuse to negotiate the same) under section 3604(a), a person can still violate the FHA by imposing discriminatory terms or conditions on the sale or rental. The phrase "provision of services or facilities" includes "such things as garbage collection and other services of the kind usually provided by municipalities." Mackey v. Nationwide Ins. Cos., 724 F.2d 419, 424 (4th Cir. 1984), superseded by regulation on other grounds. The phrase also includes maintenance or repairs delayed or foregone on account of the tenant's protected characteristic. See Nat'l Fair Housing All. v. Bank of Am., N.A., 401 F. Supp. 3d 619, 639 (D. Md. 2019) (citing 24 C.F.R. § 100.65(a)–(b)(2)). Moreover, liability under section 3604(b) also may arise from constructive eviction, which effectively denies a tenant the privileges of the rental (i.e., the privilege of inhabiting the rented dwelling). See Bloch, 587 F.3d at 779.

A person can bring a hostile housing environment claim under section 3604(b). To demonstrate a hostile housing environment claim, a plaintiff must show: "(1) she endured

16

unwelcome harassment based on a protected characteristic; (2) the harassment was severe or pervasive enough to interfere with the terms, conditions, or privileges of her residency, or in the provision of services or facilities; and (3) that there is a basis for imputing liability to the defendant." Wetzel, 901 F.3d at 861–62; cf. Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (articulating the Title VII hostile work environment standard); Honce v. Vigil, 1 F.3d 1085, 1090 (10th Cir. 1993) (applying hostile work environment analysis to hostile housing environment claim); Town of Clarkton, 682 F.2d at 1065 (noting that Title VII and Title VIII have similar "anti-discrimination objectives"); Childress v. Roberts, No. 7:17-2529-HMH, 2019 WL 6723823, at *3 (D.S.C. Dec. 11, 2019) (unpublished); Fahnbulleh v. GFZ Realty, LLC, 795 F. Supp. 2d 360, 363 (D. Md. July 7, 2011); Williams v. Poretsky Mgmt., Inc., 955 F. Supp. 490, 495–96 (D. Md. 1996).

The Harrises' lease did not include discriminatory terms or conditions. See [D.E. 99-2]. Moreover, the Harrises were not denied services, maintenance, or repairs because of their race. See [D.E. 108-1] 255–59 (showing completed work orders for the 559B unit). And, as discussed, even viewing the evidence in the light most favorable to the Harrises, Remco and Bishop bear no responsibility for the constructive eviction Gurkins caused, but genuine issues of material fact exist concerning whether Vanderburg bears any responsibility.

As for a hostile housing environment claim, viewing the evidence in the light most favorable to the Harrises, the Harrises suffered pervasive, unwelcome, racial harassment that interfered with the privileges of their rental. However, because Remco and Bishop are not liable for Gurkins's racial harassment, there is no basis for imputing liability to them for the alleged hostile housing environment. See Wetzel, 901 F.3d at 861–62. However, as discussed, genuine issues of material fact exist concerning whether to impute liability to Vanderburg for Gurkins's racial harassment.

17

Accordingly, the court grants summary judgment to Remco and Bishop and denies summary judgment to Vanderburg on the Harrises' section 3604(b) claim.

### D.

Vanderburg, Remco, and Harris seek summary judgment on the Harrises' claim under section 3604(c). See [D.E. 95] 12–13; [D.E. 100] 6–13. Section 3604(c) makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference limitation, or discrimination." 42 U.S.C. § 3604(c). Section 3604(c) prohibits "oral or written statements with respect to the rental of a dwelling that indicate a 'preference, limitation, or discrimination' based on certain protected statuses, including" race. Corey, 719 F.3d at 326. To establish liability, a plaintiff must show that (1) the defendant made a statement; (2) the defendant's statement concerned the sale or rental of a dwelling; and (3) the defendant's statement indicated a preference, limitation, or discrimination on the basis of race. See id.; White v. HUD, 475 F.3d 898, 904 (7th Cir. 2007). To determine whether a statement indicates a preference, limitation, or discrimination on the basis of race, a court uses an "ordinary reader" or "ordinary listener" standard. See Corey, 719 F.3d at 326; White, 475 F.3d at 905–06; United States v. Hunter, 459 F.2d 205, 215 (4th Cir. 1972); United States v. Cochran, 39 F. Supp. 3d 719, 737 (E.D.N.C. 2014). Evidence of a speaker's subjective motivation for the statement is unnecessary. See Corey, 719 F.3d at 326; Jancik v. HUD, 44 F.3d 553, 556 (7th Cir. 1995).

The Harrises have not presented evidence that Vanderburg, Remco, or Bishop made any oral or written discriminatory statement that indicated a racial preference concerning who could rent the 559B unit. As for Vanderburg, the Harrises never spoke directly to Vanderburg about renting the

18

559B unit but rather communicated directly with Remco. See P. Harris Depo. [D.E. 107-8] 29–30; W. Harris Depo. [D.E. 107-9] 16–17. As for Remco and Bishop, no Remco employee said anything to the Harrises indicating that there was a racial preference concerning who could rent the 559B unit. See, e.g., [D.E. 111] 10. Moreover, to the extent Vanderburg is liable for Gurkins's racial harassment, Gurkins's racial harassment does not concern limitations or preferences related to the sale or rental of a dwelling. Indeed, Gurkins never spoke to the Harrises until after the Harrises had moved in to the 559B unit. See 24 C.F.R. § 100.75(b) ("The prohibitions [in section 3604(c)] shall apply to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling."). Thus, the court grants Vanderburg, Remco, and Bishop's motions for summary judgment on the Harrises' claim under section 3604(c).

### E.

Vanderburg, Remco, and Bishop seek summary judgment on the Harrises' claim under section 3617 of the FHA. See [D.E. 95] 14–19; [D.E. 100] 8–13. Section 3617 provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. A plaintiff need not show a violation of sections 3603 through 3606 to show a violation of section 3617. See Revock v. Cowpet Bay W. Condominium Ass'n, 853 F.3d 96, 112 (3d Cir. 2017); Linkletter v. W. & S. Fin. Grp., Inc., 851 F.3d 632, 639 (6th Cir. 2017) ("Section 3617 requires a nexus with the rights protected by §§ 3603–06, without requiring an actual violation of the underlying provisions."); Bloch, 587 F.3d at 781–82; Smith v. Stechel, 510 F.2d 1162, 1164 (9th Cir. 1975). And "[a] claim may arise before or, as here, after a plaintiff acquires housing." Revock, 853 F.3d at 112; see Bloch, 587 F.3d at 782.

19

To demonstrate a retaliation claim, a plaintiff must show "that (1) she was engaged in protected activity; (2) [the defendant] was aware of that activity; (3) [the defendant] took adverse action against her; and (4) a causal connection existed between the protected activity and the asserted adverse action." Hall v. Greystar Mgmt. Srvs., L.P., 637 F. App'x 93, 97–98 (4th Cir. 2016) (unpublished); see Bryant v. City of Norfolk, No. 2:20CV26 (RCY), 2021 WL 765405, at *3 (E.D. Va. Feb. 26, 2021) (unpublished). Claims under "section 3617 are based, at least in part, on an intent to discriminate." Morgan v. Brittany Woods Homeowner's Ass'n, No. 5:18-CV-291-D, 2019 WL 2114255, at *5 (E.D.N.C. May 14, 2019) (unpublished) (quotation omitted); see Linkletter, 851 F.3d at 639; Austin v. Town of Farmington, 826 F.3d 622, 630 (2d Cir. 2016); Sofarelli v. Pinellas Cnty., 931 F.2d 718, 722–23 (11th Cir. 1991); Davis v. Raleigh Hous. Auth., No. 5:09-CV-522-F, 2011 WL 832330, at *4 (E.D.N.C. Jan. 27, 2011) (unpublished), report and recommendation adopted, 2011 WL 830557 (E.D.N.C. Mar. 3, 2011) (unpublished). Moreover, the "[r]etaliatory conduct, by its very nature, must come after the protected activity." Hall, 637 F. App'x at 98; see Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998), abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006).

The court denies Vanderburg, Remco, and Bishop's motions for summary judgment. As discussed, genuine issues of material fact exist concerning what the Harrises reported to Bishop and Remco, what Bishop and Remco reported to Vanderburg, and who knew what and when. Moreover, during the time period when Gurkins was racially harassing the Harrises, Vanderburg, Remco, and Bishop attempted to evict the Harrises and told the Harrises they could not renew their lease. See [D.E. 99-3, 99-4]; [D.E. 108-1] 147. The temporal relationship between the eviction, the notice that the Harrises could not renew their lease, Gurkins's racial harassment, and the Harrises' complaints

to Remco creates a jury question. See Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015).

In opposition, Vanderburg, Remco, and Bishop argue they had a nondiscriminatory reason to evict the Harrises—namely, that Gurkins had complained to Vanderburg (and Vanderburg then to Remco and Bishop) that the Harrises were causing disturbances at the duplex. See, e.g., [D.E. 100] 12. The Harrises respond that evicting tenants was unusual for Remco and that Remco did not follow its usual eviction procedures when it evicted the Harrises. See [D.E. 110] 25–26. A jury question exists concerning Vanderburg, Remco, and Bishop's reasons for evicting the Harrises and not renewing their lease. Thus, the court denies Vanderburg, Remco, and Bishop's motions for summary judgment on the Harrises' section 3617 claim.

### III.

The court next addresses the Harrises' state law claims. Vanderburg, Remco, and Bishop ask the court not to exercise supplemental jurisdiction over these claims. See [D.E. 95] 19–20; [D.E. 100] 13. Because the claims arise from the same nucleus of operative fact and because the court is not granting summary judgment on all of the Harrises' federal law claims, the court will continue to exercise supplemental jurisdiction over these claims. See, e.g., 28 U.S.C. § 1367; Carnegie-Melon Univ. v. Cohill, 484 U.S. 343, 349 (1988); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966); ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 394 (4th Cir. 2012); Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995). Vanderburg, Remco, and Bishop also argue they are entitled to summary judgment on the merits of the state-law claims. See [D.E. 95] 20–29; [D.E. 100] 13–16. The court considers each claim in turn.

## A.

As for the Harrises' claim for breach of the covenant of quiet enjoyment, see Am. Compl. ¶¶ 78–79, the court grants summary judgment. Under North Carolina law, leases contain an implied covenant of quiet enjoyment. See N.C. Indian Cultural Ctr., Inc. v. Sanders, 266 N.C. App. 62, 68, 830 S.E.2d 675, 681 (2019); Charlotte Eastland Mall, LLC v. Sole Survivor, Inc., 166 N.C. App. 659, 663, 608 S.E.2d 70, 73 (2004); K & S Enters., 135 N.C. App. at 267, 520 S.E.2d at 126–27. "[I]t is long-settled that the covenant of quiet enjoyment does not extend to the acts of trespassers and wrongdoers." N.C. Indian Cultural Ctr., 266 N.C. App. at 70, 830 S.E.2d at 682 (cleaned up); see Huggins v. Waters, 167 N.C. 197, 198, 83 S.E. 334, 334 (1914); Charlotte Eastland Mall, 166 N.C. App. at 663, 608 S.E.2d at 73. Thus, for a breach of the covenant of quiet enjoyment, a court focuses on the landlord's conduct, not on the conduct of a wrongdoer like Gurkins. But outside of Gurkins's racial harassment, the Harrises have not cited conduct by Vanderburg, Remco, and Bishop that breached the covenant of quiet enjoyment. See [D.E. 110] 26–28; [D.E. 112] 22–24. Thus, the court grants summary judgment on this claim.

## B.

As for the Harrises' wrongful eviction claim under N.C. Gen. Stat. § 42-42.2, see Am. Compl. ¶¶ 80–86, the court grants summary judgment. Under N.C. Gen. Stat. § 42-42.2, in relevant part, a landlord may not evict a tenant or refuse to renew a lease based on the tenant's "status as a victim of domestic violence, sexual assault, or stalking." N.C. Gen. Stat. § 42-42.2(i). To put a landlord on notice of a tenant's protected status, a tenant may provide to the landlord, among other things, "[l]aw enforcement, court, or federal agency records or files." Id. § 42-42.2(1).

On November 14, 2017, the Harrises filed stalking charges against Gurkins. See Am. Compl. ¶ 49; [D.E. 108-1] 191–94. But by then, the eviction proceedings against the Harrises had already

22

been initiated and dismissed with prejudice. See [D.E. 99-3, 99-4]. Moreover, Vanderburg, Remco, and Bishop already had told the Harrises they would not renew the lease. See [D.E. 108-1] 147. Finally, the Harrises never provided any police records or files to Vanderburg, Remco, or Bishop. See [D.E. 96] ¶ 37; [D.E. 99] ¶ 17; [D.E. 111] 12; [D.E. 113] 23. Thus, Vanderburg, Remco, and Bishop could not have attempted to evict the Harrises based on the stalking charges against Gurkins or because of police records or files related to stalking. Accordingly, the court grants summary judgment on this claim.

## C.

As for the Harrises claims that Vanderburg, Remco, and Bishop maintained unsafe premises in violation of N.C. Gen. Stat. § 42-42(a)(3) and were negligent for failing to maintain the premises at the 559B unit, see Am. Compl. ¶¶ 87–96, the court grants summary judgment. The duty of a landlord to maintain safe premises under this statute focuses on a landlord's duty to keep the physical property in good repair. See, e.g., Poursaied v. Summermill at Falls River-Banner Apartment Buildings, No. 5:17-CV-115-D, 2018 WL 1311997, at *7 (E.D.N.C. Feb. 14, 2018) (unpublished), report and recommendation adopted, 2018 WL 1129971 (E.D.N.C. Mar. 1, 2018) (unpublished); Lenz v. Ridgewood Assocs., 55 N.C. App. 115, 117–20, 284 S.E.2d 702, 703–05 (1981); Mansfield v. Real Estate Plus, Inc., 244 N.C. App. 344, 780 S.E.2d 890, 2015 WL 7729227, at *1–3 (2015) (unpublished table decision); Baker v. Duhan, 75 N.C. App. 191, 192–94, 330 S.E.2d 53, 54–55 (1985); O'Neal v. Kellett, 55 N.C. App. 225, 226–28, 284 S.E.2d 707, 709–10 (1981). The relevant statutory provisions focus on, inter alia, building and housing codes, keeping premises in a habitable condition, maintaining electrical, plumbing, and HVAC systems, and providing smoke alarms. See N.C. Gen. Stat. § 42-42. This case does not involve the physical conditions of the 559 Huntingridge Road duplex. Accordingly, the court grants summary judgment on this claim. And because the

23

Harrises' negligence claim, see Am. Compl. ¶¶ 91–96, relies solely on the alleged breach of a duty to maintain safe premises, the court grants defendants summary judgment on that claim also.

## D.

As for the Harrises' claims for trespass, assault, and invasion of privacy, see Am. Compl. ¶¶ 97–106, the court denies summary judgment. Under North Carolina law, a business owner may be liable for the reasonably foreseeable "accidental, negligent, or intentionally harmful acts of third persons" toward the owners' invitees. Foster v. Winston-Salem Joint Venture, 303 N.C. 636, 638, 281 S.E.2d 36, 38 (1981). An owner may similarly be liable for injuries caused by reasonably foreseeable, intentional, criminal acts committed by third persons. See id. at 638–40, 281 S.E.2d at 38–39; Davenport v. D.M. Rental Props., Inc., 217 N.C. App. 133, 135–36, 718 S.E.2d 188, 189–90 (2011). The conduct of third persons is reasonably foreseeable if the owner "know[s] or ha[s] reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor." Foster, 303 N.C. at 639–40, 281 S.E.2d at 38 (quotation omitted); see Stricklin v. Stefani, 358 F. Supp. 3d 516, 531–32 (W.D.N.C. 2018). In a landlord-tenant relationship, "[a] tenant is normally seen as an invitee." Shepard v. Drucker & Falk, 63 N.C. App. 667, 669, 306 S.E.2d 199, 201 (1983); see Davenport, 217 N.C. App. at 135, 718 S.E.2d at 190.

The Harrises, as tenants, were the invitees of Vanderburg, Remco, and Bishop. And based on Gurkins's mistreatment of the Harrises, Gurkins sustained convictions for communicating threats, trespassing, and stalking. Moreover, Vanderburg, Remco, and Bishop do not contest that Gurkins trespassed on the Harrises' rental property, assaulted Mrs. Harris, and invaded the Harrises' privacy. They argue only that summary judgment is warranted because they are not accountable for Gurkins's conduct. See [D.E. 95] 28; [D.E. 100] 15. Under North Carolina law, however, defendants may be

24

liable for Gurkins's assault, trespass, and invasion of privacy if the conduct was reasonably foreseeable. Moreover, Gurkins has a history of harassing and committing crimes against tenants renting Vanderburg's properties. See [D.E. 108-1] 278–319. Viewing the evidence in the light most favorable to plaintiffs, the court denies summary judgment on these claims.

E.

As for the Harrises' unfair and deceptive trade practices claim under N.C. Gen. Stat. §§ 75-1.1 et seq., see Am. Compl. ¶¶ 107–113, defendants concede that the unfair and deceptive trade practices claim "is contingent upon [the Harrises'] ability to maintain a viable FHA claim." [D.E. 100] 15; see [D.E. 95] 29. Because the court denies summary judgment on some of the Harrises' FHA claims, the court denies summary judgment on the Harrises' unfair and deceptive trade practices claim. See Johnson v. York Simpson Underwood, LLC, No. 1:03CV01141, 2005 WL 1378848, at *9–10 (M.D.N.C. June 9, 2005) (unpublished).

IV.

In sum, the court DENIES IN PART Vanderburg's motion for summary judgment as to the claims under section 3604(a), section 3604(b), section 3617, and the Harrises' trespass, assault, invasion of privacy, and unfair and deceptive trade practices claims [D.E. 94]. The court GRANTS IN PART Vanderburg's motion for summary judgment as to the section 3604(c) claim and the remaining state law claims [D.E. 94]. The court DENIES IN PART Remco and Bishop's motion for summary judgment on the section 3617 claim and the Harries's trespass, assault, invasion of privacy, and unfair and deceptive trade practices claims [D.E. 98]. The court GRANTS IN PART Remco and Bishop's motion for summary judgment on the FHA claims under section 3604(a), section 3604(b), and section 3604(c), as well as the remaining state law claims [D.E. 98]. The court DENIES as moot the Harrises' motion for leave to file a combined surreply [D.E. 126]. Nothing in

25

this order resolves any of the claims pending against Gurkins, who was not a party to the motions for summary judgment.

The parties SHALL participate in a court-hosted settlement conference with Magistrate Judge Gates. If the case does not settle, the parties will propose trial dates.

SO ORDERED. This 10 day of February, 2022.

J. Dever
JAMES C. DEVER III
United States District Judge