IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO.: 4:19-CV-00111-D

| | |
|---|---|
| **WILLIAM HARRIS** *and* **PHYLLIS HARRIS,**<br><br>　　　　　　　*Plaintiffs,*<br><br>　　v.<br><br>**MICHAEL V. GURKINS, IN HIS CAPACITY AS EXECUTOR OF THE ESTATE OF MARY JANE VANDERBURG, DOUGLAS MATTHEW GURKINS, REMCO EAST, INC.,** *and* **MARY GRACE BISHOP,**<br><br>　　　　　　　*Defendants.* | **CONSENT DECREE AND FINAL ORDER AS TO DEFENDANT MICHAEL V. GURKINS, IN HIS CAPACITY AS EXECUTOR OF THE ESTATE OF MARY JANE VANDERBURG ONLY** |

## I. INTRODUCTION

1.　　On August 9, 2019, Plaintiffs William and Phyllis Harris, an elderly

Black American couple, filed a complaint to recover injunctive and monetary relief

under the federal Fair Housing Act, 42 U.S.C. § 3604 et seq. (FHA) and associated

state law claims for race harassment and discrimination.[1] The complaint alleged that

the defendants engaged in illegal discriminatory housing practices on the basis of

race and/or color.

---

[1] This complaint was amended on October 24, 2019. (D.E. 33.).

1

2.   In 2017, William and Phyllis Harris leased and occupied the dwelling located at 559B Huntingridge Road, Greenville, North Carolina ("Huntingridge Duplex").   The dwelling was part of a duplex owned by Mary Jane Vanderburg ("Vanderburg"), who had hired defendant Remco East, Inc., a licensed real estate company, to manage the dwelling on her behalf.   Defendant Mary Grace Bishop ("Bishop") was the licensed broker in charge of Remco. Defendant Douglas Matthew Gurkins, Vanderburg's nephew, occupied Unit 559A at the Huntingridge Duplex.

3.   William and Phyllis Harris allege that during their tenancy at the Huntingridge Duplex defendant Douglas Matthew Gurkins engaged in racial discrimination and harassment against them, including threats, assaults, and trespass; that William and Phyllis Harris reported Douglas Matthew Gurkins's unlawful misconduct to the Pitt County Sheriff's Department, Remco and Bishop; that Remco and Bishop reported Douglas Matthew Gurkins's unlawful misconduct to Vanderburg; that Remco, Bishop and Vanderburg failed or refused to take any corrective action to stop Douglas Matthew Gurkins's discrimination and harassment of William and Phyllis Harris; and that instead, Remco, Bishop and Vanderburg retaliated against William and Phyllis Harris by attempting to evict them from their dwelling and terminating their tenancy.   Based on these allegations, William and Phyllis Harris claim that defendants, and each of them, violated the federal Fair

2

Housing Act and related supplemental state laws. Each defendant answered the complaint denying any liability to William and Phyllis Harris.

4. Following the death of Vanderburg in 2022, the Court substituted Michael V. Gurkin's, the Executor of Vanderburg's Estate, as a defendant in his capacity as the estate's executor. Under Vanderburg's will, her rental dwellings are to be distributed in accordance with the Second Amended and Restated Mary Jane Vanderburg Living Trust. This Consent Decree concerns the operation and management of the rental dwellings held in that trust (hereinafter the "Vanderburg Trust Dwellings").

5. To avoid protracted, costly litigation, plaintiffs William and Phyllis Harris and defendant Michael V. Gurkins, Executor of Vanderburg's Estate, consent to entry of Decree. Michael V. Gurkins's consent to entry of this Decree shall not be construed as an admission of liability.

**ACCORDINGLY, it is hereby ADJUDGED, ORDERED AND DECREED:**

## II.     SCOPE OF THE CONSENT DECREE

6. The provisions of this Consent Decree shall apply to Michael V. Gurkins, in his capacity as Executor of the Estate of Mary Jane Vanderburg and his agents, employees, successors or assigns, and to the Vanderburg Trust Dwellings.

7. This Consent Decree is effective immediately upon its entry by the Court. For purposes of this Consent Decree, the phrases "date of the Consent

3

Decree" and "effective date" shall refer to the date on which the Court enters the Consent Decree.

## III.    GENERAL INJUNCTION

8.    Defendant Michael V. Gurkins, his agents, employees, successors and assigns are enjoined in connection with the ownership or operation of any Vanderburg Trust Dwellings from:

    a. Otherwise make unavailable or deny a dwelling to any person because of race, color or national origin;

    b. Discriminating against any person in the terms, conditions or privileges of renting a dwelling unit, or in the provision of services or facilities in connection therewith, because of r race, color or national origin;

    c. Making, printing, publishing, or causing to be made any notice, statement or advertisement with respect to the rental of a dwelling unit that states any preference, limitation or discrimination based on race, color or national origin;

    d. Coercing, intimidating, threatening or interfering with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided and encouraged any other person in the exercise or enjoyment of, any right granted by the FHA;

4

e. Allowing Douglas Matthew Gurkins to have any responsibility or control in connection with the rental of any Vanderburg Trust Dwellings, including entry on their premises or any connection with the occupants of those dwellings unless expressly invited; and

f. Allowing Douglas Matthew Gurkins to own, occupy, manage or operate any Vanderburg Trust Dwellings located on Huntingridge Road in Greenville, NC. The term "occupy" means to live in or reside in a dwelling of the Vanderburg Trust Dwellings located on the aforementioned Huntingridge Road and shall not include any short-term visit to any individuals who occupy any such dwelling located on Huntingridge Road and who expressly invited Douglas Matthew Gurkins to visit for this short period of time.

9. If any of the Vanderburg Trust Dwellings are currently rented, then Michael V. Gurkins, directly or through his agents or employees, shall:

a. Within 30 days of entry of this Consent Decree, provide each agent or employee with a copy of this Consent Decree (including ATTACHMENT A AND ATTACHMENT A EXHIBIT 1) and obtain their certification that the agent or employee has read and understood its requirements, see ATTACHMENT B to this Consent Decree;

5

b. Within 30 days of entry of this Consent Decree, provide each household renting one of the Vanderburg Trust Dwellings with copies of the following:

- the HUD pamphlet, "Are You a Victim of Housing Discrimination?" (HUD Form 903.1);

- North Carolina Attorney General's Office – https://ncdoj.gov/wp-admin/admin-ajax.php?juwpfisadmin=false&action=wpfd&task=file.download&wpfd_category_id=16&wpfd_file_id=12454;

- North Carolina Real Estate Commission - https://www.ncrec.gov/Brochures/Print/Renting.pdf;

- North Carolina Human Relations Commission (NCHRC) - https://files.nc.gov/ncoah/documents/files/fair-housing-for-everyone-english.pdf; and

- Legal Aid of North Carolina - https://www.fairhousingnc.org/wp-content/uploads/2019/04/General-Fair-Housing-10-8-2018.pdf

c. Starting 30 days of entry of this Consent Decree, provide each person who applies for rental of one of the Vanderburg Trust Dwellings with a copy of the following:

6

- the HUD pamphlet, "Are You a Victim of Housing Discrimination?"
  (HUD Form 903.1);

- North Carolina Attorney General's Office – https://ncdoj.gov/wp-admin/admin-ajax.php?juwpfisadmin=false&action=wpfd&task=file.download&wpfd_category_id=16&wpfd_file_id=12454;

- North Carolina Real Estate Commission - https://www.ncrec.gov/Brochures/Print/Renting.pdf;

- North Carolina Human Relations Commission (NCHRC) - https://files.nc.gov/ncoah/documents/files/fair-housing-for-everyone-english.pdf; and

- Legal Aid of North Carolina - https://www.fairhousingnc.org/wp-content/uploads/2019/04/General-Fair-Housing-10-8-2018.pdf

d. Require that any advertisement for rental of one of the Vanderburg Trust Dwellings include the words, "Fair Housing Provider, or Equal Opportunity Housing," or words that that effect.

e. Require that each rental application, agreement or lease including the statement, "We do not discriminate on the basis of race, color, religion, national origin, sex, sexual orientation, gender identity, handicap (disability) or familial status nor do we tolerate harassment of any of

7

our tenants based on any of these protected characteristics. Harassment of a tenant because of her race, color, religion, national origin, sex, sexual orientation, gender identity, handicap (disability) or familial status by another tenant, resident, occupant, is a violation of the lease agreement and rules and is grounds for eviction;"

f.  Within 30 days of entry of this Consent Decree, provide each rental with a copy of ATTACHMENT A (including Exhibit 1).

g.  Maintain and implement non-discrimination policies and procedures that meet the requirements set forth in this Section and ATTACHMENT A (including Exhibit 1) of the Consent Decree.

h.  The obligations set forth in the above paragraph for Michael V. Gurkins, as Executor of Mary Jane Vanderburg Estate and any of his employees, agents, or assigns will no longer be required once and if the dwellings of the Vanderburg Trust are sold upon the closing of this estate.

## IV.  AUTHORIZING THE REMOVAL OF ANY DEROGATORY CREDIT REPORTING REGARDING WILLIAM AND PHYLLIS HARRIS

10.     Within 14 days upon entry of this Consent Decree, Michael V. Gurkins, as Executor of the Vanderburg Estate, or his counsel, will make a request to the 3 major credit reporting agencies, Equifax, Experian, and Trans Union, using

the letter prepared by counsel for William and Phyllis Harris, a copy of which is attached as <u>ATTACHMENT C (including also Exhibit 1 to ATTACHMENT C)</u> to this Consent Decree. This request will consist of asking that any negative or derogatory information related to the Harrises' prior tenancy at 559B Huntingridge Road, Greenville, North Carolina and/ or the summary ejectment filing in Pitt County, North Carolina, File No. 17CV004461 or 17CVM00461 (including, but not limited, to the filing) be removed. Since Michael V. Gurkins is not a paying subscriber to this reporting service, it cannot complete the Universal Data Form generally used by subscribers to remove this information itself. As written confirmation of Michael V. Gurkins's reporting to the credit reporting agencies, Michael V. Gurkins or his counsel will copy Kelly Clarke of Legal Aid of North Carolina, one of the attorneys for Mr. and Mrs. Harris, on its letters to these agencies. It is understood by William and Phyllis Harris that one or more of these 3 major credit reporting agencies may still report negative information about their prior tenancy at 559 B Huntingridge Road, Greenville, North Carolina, despite Michael V. Gurkins's best efforts to the contrary. Michael V. Gurkins agrees that, if any negative information continues to appear on William and Phyllis Harris' respective credits report within 90 days of the Entry of the Consent Decree, they or their counsel will notify him in writing, and Michael V. Gurkins will make a second submission as outlined above to request a change of the item or items from the credit

9

reports of William and Phyllis Harris. Written confirmation of this action will be sent to Legal Aid of North Carolina. The taking of these 2 efforts by Michael V. Gurkins shall fulfill his responsibility in this regard.

11.     Michael V. Gurkins or the Vanderburg Estate also has no objection to the issuance of a letter by either Remco or Bishop requesting that any derogatory credit reporting about William and Phyllis Harris in connection with their rental of the dwelling located at 559B Huntingridge Road be removed from their credit report and further has no objection if any credit reporting agency removes any derogatory credit reporting about William and Phyllis Harris in connection with their rental of the dwelling located at 559B Huntingridge Road.

## V. OTHER EDUCATION AND TRAINING

12.     Unless and until Michael V. Gurkins, individually or through agents, fully divest from any ownership, management or control of any Vanderburg Trust Dwellings, and provides written notice of same to attorneys for the Plaintiffs, then Michael V. Gurkins, including his agents, contractors, or employees involved in the ownership or operation of the Vanderburg Trust Dwellings shall attend a training on fair housing laws and pay for the reasonable costs of that training within 180 days of entry of this Consent Decree and require any new employees, agents or contractors to complete a similar training within 180 days of their hire, agency or employment.

10

## VI. COMPLIANCE

13.     Within 180 days of entry of this Consent Decree, Michael V. Gurkins will provide Legal Aid of North Carolina[2] with a letter certifying that he has complied with the requirements set forth in this Consent Decree.   In the event that Michael V. Gurkins, individually or through his agents, still owns, manages, or controls any of the Vanderburg Trust Dwellings a year from entry of the Consent Decree, he will provide Legal Aid of North Carolina with a letter certifying his continued compliance   with the requirements of the Consent Decree. If these conditions are present, the letter would be due within 30 days from the anniversary date (one year) from the entry of the Consent Decree.

## VII.   COMPENSATION FOR DAMAGES, ATTORNEYS' FEES AND COSTS

14.     Within thirty (30) days of the entry of this Consent Decree, defendant Michael V. Gurkins will pay the sum of two hundred and fifty thousand dollars ($250,000.00) in full settlement of any claims for damages, costs, or attorneys' fees by plaintiffs  William and Phyllis Harris arising from their claims against defendant Mary Jane Vanderburg, her estate, and defendant Michael V. Gurkins, in his capacity as Executor of that estate.   The funds shall be paid in the form of a check made

---

[2] Such information can be provided to Kelly Clarke at Legal Aid of North Carolina – Fair Housing Project, 2101 Angier Avenue, Suite 300, Durham, NC 27703 and kellyc@legalaidnc.org.

11

payable to the Attorney-Client Trust Account of Brancart & Brancart and delivered to Christopher Brancart, Brancart & Brancart, 8205 Pescadero Creek Road, Loma Mar, CA 94021 via express mail or FedEx, billing Brancart for the cost of that FedEx shipment. In connection with the payment pursuant to this paragraph, William and Phyllis Harris will execute and deliver via email a mutual release to counsel for Michael V. Gurkins before any settlement funds are disbursed from the Attorney-Client Trust Account of Brancart & Brancart.

## VIII. COSTS AND ATTORNEYS FEES

15. Except as otherwise stated in Section VII above, upon entry of this Decree, the parties subject to this Consent Decree – plaintiffs and defendant Michael V. Gurkins, on behalf of the Vanderburg Estate, agree to bear their own costs, expenses, and attorneys' fees.

## IX. DURATION, MODIFICATIONS, AND REMEDIES

16. Unless otherwise provided herein, the terms of this Consent Decree shall remain in effect for five (5) years after the date of its entry. Plaintiffs may move the Court to extend the period in which this Order is in effect if defendant Michael V. Gurkin in his capacity as Executor of the Estate of Mary Jane Vanderburg violates one or more terms of the Consent Decree or if the interests of justice so require.

12

17. Any time limits for performance imposed by this Consent Decree may be extended by mutual written agreement of the parties.

18. The Court shall retain jurisdiction for purposes of enforcement only.

19. The parties will confer in good faith before moving the Court for an order compelling compliance with the terms of this Consent Decree.

## X. DISMISSAL

20. Upon receipt of the settlement funds as described in Section VII above, counsel for William and Phyllis Harris shall file a dismissal of their claims against Michael V. Gurkins, as Executor of the Vanderburg Estate, only and upon the following terms. First, this dismissal shall be taken without prejudice while the Consent Decree remains in effect; upon expiration of the Consent Decree, counsel for William and Phyllis Harris will file a dismissal with prejudice of the Harrises' claims against the Vanderburg Estate. And second, the dismissal that is filed without prejudice as to the claims against the Vanderburg Estate only will specify the Court retains jurisdiction to enforce the Consent Decree as stated in Section IX above. In sum, the aforementioned dismissal without prejudice is made subject to the Consent

13

Decree and reserves the Court's jurisdiction to enforce the Consent Decree.

**SO ORDERED. This _8_ day of August, 2022.**

James C. Dever III
United States District Judge

14

# ATTACHMENT A

## ANTI-DISCRIMINATION/ANTI-HARASSMENT/ANTI-RETALIATION POLICY

**(1)  Discrimination is Strictly Prohibited**

It is the policy of the owners and/or managers of the residential properties not to discriminate against anyone because of race, color, national origin, religion, sex, sexual orientation, gender identity, disability, or familial status.

This policy means, among other things, that agents or employees or the owners and managers who show, rent, repair, or operate any housing unit(s) must do the following:

(i)  Treat all applicants to be tenants equally regardless of race, color, national origin, religion, sex, sexual orientation, gender identity, disability, or familial status.

(ii)  Treat all tenants equally regardless of race, color, national origin, religion, sex, sexual orientation, gender identity, disability, or familial status.

Therefore, a person's applications cannot be rejected, rejected, repairs for a tenant cannot be unreasonably delayed or refused, and a tenant's lease cannot be terminated because of race, color, national origin, religion, sex, sexual orientation, gender identity, or familial status.

15

## (2)  Harassment Is Strictly Prohibited

It is also the policy of the owner and managers of the residential properties not to harass anyone because of race, color, national origin, religion, sex, sexual orientation, gender identity, disability, or familial status. This policy also means, among other things, that all agents or employees who show, rent, repair, or operate housing unit(s) must not take any actions that could create an objectively and subjectively hostile environment based on race, color, national origin, religion, sex, sexual orientation, gender identity, disability, or familial status.

In addition, this policy also means that if any other tenant, guest, or other third party harasses another tenant, household member or guest because of race, color, national origin, religion, sex, sexual orientation, gender identity, disability, or familial status, the owner and members of the residential properties will take prompt corrective action to stop or remedy the unlawful harassment once that harassment is known or should have been known in accordance with the Fair Housing Act and *HUD's Quid Pro Quo and Hostile Housing Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act*, 81 FR 63054-63075 (Aug. 18, 2016), a copy of the latter found under ATTACHMENT A, EXHIBIT 1 which is incorporated in its entirety into this policy.

16

This policy also prohibits, for example, negative and insulting behavior related to race, color, national origin, religion, sex, sexual orientation, gender identity, disability, or familial status.

**(3)    Retaliation Is Strictly Prohibited**

It is further the policy of the owners and managers of the residential properties not to retaliate against anyone for opposing discrimination or harassment or for otherwise trying to exercise their rights under fair housing laws. This policy means, among other things, that all agents or employees of the owners and managers who show rent, repairs, or operate any housing unit(s) must not take any negative actions against a person for exercising or trying to exercise her/his/their rights.

This policy means, for example, that a person's application cannot be rejected, repairs for a tenant cannot be unreasonably delayed or refused, and a tenant's lease cannot be terminated because a person complained about potential discrimination or harassment.

**(4)    Protection Of Your Rights**

Any employee or agent of the owners and managers who does not follow any part of the policy summarized above will be subject to disciplinary action, termination of employment, and/or federal court sanctions.

If you believe this policy has been violated, you may contact:

*Atlanta Regional Office of Fair Housing and Equal Opportunity (FHEO)*

U.S. Department of Housing and Urban Development (HUD) Five Points Plaza
40 Marietta Street, 16th Floor
Atlanta, Georgia 30303-2806
(404) 331-5140 (ph)
1-800-440-8091 (ph); (404) 730-2654
(TTY) https://www.hud.gov/complaints


North Carolina Office of Administrative Hearings
Civil Rights Division – Housing Discrimination Section
North Carolina Human Relations Commission (NCHRC)
1711 New Hope Church Road
Raleigh, North Carolina 27609 (919) 431-3030 (ph)
https://files.nc.gov/ncoah/documents/files/HOUSING_DISCRIMINATION_COMPLAINT_
FORM.pdf


Legal Aid of North Carolina – Fair Housing Project
1-855-797-FAIR (3247)
http://www.fairhousingnc.org

## **ATTACHMENT A, EXHIBIT 1**

*HUD's Quid Pro Quo and Hostile Housing Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act*, 81 FR 63054-63075 (Sept. 14, 2016).

## ATTACHMENT B

## EMPLOYEE ACKNOWLEDGMENT

I acknowledge that on _____, 20___, I was provided copies of the Consent Decree and Nondiscrimination Policy required by the Consent Decree entered by the Court in *William and Phyllis Harris v. Michael V. Gurkins's in his capacity as Executor of the Estate of Mary Jane Vanderburg et al.*, 4:19-cv-00111-D (E.D.N.C.). I have read and understand this document and have had my questions about this document answered. I understand my legal responsibilities and shall comply with those responsibilities.

_____
Signature

_____
Print Name

_____
Job Title

_____
Company/Employer

_____
Home Address

_____
Home Address Continued

_____
Home Telephone Number

_____
Date

20

# ATTACHMENT C

[LETTERHEAD OF EXECUTOR MICHAEL V. GURKINS OR HIS COUNSEL]


Experian
P.O. Box 4500
Allen, TX 75013

Equifax Information Services, LLC
P.O. Box 740256
Atlanta, GA  30374-0256

TransUnion Consumer Solutions
P.O. Box 2000
Chester, PA  19016

Re: William Harris, DOB: 7/31/1943, SS#: ---/--/4032
     Phyllis Harris,  DOB: 6/22/1956, SS#: ---/--/8505
     *Tenancy at 559 B Huntingridge Rd, Greenville, NC*
     *Eviction/Summary Ejectment Filing: 17CV004461*

Dear Representative:

I am the Executor of the Estate of Mary Jane Vanderburg, also the nephew of now deceased Mary Jane Vanderburg. Prior to the death of my aunt in March 2022, she owned 559B Huntingridge Road, Greenville, North Carolina 27834.  She leased it to William and Phyllis Harris through her agents, Remco East, Inc. ("Remco') and Mary Grace Bishop ('Bishop") from March 2017 to then end of January 2018.

In September 2017, while the Harris were still tenants of my aunt, Remco and Bishop filed a summary ejectment or eviction action in Greenville, Pitt County, North Carolina, against the Harrises, File No. 17CV004461 or 17CVM004461, for alleged breach of lease. The magistrate presiding over this case involuntarily dismissed the action against the Harrises on October 10, 2017.  Copies of the complaint filed in this action and the magistrate's dismissal are attached to this letter.

I am writing to request that any reference to this summary ejectment filing or any other negative or derogatory information related to this filing included on

21

William and Phyllis Harris' respective credit reports be removed. Any reporting of this summary ejectment filing or any negative or derogatory information related to it would be in error.

Sincerely yours,

Michael V. Gurkins, Executor of the
Mary Jane Vanderburg Estate

Sworn to by Michael V. Gurkins, Executor of the Mary Jane Vanderburg Estate and subscribed before me this the _____ day of _____, 2022.

_____
Notary Public
My Commission Expires:_____

## **ATTACHMENT C, EXHIBIT 1**

Copy of summary ejectment case file, *Remco East, Inc. v. William and Phyllis*

*Harris*, Case No. 17CV004461, Pitt County, North Carolina, Small Claims Court

23

The Agency has determined under 21 CFR 25.33(a) that this action is categorically excluded from the requirement to submit an environmental assessment or an environmental impact statement because it is of a type that does not individually or cumulatively have a significant effect on the human environment.

Elsewhere in this issue of the Federal Register, FDA gave notice that the approval of those parts of NADA 138–934 pertaining to the procaine penicillin component indications for growth promotion and increased feed efficiency in swine is withdrawn, effective September 14, 2016. As provided for in the regulatory text of this document, the animal drug regulations are amended to reflect this partial withdrawal of approval and subsequent product reformulation.

NADA 138–934 was identified as being affected by guidance for industry (GFI) #213 "New Animal Drugs and New Animal Drug Combination Products Administered in or on Medicated Feed or Drinking Water of Food-Producing Animals: Recommendations for Drug Sponsors for Voluntarily Aligning Product Use Conditions with GFI #209," December 2013.

This rule does not meet the definition of "rule" in 5 U.S.C. 804(3)(A) because it is a rule of "particular applicability." Therefore, it is not subject to the congressional review requirements in 5 U.S.C. 801–808.

List of Subjects in 21 CFR Part 558

Animal drugs, Animal feeds.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs and redelegated to the Director of the Center for Veterinary Medicine, 21 CFR part 558 is amended as follows:

## PART 558—NEW ANIMAL DRUGS FOR USE IN ANIMAL FEEDS

■ 1. The authority citation for part 558 continues to read as follows:

**Authority:** 21 U.S.C. 354, 360b, 360ccc, 360ccc–1, 371.

### § 558.140 [Amended]

■ 2. In § 558.140, in paragraph (b)(2), remove "No. 054771" and in its place add "Nos. 054771 and 069254".

### § 558.145 [Amended]

■ 3. In § 558.145, remove and reserve paragraph (a)(2).

Dated: September 6, 2016.
**William T. Flynn,**
*Acting Director, Center for Veterinary Medicine.*
[FR Doc. 2016–21985 Filed 9–13–16; 8:45 am]
**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Part 100

[Docket No. FR–5248–F–02]

RIN 2529–AA94

### Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends HUD's fair housing regulations to formalize standards for use in investigations and adjudications involving allegations of harassment on the basis of race, color, religion, national origin, sex, familial status, or disability. The rule specifies how HUD will evaluate complaints of quid pro quo ("this for that") harassment and hostile environment harassment under the Fair Housing Act. It will also provide for uniform treatment of Fair Housing Act claims raising allegations of quid pro quo and hostile environment harassment in judicial and administrative forums. This rule defines "quid pro quo" and "hostile environment harassment," as prohibited under the Fair Housing Act, and provides illustrations of discriminatory housing practices that constitute such harassment. In addition, this rule clarifies the operation of traditional principles of direct and vicarious liability in the Fair Housing Act context.

**DATES:** *Effective date:* October 14, 2016.

**FOR FURTHER INFORMATION CONTACT:** Lynn Grosso, Acting Deputy Assistant Secretary for Enforcement and Programs, Office of Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 7th Street SW., Room 5204, Washington DC 20410–2000; telephone number 202–402–5361 (this is not a toll-free number). Persons with hearing or speech impairments may contact this number via TTY by calling the toll-free Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### I. Executive Summary

#### A. Purpose of the Regulatory Action

Both HUD and the courts have long recognized that Title VIII of the Civil Rights Act of 1968, as amended, (42 U.S.C. 3601 *et seq.*) (Fair Housing Act or Act) prohibits harassment in housing and housing-related transactions because of race, color, religion, sex, national origin, disability,[1] and familial status, just as Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*) (Title VII) prohibits such harassment in employment. But no standards had been formalized for assessing claims of harassment under the Fair Housing Act. Courts have often applied standards first adopted under Title VII to evaluate claims of harassment under the Fair Housing Act, but there are differences between the Fair Housing Act and Title VII, and between harassment in the workplace and harassment in or around one's home, that warrant this rulemaking.

This rule formalizes standards for evaluating claims of quid pro quo and hostile environment harassment in the housing context. The rule does so by defining "quid pro quo harassment" and "hostile environment harassment" as conduct prohibited under the Fair Housing Act, and by specifying the standards to be used to evaluate whether particular conduct creates a quid pro quo or hostile environment in violation of the Act. Such standards will apply both in administrative adjudications and in cases brought in federal and state courts under the Fair Housing Act. This rule also adds to HUD's existing Fair Housing Act regulations illustrations of discriminatory housing practices that may constitute illegal quid pro quo and hostile environment harassment.

By establishing consistent standards for evaluating claims of quid pro quo and hostile environment harassment, this rule provides guidance to providers of housing or housing-related services seeking to ensure that their properties or businesses are free of unlawful harassment. The rule also provides clarity to victims of harassment and their representatives regarding how to assess potential claims of illegal harassment under the Fair Housing Act.

In addition, this final rule clarifies when housing providers and other entities or individuals covered by the Fair Housing Act may be held directly or vicariously liable under the Act for

---

[1] This rule uses the term "disability" to refer to what the Fair Housing Act and its implementing regulations refer to as "handicap." Both terms have the same legal meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

illegal harassment, as well as for other discriminatory housing practices that violate the Act. This rule sets forth how these traditional liability standards apply in the housing context because, in HUD's experience, there has been significant misunderstanding among public and private housing providers as to the circumstances under which they will be subject to liability under the Fair Housing Act for discriminatory housing practices undertaken by others.

### B. Legal Authority for the Regulation

The legal authority for this regulation is found in the Fair Housing Act, which gives the Secretary of HUD the "authority and responsibility for administering this Act." 42 U.S.C. 3608(a). In addition, the Act provides that "[t]he Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this title. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section." 42 U.S.C. 3614a. HUD also has general rulemaking authority under the Department of Housing and Urban Development Act to make such rules and regulations as may be necessary to carry out its functions, powers and duties. See 42 U.S.C. 3535(d).

### C. Summary of Major Provisions

The major provisions of this rule:
- Formalize definitions of "quid pro quo harassment" and "hostile environment harassment" under the Fair Housing Act.
- Formalize standards for evaluating claims of quid pro quo and hostile environment harassment under the Fair Housing Act.
- Add illustrations of prohibited quid pro quo and hostile environment harassment to HUD's existing Fair Housing Act regulations.
- Identify traditional principles of direct and vicarious liability applicable to all discriminatory housing practices under the Fair Housing Act, including quid pro quo and hostile environment harassment.

Please refer to section III of this preamble, entitled "This Final Rule," for a discussion of the changes made to HUD's regulations by this final rule.

### D. Costs and Benefits

This rule formalizes clear, consistent, nationwide standards for evaluating harassment claims under the Fair Housing Act. The rule does not create any new forms of liability under the Fair Housing Act and thus adds no additional costs for housing providers

and others engaged in housing transactions.

The benefits of the rule are that it will assist in ensuring compliance with the Fair Housing Act by defining quid pro quo and hostile environment harassment that violates the Act and by specifying traditional principles of direct and vicarious liability, consistent with Supreme Court precedent. Articulating clear standards enables entities subject to the Fair Housing Act's prohibitions and persons protected by its terms to understand the types of conduct that constitute actionable quid pro quo and hostile environment harassment. As a result, HUD expects this rule to facilitate more effective training to avoid discriminatory harassment in housing and decrease the need for protracted litigation to resolve disputed claims.

### II. Background

Title VIII of the Civil Rights Act of 1968, as amended (the Fair Housing Act or Act), prohibits discrimination in the availability and enjoyment of housing and housing-related services, facilities, and transactions because of race, color, national origin, religion, sex, disability, and familial status. 42 U.S.C. 3601–19. The Act prohibits a wide range of discriminatory housing and housing-related practices, including, among other things, making discriminatory statements, refusing to rent or sell, denying access to services, setting different terms or conditions, refusing to make reasonable modifications or accommodations, discriminating in residential real estate-related transactions, and retaliating. See 42 U.S.C. 3604, 3605, 3606 and 3617.

In 1989, HUD promulgated fair housing regulations at 24 CFR part 100 that address discriminatory conduct in housing generally. The 1989 regulations include examples of discriminatory housing practices that cover quid pro quo sexual harassment and hostile environment harassment generally. Section 100.65(b)(5) identifies, as an example of unlawful conduct, denying or limiting housing-related services or facilities because a person refused to provide sexual favors. Section 100.400(c)(2) offers as an example of illegal conduct ". . . interfering with persons in their enjoyment of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons." The 1989 regulations do not, however, expressly define quid pro quo or hostile environment harassment, specify standards for examining such claims, or provide illustrations of other types of

quid pro quo or hostile environment harassment prohibited by the Act. The 1989 regulations also do not discuss liability standards for prohibited harassment or other discriminatory housing practices.

Over time, forms of harassment that violate civil rights laws have coalesced into two legal doctrines—quid pro quo and hostile environment. Although HUD and the courts have recognized that the Fair Housing Act prohibits harassment because of race or color,[2] disability,[3] religion,[4] national origin,[5] familial status,[6] and sex,[7] the doctrines of quid pro quo and hostile environment harassment are not well developed under the Fair Housing Act.

As a result, when deciding harassment cases under the Fair Housing Act, courts have often looked to case law decided under Title VII, which prohibits employment discrimination because of race, color, religion, sex, and national origin.[8] But the home and the workplace are significantly different environments such that strict reliance on Title VII case law is not always appropriate. One's home is a place of privacy, security, and refuge (or should be), and harassment that occurs in or around one's home can be far more intrusive, violative and threatening than harassment in the more public environment of one's work place.[9] Consistent with this reality, the

---

[2] See, e.g., Smith v. Mission Assoc. Ltd. P'ship, 225 F. Supp. 2d 1293, 1298–99 (D. Kan. 2002) (42 U.S.C. 3604(b)); HUD v. Tucker, 2002 ALJ LEXIS 33, *3–4 (HUD ALJ 2002) (42 U.S.C. 3604(a) and (b)).

[3] See, e.g., Neudecker v. Boisclair Corp., 351 F. 3d 361, 364 (8th Cir. 2003) (42 U.S.C. 3604(f)(2)).

[4] See, e.g., Bloch v. Frischholz, 587 F. 3d 771, 787 (7th Cir. 2009) (42 U.S.C. 3604(b), 3617).

[5] See, e.g., Effendi v. Amber Fields Homeowners Assoc., 2011 U.S. Dist. Lexis 35265, *1 (N.D. Ill. 2011) (42 U.S.C. 3604(b) and 3617); Texas v. Crest Asset Mgmt., 85 F. Supp. 722, 736 (S.D. TX 2000) (42 U.S.C. 3604(a) and (b), 3617).

[6] See, e.g., Bischoff v. Brittain, 2014 U.S. Dist. LEXIS 145945, *13–14, *17 (E.D. Cal. 2014) (3604(b)); United States v. M. Westland Co., 1995 U.S. Dist. LEXIS 22466, *4 (C.D. Cal. 1995) (Fair Housing Act provision not specified).

[7] See, e.g., Quigley v. Winter, 598 F. 3d 938, 946 (8th Cir. 2010) (42 U.S.C. 804(b), 3617); Krueger v. Cuomo, 115 F. 3d 487, 491 (7th Cir. 1997) (42 U.S.C. 3604(b), 3617); Honce v. Vigil, 1 F. 3d 1085, 1088 (10th Cir. 1993) (42 U.S.C. 3604(b)); Shellhammer v. Lewallen, 770 F. 2d 167 (6th Cir. 1985) (sexual harassment under the Fair Housing Act in general).

[8] See, e.g., Honce v. Vigil, 1 F. 3d at 1088; Shellhammer v. Lewallen, 770 F. 2d 167; Glover v. Jones, 522 F. Supp. 2d 496, 503 (W.D.N.Y. 2007); Beliveau v. Caras, 873 F. Supp. 1393, 1396 (C.D. Cal. 1995); see also Neudecker v. Boisclair Corp., 351 F. 3d at 364 (applying Title VII concepts to find hostile environment based on disability violated Act). Unlike Title VII, the Act also includes disability and familial status among its protected characteristics.

[9] See, e.g., Quigley v. Winter, 598 F. 3d at 947 (emphasizing that defendant's harassing conduct
Continued

Supreme Court has recognized that individuals have heightened expectations of privacy within the home.[10]

This rule therefore formalizes standards to address harassment in and around one's home and identifies some of the differences between harassment in the home and harassment in the workplace. While Title VII and Fair Housing Act case law contain many similar concepts, this regulation describes the appropriate analytical framework for harassment claims under the Fair Housing Act.

The rule addresses only quid pro quo and hostile environment harassment, and not conduct generically referred to as harassment that, for different reasons, may violate section 818 or other provisions of the Fair Housing Act. For example, a racially hostile statement by a housing provider could indicate a discriminatory preference in violation of section 804(c) of the Act, or it could evidence intent to deny housing or discriminate in the terms or conditions of housing in violation of sections 804(a) or 804(b), even if the statement does not create a hostile environment or establish a quid pro quo. Section 818, which makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" rights protected by the Act, or on account of a person having aided others in exercising or enjoying rights protected by the Act, could be violated by conduct that creates a quid pro quo

was made "even more egregious" by the fact that it occurred in plaintiff's home, "a place where [she] was entitled to feel safe and secure and need not flee."); *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1292 (E.D. Cal. 2013) ("[c]ourts have recognized that harassment in one's own home is particularly egregious and is a factor that must be considered in determining the seriousness of the alleged harassment"); *Williams v. Poretsky Management*, 955 F. Supp. 490, 498 (D. Md. 1996) (noting sexual harassment in the home more severe than in workplace); *Beliveau v. Caras*, 873 F. Supp. at 1398 (describing home as place where one should feel safe and not vulnerable to sexual harassment); D. Benjamin Barros, Home As a Legal Concept, 46 Santa Clara L. Rev. 255, 277–82 (2006) (discussing legal concept of home as source of security, liberty and privacy which justifies favored legal status in many circumstances); Nicole A. Forkenbrock Lindemyer, Article, Sexual Harassment on the Second Shift: The Misfit Application of Title VII Employment Standards to Title VIII Housing Cases, 18 Law & Ineq. 351, 368–80 (2000) (noting that transporting of Title VII workplace standards for sexual harassment into Fair Housing Act cases of residential sexual harassment ignores important distinctions between the two settings); Michelle Adams, Knowing Your Place: Theorizing Sexual Harassment at Home, 40 Ariz. L. Rev. 17, 21–28 (1998) (describing destabilizing effect of sexual harassment in the home).

[10] *See, e.g. Frisby v. Schultz*, 487 U.S. 474, 484 (1988) ("[w]e have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom").

or hostile environment. It is not, however, limited to quid pro quo or hostile environment claims and could be violated by other conduct that constitutes retaliation or another form of coercion, intimidation, threats, or interference because of a protected characteristic. In sum, this rule provides standards that are uniformly applicable to claims of quid pro quo and hostile environment harassment under the Fair Housing Act, regardless of the section of the Act that is alleged to have been violated, and the same discriminatory conduct could violate more than one provision of the Act whether or not it also constitutes quid pro quo or hostile environment harassment.

## III. Changes Made at the Final Rule Stage

### A. Overview of Changes Made at the Final Rule Stage

In response to public comment and upon further consideration by HUD of the issues presented in this rulemaking, HUD makes the following changes at this final rule stage:

• Re-words proposed § 100.7(a)(1)(iii) to avoid confusing the substantive obligation to comply with the Fair Housing Act with the standard of liability for discriminatory third-party conduct. Proposed § 100.7(a)(1)(iii) stated that a person is directly liable for "failing to fulfill a duty to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct. The duty to take prompt action to correct and end a discriminatory housing practice by a third-party derives from an obligation to the aggrieved person created by contract or lease (including bylaws or other rules of a homeowner's association, condominium or cooperative), or by federal, state or local law." Section 100.7(a)(1)(iii) of this final rule provides that a person is directly liable for "failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct a discriminatory housing practice by a third-party depends upon the extent of control or any other legal responsibility the person may have with respect to the conduct of such third-party."

• Adds to § 100.400 a new paragraph (c)(6) specifying as an example of a discriminatory housing practice retaliation because a person reported a discriminatory housing practice,

including quid pro quo or hostile environment harassment.

• Adds to § 100.600(a)(2)(i), "Totality of the circumstances," a new paragraph (C) that explains the reasonable person standard under which hostile environment harassment is assessed "Whether unwelcome conduct is sufficiently severe or pervasive as to create a hostile environment is evaluated from the perspective of a reasonable person in the aggrieved person's position."

• Re-words proposed § 100.600(a)(2)(i)(B) to clarify that proof of hostile environment would not require demonstrating psychological or physical harm to avoid any confusion on that point. Proposed § 100.600(a)(2)(i)(B) stated "Evidence of psychological or physical harm is relevant in determining whether a hostile environment was created, as well as the amount of damages to which an aggrieved person may be entitled. Neither psychological nor physical harm, however, must be demonstrated to prove that a hostile environment exists." Section 100.600(a)(2)(i)(B) in this final rule provides: "Neither psychological nor physical harm must be demonstrated to prove that a hostile environment exists. Evidence of psychological or physical harm may, however, be relevant in determining whether a hostile environment existed and, if so, the amount of damages to which an aggrieved person may be entitled."

• Re-words proposed § 100.600(c) to clarify that a single incident may constitute either quid pro quo or hostile environment harassment if the incident meets the standard for either type of harassment under § 100.600(a)(1) or (a)(2). Proposed § 100.600(c) provided "A single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is severe, or evidences a quid pro quo." Section 100.600(c) in this final rule provides "A single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment, or evidences a quid pro quo."

• Corrects the illustration in proposed § 100.65(b)(7) to fix a typographical error in the proposed rule. In the final rule, the word "service" is corrected and made plural.

## IV. The Public Comments

On October 21, 2015, at 80 FR 63720, HUD published for public comment a proposed rule on Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act. The public comment period closed on December 21, 2015. HUD received 63 comments. The comments were submitted by public housing agencies (PHAs) and other government agencies; private housing providers and their representatives; nonprofit organizations, including fair housing, civil rights, housing advocacy, and legal groups; tenants and other individuals. This section of the preamble addresses significant issues raised in the public comments and provides HUD's responses. All public comments can be viewed at: *http://www.regulations.gov/#!docketDetail;D=HUD-2015-0095*.

The majority of the commenters were generally supportive of the rule, with some urging HUD to publish the rule quickly. This summary does not provide responses to comments that expressed support for the proposed rule without suggesting any modifications to the rule. General supportive comments included statements of the importance of the rule in addressing and preventing sexual assault of tenants by landlords and descriptions of how the rule would empower housing providers, renters, and other consumers to understand and avoid illegal housing practices by defining and illustrating quid pro quo and hostile environment harassment. Some commenters stated that this rule may help providers focus on the importance of eliminating harassment on their properties, and some commenters identified provisions of the rule that would provide useful guidance to housing providers, tenants, residents, and others involved in housing transactions.

More specifically, commenters expressed appreciation that the rule would apply not solely to sexual harassment but to harassment because of all protected characteristics, with some commenters sharing anecdotes of harassment based on a variety of protected characteristics that they believe the rule may help remedy. Other commenters supported the proposed rule's distinction between the Fair Housing Act and Title VII, with commenters endorsing the Department's proposal not to adopt the Title VII affirmative defense to an employer's vicarious liability.

A number of commenters assessed the rule to be in accord with case law, and approved of the balance the rule strikes between the rights and obligations of the parties in a fair housing matter. Some commenters noted that the proposed standard for determining whether conduct constitutes a hostile environment is appropriately individualized to the facts of each case. Some commenters specifically identified the benefits provided by the rule in establishing a uniform framework for fairly evaluating and appropriately responding to alleged harassment, which minimizes the subjective nature of adjudicating such claims. Other commenters expressed appreciation for the proposed rule's recognition that a single incident may establish hostile environment harassment. Some commenters expressed support for the rule's acknowledgement of the fear of retaliation many individuals with disabilities experience when trying to address issues of harassment in their housing.

Many commenters stated that the rule's description of traditional principles of agency liability is accurate and not an expansion of existing liability. Some commenters expressed appreciation that the rule would incorporate traditional liability principles for any type of discriminatory housing practice, not just harassment, and would rely on negligence principles and distinguish between direct and vicarious liability. Other commenters stated that the rule would not burden housing providers because the direct liability standard is aligned with established housing provider business practice. Some commenters expressed appreciation that the rule would place landlords on notice that they should take corrective action early on, once they know or should have known of the discrimination.

Several commenters stated that housing providers are already in possession of the tools they need to create living environments free from harassment. In particular, the commenters stated that housing providers are familiar with the corrective actions they may take in order to enforce their own rules. Another commenter stated that housing providers are in the best position to select, train, oversee, and assure the correct behavior of their agents, noting that effective enforcement of the rule depends on the potential for liability on the part of housing providers.

Some commenters expressed support for the proposed rule while seeking modifications at the final rule stage. For example, a commenter encouraged broad application of the rule so that intervention and corrective action

would occur before victims of housing discrimination are forced out of their homes. Another commenter sought an expansive reading of the rule in order to prevent all forms of bullying. Some commenters sought to add factors to the totality of circumstances consideration, while other commenters sought to add to the classes protected by the rule.

Following are HUD's responses to commenters' suggested modifications to the rule and the other significant issues raised in the public comments.

### A. Quid Pro Quo and Hostile Environment Harassment: § 100.600

#### a. General: § 100.600(a)

*Issue:* A commenter requested that HUD add seniors as a protected class under the rule. Other commenters stated that elderly persons often have disabilities, which make them particularly vulnerable to harassment. These commenters requested that the final rule make clear that the rule protects elderly persons from harassment because of disability.

*HUD Response:* HUD shares the commenters' concern for elderly persons but does not have the authority to add a new protected class to the Fair Housing Act and therefore is unable to adopt the commenters' recommendation to expand the scope of the rule in this way. Neither age nor senior status is a protected characteristic under the Act, although persons who are discriminated against because of their disabilities are protected under the Act without regard to their age. Therefore, elderly individuals who are subjected to quid pro quo or hostile environment harassment on the basis of disability or another protected characteristic are protected under the Act and this final rule.

*Issue:* A commenter suggested that HUD include a clause in the final rule to protect whistleblowers who experience harassment for reporting quid pro quo or hostile environment harassment. The commenter reported having witnessed such harassment and explained that whistleblowers are particularly vulnerable to quid pro quo and hostile environment harassment, but because they are not harassed on the basis of their race, color, religion, national origin, sex, familial status, or disability, they are not directly protected by the proposed regulation.

*HUD Response:* Anyone who is harassed for reporting discriminatory harassment in housing is protected by the Fair Housing Act. Section 818 of the Act makes it unlawful to coerce, intimidate, threaten, or interfere with a person on account of his or her having

**63058** Federal Register / Vol. 81, No. 178 / Wednesday, September 14, 2016 / Rules and Regulations

aided or encouraged another person in the exercise or enjoyment of any right granted or protected by sections 803–806 of the Act. To highlight the essential role whistleblower protection plays in ensuring fair housing, HUD is adding to § 100.400 a new paragraph (c)(6), which provides the following example of a discriminatory housing practice "Retaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority."

*Issue:* Several commenters urged HUD to state in the final rule that harassment against persons who are lesbian, gay, bisexual, or transgender (LGBT), or because of pregnancy, violates the Fair Housing Act. They asked HUD to define harassment because of sex to include harassment based on sexual orientation, gender identity, sex stereotyping, or pregnancy. The commenters referenced studies about the pervasive harassment and discrimination such persons face in housing. They also noted that a number of federal courts and federal agencies have interpreted Title VII and other laws prohibiting discrimination on the basis of gender identity, gender transition, or transgender status. The commenters also pointed to HUD's "Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity" rule, which provides that persons may not be denied access to HUD programs because of sexual orientation or gender identity.

*HUD Response:* The Fair Housing Act already expressly prohibits discrimination based on pregnancy as part of its prohibition of discrimination because of familial status (42 U.S.C. 3602(k)), and HUD's Equal Access Rule applies only to HUD programs.

HUD agrees with the commenters' view that the Fair Housing Act's prohibition on sex discrimination prohibits discrimination because of gender identity. In *Price Waterhouse v. Hopkins,* the Supreme Court interpreted Title VII's prohibition of sex discrimination to encompass discrimination based on non-conformance with sex stereotypes, stating that "[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." [11] Taking note of *Price Waterhouse* and its progeny, in 2010, HUD issued a memorandum recognizing that sex discrimination prohibited by the Fair Housing Act includes discrimination

[11] 490 U.S. 228, 251 (1989).

because of gender identity. In 2012, the Equal Employment Opportunity Commission (EEOC) reached the same conclusion, "clarifying that claims of discrimination based on transgender status, also referred to as claims of discrimination based on gender identity, are cognizable under Title VII's sex discrimination prohibition." [12] Following the EEOC's decision, the Attorney General also concluded that:

the best reading of Title VII's prohibition of sex discrimination is that it encompasses discrimination based on gender identity, including transgender status. The most straightforward reading of Title VII is that discrimination "because of . . . sex" includes discrimination because an employee's gender identification is as a member of a particular sex, or because the employee is transitioning, or has transitioned, to another sex.[13]

HUD reaffirms its view that under the Fair Housing Act, discrimination based on gender identity is sex discrimination. Accordingly, quid pro quo or hostile environment harassment in housing because of a person's gender identity is indistinguishable from harassment because of sex.[14]

HUD, in its 2010 memorandum, also advised that claims of housing discrimination because of sexual orientation can be investigated under the *Price Waterhouse* sex-stereotyping

[12] *Macy v. Dept. of Justice,* No. 0120120821, 2012 EEOPUB LEXIS 1181, *13 (EEOC Apr. 20, 2012); *see also Lusardi v. Dept. of the Army,* No. 0120133395, 2015 EEOPUB LEXIS 896, *17 (EEOC Apr. 1, 2015).

[13] Attorney General Memorandum, Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014), posted at *http://www.justice.gov/file/188671/download.* Similarly, the Office of Personnel Management revised its nondiscrimination regulations to make clear that sex discrimination under Title VII includes discrimination based on gender identity. *See* 5 CFR 300.102–300.103; *see also* OFCCP Directive 2014–02, Gender Identity and Sex Discrimination (Aug. 19, 2014) (stating that discrimination based on gender identity or transgender status is discrimination based on sex), posted at *http://www.dol.gov/ofccp/regs/compliance/directives/Directive_2014–02_508c.pdf.*

[14] *See Glenn v. Brumby,* 663 F.3d at 1317 ("discrimination against a transgender individual because of her gender nonconformity is sex discrimination, whether it is described as being on the basis of sex or gender."); *see also Finkle v. Howard Cnty,* 12 F. Supp. 3d 780, 788 (D. Md. 2014) (holding that "Plaintiff's claim that she was discriminated against 'because of her obvious transgender[] status is a cognizable claim of sex discrimination under Title VII"); *Rumble v. Fairview Health Services,* No. 14–cv–2037, 2015 U.S. Dist. LEXIS 31591, *4–5 (D. Minn. Mar. 16, 2015) (in Affordable Care Act case, holding that "[b]ecause the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping. Therefore, Plaintiff's transgender status is necessarily part of his 'sex' or 'gender' identity").

theory. Over the past two decades, an increasing number of Federal courts, building on the *Price Waterhouse* rationale, have found protections under Title VII for those asserting discrimination claims related to their sexual orientation.[15] Many Federal-sector EEOC decisions have found the same.[16] Although some Federal

[15] *See, e.g., Prowel v. Wise Bus. Forms, Inc.,* 579 F.3d 285, 291–92 (3rd Cir. 2009) (harassment of a plaintiff because of his "effeminate traits" and behaviors could constitute sufficient evidence that he "was harassed because he did not conform to [the employer's] vision of how a man should look, speak, and act—rather than harassment based solely on his sexual orientation"); *Nichols v. Azteca Rest. Enter., Inc.,* 256 F.3d 864, 874–75 (9th Cir. 2001) (coworkers' and supervisors' harassment of a gay male because he did not conform to gender norms created a hostile work environment in violation of Title VII); *Hall v. BNSF Ry. Co.,* No. C13–2160 RSM, 2014 U.S. Dist. LEXIS 132878 *8–9 (W.D. Wash. September 22, 2014) (plaintiff's allegation that "he (as a male who married a male) was treated differently in comparison to his female coworkers who also married males" stated a sex discrimination claim under Title VII); *Terveer v. Billington,* 34 F. Supp. 3d 100, 116 (D.D.C. 2014) (Title VII claim based on sex stated when plaintiff's "orientation as homosexual" removed him from the employer's preconceived definition of male); *Heller v. Columbia Edgewater Country Club,* 195 F. Supp. 2d 1212, 1224 (D. Or. 2002) ("[A] jury could find that Cagle repeatedly harassed (and ultimately discharged) Heller because Heller did not conform to Cagle's stereotype of how a woman ought to behave. Heller is attracted to and dates other women, whereas Cagle believes that a woman should be attracted to and date only men."); *Centola v. Potter,* 183 F. Supp. 2d 403, 410 (D. Mass. 2002) ("Sexual orientation harassment is often, if not always, motivated by a desire to enforce heterosexually defined gender norms. In fact, stereotypes about homosexuality are directly related to our stereotypes about the proper roles of men and women."). *Cf. Videckis v. Pepperdine Univ.,* 2015 U.S. Dist. LEXIS 167672, *16 (C.D. Cal. 2015) ("It is impossible to categorically separate 'sexual orientation discrimination' from discrimination on the basis of sex or from gender stereotypes; to do so would result in a false choice. Simply put, to allege discrimination on the basis of sexuality is to state a Title IX claim on the basis of sex or gender.").

[16] *Baldwin v. Dep't of Transp.,* EEOC Appeal No. 0120133080, slip op. at 9–11 (July 16, 2015); *Complainant v. Dep't of Homeland Sec.,* EEOC Appeal No. 0120110576, slip op. at 1 (Aug. 20, 2014) ("While Title VII's prohibition of discrimination does not explicitly include sexual orientation as a basis, Title VII prohibits sex discrimination, including sex-stereotyping discrimination and gender discrimination" and "sex discrimination claims may intersect with claims of sexual orientation discrimination."); *Couch v. Dep't of Energy,* EEOC Appeal No. 0120131136, slip op. at 1 (Aug. 13, 2013) (finding harassment claim based on perceived sexual orientation is a discrimination claim based on failure to conform to gender stereotypes); *Culp v. Dep't of Homeland Sec.,* EEOC Appeal 0720130012, slip op. at 1 (May 7, 2013) (Title VII covers discrimination based on associating with lesbian colleague); *Castello v. U.S. Postal Serv.,* EEOC Appeal No. 0520110649, slip op. at 1 (Dec. 20, 2011) (vacating prior decision and holding that complainant stated claim of discrimination based on sex-stereotyping through evidence of offensive comments by manager about female subordinate's relationships with women); *Veretto v. U.S. Postal Serv.,* EEOC Appeal No. 0120110873, slip op. at 1

appellate courts have declined to find sex discrimination under Title VII based on the sole fact of the person's sexual orientation, those courts nonetheless recognized the *Price Waterhouse* sex-stereotyping theory may be used to find discrimination based on sex.[17] These Title VII legal authorities are consistent with HUD's 2010 memorandum, in which HUD interprets the Fair Housing Act's prohibition on sex discrimination to include, at a minimum, discrimination related to an individual's sexual orientation where the evidence establishes that the discrimination is based on sex stereotypes. HUD's interpretation of sex discrimination under the Fair Housing Act is also consistent with the Department of Health and Human Services' rule interpreting sex discrimination under Section 1557 the Affordable Care Act [18] and the Department of Labor's rule interpreting sex discrimination under Title VII of the Civil Rights Act of 1964.[19]

*Issue:* Some commenters asked HUD to provide a definition of harassment. A commenter noted that the proposed rule defines two types of harassment—quid pro quo and hostile environment, but does not define the general term "harassment." Another commenter stated that if HUD believes that other types of harassment may also violate the Fair Housing Act, HUD should provide a definition of harassment. Other commenters strongly supported the rule's definitions of quid pro quo and hostile environment harassment, describing them as clear and inclusive, and stated that the definitions and related examples provided in the rule clarify what conduct the Fair Housing Act prohibits and will aid all stakeholders' understanding of the rule's provisions.

*HUD Response:* The term harassment has broad colloquial usage with no defined parameters. For this reason, the final rule defines the specific terms "quid pro quo" and "hostile environment harassment." Other conduct that might generically be referred to as harassment might fall in the categories of quid pro quo or hostile environment, or the conduct may constitute a different type of discriminatory housing practice in violation of section 818 of the Act or other provisions of the Act, or the conduct may not violate the Act at all. As the preamble to the proposed rule explained, a violation of section 818 may be established using the standards for quid pro quo or hostile environment harassment or by the specific elements of a section 818 violation, *i.e.,* (1) the plaintiff or complainant exercised or enjoyed—or aided or encouraged another person in the exercise or enjoyment of—a right guaranteed by sections 803–06; (2) the defendant's or respondent's conduct constituted coercion, intimidation, a threat, or interference; and (3) a causal connection existed between the exercise, enjoyment, aid or encouragement of the right and the defendant's or respondent's conduct.

*Issue:* Some commenters expressed concern that the proposed rule did not expressly state that sections 804(b) and 818 of the Fair Housing Act apply to discrimination that occurs after the complainant or plaintiff acquires the dwelling. The commenters stated that some courts have held that these provisions apply only to discrimination that affects access to housing and urged HUD to add language to the rule making clear that these particular provisions apply to post-acquisition discrimination claims.

*HUD Response:* HUD believes that the definitions of "quid pro quo" and "hostile environment harassment" make clear HUD's view that the Act covers post-acquisition conduct and therefore no additional language is required. These definitions mirror the coverage of sections 804(b), 804(f)(2), and 818 of the Fair Housing Act, which plainly apply to both pre-acquisition and post-acquisition discrimination claims. Moreover, HUD has long interpreted and enforced these provisions of the Act and others to protect against discrimination that occurs before one acquires a dwelling as well as while one is living in the dwelling. HUD's 1989 regulations interpreting sections 804(b), 804(f)(2), and 818 of the Act, for example, provide that discrimination prohibited under these provisions includes the "maintenance or repairs of sale or rental dwellings," "[d]enying or limiting the use of privileges, services, or facilities associated with a dwelling," and threatening, intimidating or interfering with persons "in their enjoyment of a dwelling." The inclusion of language covering the maintenance of housing, the continued use of privileges, services, or facilities associated with housing, and the "exercise or enjoyment" of housing indicates circumstances in which residents—as opposed to just applicants—benefit from the Act's protections throughout their residency.

Sections 100.65(b)(6)–(7) of the proposed and of the final rule further illustrate some ways in which a person may violate sections 804(b), 804(f)(2), and 818 of the Fair Housing Act: "conditioning the terms, conditions, or privileges relating to the sale or rental of a dwelling, or denying or limiting the services or facilities in connection therewith, on a person's response to harassment because of [a protected characteristic]; "subjecting a person to harassment because of [a protected characteristic] that has the effect of imposing different terms, conditions, or privileges relating to the sale or rental of a dwelling or denying or limiting services or facilities in connection with the sale or rental of a dwelling." In sum, the Act and HUD's regulations, including this final rule, make clear that the Act prohibits discrimination that occurs while a person resides in a dwelling, and courts have repeatedly interpreted the Act similarly.[20]

---

(July 1, 2011) (court found that "Complainant has alleged a plausible sex-stereotyping" claim of harassment because he married a man).

[17] *See, e.g., Gilbert v. Country Music Ass'n,* 432 F. App'x 516, 520 (6th Cir. 2011) (acknowledging the validity of a sex-stereotyping claim "based on gender non-conforming 'behavior observed at work or affecting . . . job performance,' such as . . . 'appearance or mannerisms on the job,'" but rejecting the plaintiff's sex discrimination claim because his "allegations involve discrimination based on sexual orientation, nothing more. He does not make a single allegation that anyone discriminated against him based on his 'appearance or mannerisms' or for his 'gender non-conformity.'") (quoting *Vickers v. Fairfield Med. Ctr.,* 453 F.3d 757, 763 (6th Cir. 2006); *Pagan v. Gonzalez,* 430 F. App'x 170, 171–72 (3d Cir. 2011) (recognizing that "discrimination based on a failure to conform to gender stereotypes is cognizable" but affirming dismissal of the plaintiff's sex discrimination claim based on "the absence of any evidence to show that the discrimination was based on Pagan's acting in a masculine manner"); *Dawson v. Bumble & Bumble,* 398 F.3d 211, 221, 222–23 (2d Cir. 2005) (observing that "one can fail to conform to gender stereotypes in two ways: (1) Through behavior or (2) through appearance, but dismissing the plaintiff's sex discrimination claim because she "has produced no substantial evidence from which we may plausibly infer that her alleged failure to conform her appearance to feminine stereotypes resulted in her suffering any adverse employment action"). *See also Hively v. Ivy Tech Community College,* 2016 U.S. App. LEXIS 13748, *16–25 (7th Cir. 2016) (reviewing this line of cases).

[18] Nondiscrimination in Health Programs and Activities, 81 FR 31376, 31388–90 (May 18, 2016) (to be codified at 45 CFR part 92).

[19] Discrimination Because of Sex, 81 FR 39108, 39137–40 (June 15, 2016) (to be codified at 41 CFR part 60–20).

[20] *See, e.g., Bloch v. Frischholz,* 587 F.3d at779–81 (ruling that post-sale conduct by a homeowner's association could violate section 804(b) of the Act and allowing section 3604(b) claims to address post-acquisition conduct was consistent with HUD's regulations (citing 24 CFR 100.65(b)(4))); *Comm. Concerning Cmty. Improvement v. City of Modesto,* 583 F.3d 690, 713 (9th Cir. 2009) (concluding that the Act covers post-acquisition discrimination); *Neudecker v. Boisclair Corp.,* 351 F.3d at 364 (finding plaintiff's post-acquisition harassment claim valid under the Act); *DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir. 1996) (recognizing claim for sexual harassment hostile housing environment under the Act); *Honce v. Vigil,* 1 F.3d at 1089–90 (recognizing that the Act prohibits both quid pro quo and hostile housing

Continued

*Issue:* Some commenters asked HUD to clarify how to distinguish potentially actionable harassment under the Fair Housing Act from protected speech under the First Amendment. A commenter said that it is not clear how conduct that allegedly constitutes harassment under the rule may be distinguished from other speech or conduct that is constitutionally protected or so trivial so as not to qualify as harassment in the first place. Another commenter said that courts have consistently held that the First Amendment protects a tenant who publicly speaks about a neighbor, even if that conduct is motivated by discriminatory intent. Another commenter asked whether the proposed rule would implicate constitutional protections of free speech or free exercise of religion if the housing provider evicts a tenant where, for example, two tenants are having heated religious arguments about the other's choice of religious attire. Another commenter stated that the proposed rule properly balanced the competing rights at issue and did not interfere with constitutionally protected speech because the rule would not encompass speech that is merely offensive or that causes nothing more than hurt feelings.

*HUD Response:* As discussed elsewhere in this preamble, not every dispute between neighbors is a violation of the Fair Housing Act. Moreover, speech is protected by the First Amendment is not within the Act's prohibitions. First Amendment protections do not extend to certain acts of coercion, intimidation, or threats of bodily harm proscribed by section 818

environment sexual harassment); *Woods-Drake* v. *Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) (finding that a landlord's discriminatory conduct against current tenants violated section 3604(b) of the Act); *Richards* v. *Bono*, No. 5:04CV484–OC–10GRJ, 2005 WL 1065141, at *3 (M.D. Fla. May 2, 2005) ("[b]ecause the plain meaning of 'rental' contemplates an ongoing relationship, the use of that term in § 3604(b) means that the statute prohibits discrimination at any time during the landlord/tenant relationship, including after the tenant takes possession of the property"); *United States* v. *Koch*, 352 F. Supp. 2d 970, 976 (D. Neb. 2004) ("[i]t is difficult to imagine a privilege that flows more naturally from the purchase or rental of a dwelling than the privilege of residing therein."); U.S. Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, Questions and Answers on Sexual Harassment under the Fair Housing Act (2008), available at *http://portal.hud.gov/hudportal/ documents/huddoc?id=QAndASexualHarassment .pdf* (recognizing that current tenants may file fair housing complaints under the Act); Robert G. Schwemm, *Fair Housing Litigation After Inclusive Communities: What's New and What's Not,* 115 Colum. L. Rev. Sidebar 106, 122–23 (2015) (explaining that many post-acquisition actions, such as evictions and harassment, may give rise to violations under sections 804(a) and 804(b) of the Act).

of the Act. As the Supreme Court has stated, "true threats" have no First Amendment protection.[21] In Notice FHEO–2015–01, HUD has set out substantive and procedural guidelines regarding the filing and investigation of Fair Housing Act complaints that may implicate the First Amendment.[22] The Notice discusses how HUD handles complaints against persons who are not otherwise covered by the Act, but who are alleged to have violated Section 818 of the Act.

*Issue:* A commenter suggested that the rule is unnecessary because other administrative and legal remedies already exist for victims of harassment under state and local law. Another commenter suggested that the rule is unnecessary because HUD has already charged cases involving harassment under the Act.

*HUD Response:* This final rule formalizes and provides uniform standards for evaluating complaints of quid pro quo and hostile environment harassment under the Fair Housing Act. While other administrative and legal causes of action may exist for victims of quid pro quo and hostile environment harassment under landlord-tenant law, tort law, or other state law, they do not substitute for the protections against discrimination and the remedies provided under the Act. Moreover, the fact that HUD has previously issued charges of discrimination involving quid pro quo or hostile environment harassment does not negate the need for this rule.

*Issue:* A commenter asked HUD to abandon the rulemaking process and instead provide specific, clear guidance to the regulated community so that housing providers can ascertain the types of behavior that do and do not constitute harassment under the Fair Housing Act. Other commenters requested that HUD provide technical assistance on various aspects of the rule to residents, housing providers, and practitioners to ensure all parties know their rights under the law.

*HUD Response:* HUD declines to abandon this rulemaking. This regulation is needed to formalize standards for assessing claims of harassment under the Fair Housing Act and to clarify when housing providers and others covered by the Act may be liable for illegal harassment or other discriminatory housing practices. It has been HUD's experience that there is

[21] *See, e.g., R.A.V.* v. *City of St. Paul*, 505 U.S. 377, 388 (1992).

[22] Notice FHEO 2015–01 *found at: http:// portal.hud.gov/hudportal/documents/huddoc?id=5- 26-2015notice.pdf.*

significant misunderstanding among public and private housing providers about the circumstances under which they may be liable. This regulation provides greater clarity in making that assessment. HUD will continue to offer guidance and training on the Fair Housing Act generally and on this final rule, as needed.

*Issue:* A commenter recommended that the rule expand the limits for damages in cases that establish sexual harassment in housing.

*HUD Response:* HUD declines to make this change because it is unnecessary. The Act contains no limit on damages that may be awarded, specifically authorizing an award of "actual damages." 42 U.S.C. 3612(g)(3); 3613(c)(1); 3614(d)(1)(B).

*Issue:* A commenter asked HUD to consider expanding the time for filing sexual harassment complaints where a hostile environment case includes subsequent harassment that occurs many months after the initial act of sexual harassment.

*HUD Response:* HUD declines to adopt this recommendation because the Fair Housing Act specifically defines the statute of limitations for filing complaints. It is one year after an alleged discriminatory housing practice occurred or terminated for a complaint with HUD and two years after an alleged discriminatory housing practice occurred or terminated for a civil action in federal district court or state court. *See* 42 U.S.C. 3610; 3613. If a violation is continuing, the limitations period runs from the date of the last occurrence or termination of the discriminatory act.[23]

1. Quid Pro Quo Harassment: § 100.600(a)(1)

*Issue:* A commenter asked how the rule would "differentiate between a situation of involuntary quid pro quo that genuinely must be governed by the Act and a situation where one party is manipulating the rule following a mutually beneficial and agreed upon transaction."

*HUD Response:* The rule's definition of quid pro quo harassment requires a request or demand that is "unwelcome." A mutually beneficial and agreed upon transaction is not unwelcome and would not constitute quid pro quo harassment under the rule or the Act. It is important to note, however, that, as the rule states, if an individual

[23] *See, e.g., Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 380–81 (1982); *Neudecker* v. *Boisclair Corp.,* 351 F.3d at 363 ; *Spann* v. *Colonial Vill., Inc.,* 899 F.2d 24, 34–35 (D.C. Cir. 1990); *Heights Cmty Congress* v. *Hilltop Realty, Inc.,* 774 F.2d 135, 139– 41 (6th Cir. 1985).

acquiesces to an unwelcome request or demand, unlawful quid pro quo harassment may have occurred. Moreover, if a housing provider regularly or routinely confers housing benefits based upon the granting of sexual favors, such conduct may constitute quid pro quo harassment or hostile environment harassment against others who do not welcome such conduct, regardless of whether any objectionable conduct is directed at them and regardless of whether the individuals who received favorable treatment willingly granted the sexual favors.[24] Liability in all situations involving allegations of harassment must be determined on a case-by-case basis.

*Issue:* A commenter stated that the preamble to the proposed rule was vague in stating that "a person is aggrieved if that person is denied or delayed in receiving a housing-related opportunity or benefit because another received the benefit." The commenter was concerned that this statement would require a PHA to identify, investigate, and document a defense to any tenant-perceived delay in receiving benefits.

*HUD Response:* The quoted phrase is not vague when read in context, which explains the meaning of quid pro quo harassment under the Fair Housing Act. The phrase refers to a person who is aggrieved because he or she is denied a benefit that went to another in exchange for sexual favors, for example. Aggrieved persons under the Act and HUD's regulation are limited to those who were injured (or are about to be injured) by a discriminatory housing practice as defined in the Act. Neither the Fair Housing Act nor this final rule prohibits delays in receiving housing-related opportunities or benefits for nondiscriminatory reasons. If, however, an applicant or tenant alleges that he or she has been denied or delayed in receiving a benefit because others submitted to requests for sexual favors, the PHA should investigate to determine if quid pro quo or hostile environment harassment has occurred.

### 2. Hostile Environment Harassment: § 100.600(a)(2)

*Issue:* Several commenters recommended that HUD ensure

[24] *Cf.* EEOC Policy Guidance No. N-915.048, Employer Liability under Title VII for Sexual Favoritism (Jan. 12, 1990) (providing that widespread sexual favoritism based upon solicitations for and/or the granting of sexual favors or other sexual conduct "can form the basis of an implicit 'quid pro quo' harassment claim for female employees, as well as a hostile environment claim for both women and men who find this offensive").

consistency of the discussion of hostile environment harassment throughout the preamble in order to prevent any unintentional barriers for harassment victims seeking to bring claims under the Fair Housing Act. The commenters specifically stated that in one section of the preamble to the proposed rule, HUD defines "hostile environment harassment" to require unwelcome conduct because of a protected characteristic that "*unreasonably* interferes" with the use and enjoyment of a dwelling, or with the exercise of other rights protected by the Act. By contrast, the commenters stated, other sections of the preamble rightly omit the "unreasonably" qualifier when discussing hostile environment harassment. The commenters requested that the word "unreasonably" be removed from the discussion in the preamble because it is unnecessary and will create confusion. They stated that unwelcome conduct that is "sufficiently severe or pervasive" as to interfere with one's enjoyment of rights protected under the Act is in itself unreasonable.

*HUD Response:* The term "unreasonably" does not appear in the definition of "hostile environment harassment" in the regulatory text of the proposed rule. The term "unreasonably" was used in the preamble to the proposed rule to convey how a claim of hostile environment would be evaluated; that is, from the perspective of a reasonable person in the aggrieved person's position. HUD agrees that the use of the term "unreasonably" in the preamble may have caused confusion by conflating the substantive standard with the method of proof. In this final rule, as was the case in the proposed rule, the definition of "hostile environment harassment" in § 100.600(a)(2) is not phrased as requiring proof that unwelcome conduct "unreasonably" interfere with a right protected by the Fair Housing Act. But it remains that whether unwelcome conduct is sufficiently severe or pervasive as to interfere with rights protected by the Act, and therefore constitute hostile environment harassment, is evaluated from the perspective of a reasonable person in the aggrieved person's position.

*Issue:* A commenter suggested that HUD include definitions and descriptions of "bullying" in this final rule because bullying is very similar to hostile environment harassment.

*HUD Response:* HUD does not agree that it is necessary to add the word "bullying" to the final rule in order to cover conduct that could be considered bullying. Section 100.600(a)(2) of the proposed rule and of this final rule,

which defines hostile environment harassment and specifies the factors to be considered when evaluating whether particular conduct creates a hostile environment in violation of the Act, is broadly worded and fully captures the concept of bullying because of a protected characteristic that the commenter seeks to include.

*Issue:* A commenter said HUD should include social isolation and neglect as forms of harassment under the rule, especially when they occur with the intent to drive a person from his or her home or interfere with his or her enjoyment of a dwelling. According to the commenter, these actions have major implications for the psychological well-being of an individual.

*HUD Response:* HUD appreciates that social isolation and neglect are serious concerns. This rule is limited to conduct engaged in because of a protected characteristic. If a tenant is subjected to unwanted severe or pervasive conduct because of a disability, for example, which leads to social isolation with the intent or effect of driving the tenant from his or her home or interfering with his or her enjoyment of a dwelling, such conduct could constitute hostile environment harassment under the standards set forth in the rule.

*Issue:* A commenter said the rule could more clearly distinguish harassment from inappropriate behavior or disputes that do not rise to the level of harassment. Other commenters stated that they appreciated the rule's emphasis on the totality of the circumstances, which will ensure that mere disagreements, mistaken remarks, or isolated words spoken in the heat of the moment will not result in liability unless the totality of the circumstances establishes hostile environment harassment.

*HUD Response:* HUD agrees that not every disagreement between persons involved in a housing transaction constitutes unlawful harassment because of a protected characteristic in violation of the Act and believes the rule appropriately captures the distinction. Section 100.600(a)(2) of the proposed rule and of this final rule defining hostile environment harassment requires that the unwelcome conduct be "sufficiently *severe or pervasive*" as to interfere with defined features of the housing transaction: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms or conditions of a residential real estate-related transaction.

*Issue:* A commenter recommended that the final rule recognize the role of preferential treatment for services and living arrangements, except when provided because of disability, as a type of discrimination. The commenter said that preferential treatment is a means through which to encourage and reward secondary actors for their role in creating a hostile environment, and the rule should recognize it as such. The commenter also recommended that HUD request and make available data regarding repairs or upgrades so any non-monetary favor in exchange for harassment, by an agent not directly employed by the management or owner, may be determined.

*HUD Response:* HUD declines to adopt the commenter's suggestions because the rule as currently proposed already accommodates the commenter's concerns. Providing preferential treatment that creates a hostile environment because of race, color, religion, sex, familial status, or national origin already violates the Fair Housing Act under the standards proposed in the rule. Moreover, HUD's regulations already contain illustrations as to this type of violation. Therefore, additional language regarding preferential treatment is not needed. In addition, processes for requesting and making available data regarding repairs or upgrades are outside the scope of this rule. HUD notes that in investigations, it requests data regarding repairs or upgrades as appropriate to determine whether a violation of the Fair Housing Act has occurred.

*Issue:* Two commenters asked whether the rule would apply to situations in which residential property managers or other employees of a housing provider are harassed by the housing provider's tenants. One of the commenters explained that she was a resident of the building she managed, that she had a disability, and that she had suffered harassment and threats by other residents.

*HUD Response:* The proposed standards generally would not apply to situations in which a property manager or other housing provider employee is harassed by the housing provider's tenants because such situations ordinarily do not involve a housing-related transaction covered by the Act. Where, however, a property manager is also a resident of the building that the property manager manages (*e.g.*, a resident-manager), the property manager is entitled to the same protection from discriminatory harassment under the Act and under this final rule as any other resident. Additionally, Section 818 of the Act makes it unlawful to

coerce, intimidate, threaten, or interfere with any person on account of the person having assisted others in enjoying or exercising their fair housing rights. Therefore, to the extent that a property manager or other housing provider employee (whether a resident or not) is subjected to coercion, intimidation, threats, or interference because he or she aided or encouraged other people in exercising or enjoying a right protected by the Act—*e.g.*, by receiving and responding to one tenant's complaint of discriminatory harassment by another tenant—the manager or employee may be entitled to protection under the Act.[25]

i. Totality of the Circumstances: § 100.600(a)(2)(i)

*Issue:* Some commenters requested that HUD clarify the definition of "totality of the circumstances" in § 100.600(a)(2)(i) because, in the commenters' view, the proposed rule does not sufficiently explain the showing required to prove hostile environment harassment in violation of the Fair Housing Act. Other commenters supported HUD's standard for determining whether conduct constitutes a hostile environment, stating that the standard and its factors are clear and permit an appropriately individualized assessment of the facts of each case. These commenters stated that the rule's explanation of hostile environment harassment provides meaningful guidance to both housing providers and potential claimants.

*HUD Response:* HUD believes the "totality of the circumstances" standard in this final rule provides an appropriate standard for assessing claims of hostile environment harassment, while also providing courts with the flexibility to consider the numerous and varied factual circumstances that may be relevant when assessing a specific claim. HUD therefore chooses not to alter the definition of the term "totality of the circumstances," although it will add to the final rule the standard by which the evidence is to be evaluated, which is from the perspective of a reasonable person in the aggrieved person's position. Section 100.600(a)(2) defines what constitutes hostile environment harassment under the Act. In accordance with this provision, establishing a hostile environment harassment violation requires proving that: A person was subjected to unwelcome spoken, written, or physical

conduct; the conduct was because of a protected characteristic; and the conduct was, considering the totality of the circumstances, sufficiently severe or pervasive as to interfere with or deprive the victim of his or her right to use and enjoy the housing or to exercise other rights protected by the Act. Whether a hostile environment harassment violation has occurred is a fact-specific inquiry, and the rule supplies a non-exhaustive list of factors that must be considered in making that determination. It would be impossible to quantify in the rule the amount of evidence necessary to make such a showing in every case involving a claim of hostile environment harassment. The additional instruction in the rule text, and not just the preamble, that the "totality of the circumstances" is to be evaluated from the perspective of a reasonable person in the aggrieved person's position will aid all parties in assessing whether a "hostile environment" has been created.

*Issue:* HUD received several comments regarding the explanation in the preamble to the proposed rule that hostile environment harassment should be assessed from the perspective of a reasonable person in the aggrieved person's position. A commenter expressed concern that this standard is too subjective, stating that one reasonable person's measure may be different from another reasonable person's measure. Another commenter asked HUD to provide a definition of the term "reasonable person." Other commenters approved of the standard articulated in the preamble to the proposed rule and commended HUD for recognizing that the reasonable person standard must take into account the circumstances of the aggrieved person. A commenter recommended that the rule text itself explicitly state this objective standard. Another commenter, however, recommended that HUD not add the standard to the rule text itself because such addition may invite courts to second-guess the rationality and behavior of the actual victim, rather than focusing on the conduct and its surrounding circumstances.

*HUD Response:* As HUD explained in the preamble to the proposed rule, whether unwelcome conduct is sufficiently severe or pervasive to create a hostile housing environment is evaluated from the perspective of a reasonable person in the aggrieved person's position. This standard is an objective one, but ensures that an assessment of the totality of the circumstances includes consideration of whether persons of the same protected class and of like personal experience as

---

[25] A property manager may also be protected by Title VII, whether or not he or she resides at the housing.

the plaintiff or complainant would find the challenged conduct to create a hostile environment. At the proposed rule stage, HUD chose not to add the "reasonable person in the aggrieved person's position" standard to the text of the rule itself. But in light of the confusion expressed by some of the commenters, HUD has added this standard to the text of the final rule discussing the totality of the circumstances standard. In adding this reasonable person standard for assessing the evidence to the rule text, HUD does not intend to create an additional requirement for proving a hostile environment harassment claim beyond the showing required under § 100.600(a)(2) of the rule. The definition of hostile environment harassment in this final rule remains unchanged and focuses on defining the types of conduct that may establish a claim of hostile environment harassment under the Fair Housing Act.

*(A) Factors To Be Considered: § 100.600(a)(2)(i)(A)*

*Issue:* Several commenters commended HUD's explanation in the preamble to the proposed rule that individuals have heightened rights within their home for privacy and freedom from unwelcome speech and conduct. Many commenters agreed with HUD that harassment in or around one's home can be far more intrusive, violative, and threatening than harassment in the more public environment of one's workplace. Some commenters said these considerations should be explicitly incorporated into the text of the rule itself. Commenters specifically requested that HUD revise proposed § 100.600(a)(2)(i)(A) by adding as a factor to be considered in determining whether hostile environment harassment exists "the heightened rights in or around one's home for privacy and freedom from harassment" or "the heightened reasonable expectation of privacy and freedom from harassment in one's home." Another commenter said that § 100.600(a)(2)(i)(A) should expressly state that conduct occurring in one's home may result in a violation of the Fair Housing Act even though the same conduct in one's place of employment may not violate Title VII.

*HUD Response:* HUD declines to add language regarding individuals' heightened rights within the home for privacy and freedom from unwelcome speech and conduct to the rule text in § 100.600(a)(2)(i)(A). The non-exhaustive list of factors included in § 100.600(a)(2)(i)(A) identifies circumstances that can be demonstrated

with evidence during the adjudication of a claim of hostile environment harassment under the Act. Evidence regarding the "location of the conduct," as explicitly identified in § 100.600(a)(2)(i)(A), is a critical factor for consideration and will allow courts to take into account the heightened privacy and other rights that exist within the home when determining whether hostile environment harassment occurred. For similar reasons, HUD also declines to add language stating that harassing conduct may result in a violation of the Fair Housing Act even though such conduct might not violate Title VII. HUD believes that by establishing a hostile environment harassment standard tailored to the specific rights protected by the Fair Housing Act and by directing that hostile environment claims under the Act are to be evaluated by assessing the totality of the circumstances—including the location of the unwelcome conduct and the context in which it occurred—the final rule ensures that courts consider factors unique to the housing context when making the fact-specific determination of whether the particular conduct at issue violates the Act. Therefore, while HUD agrees that unwelcome conduct in or around the home can be particularly intrusive and threatening and may violate the Fair Housing Act even though the same or similar conduct in an employment setting may not violate Title VII, HUD does not believe the proposed additions to § 100.600(a)(2)(i)(A) are necessary.

*Issue:* A commenter supported HUD's identification of the relationship of the persons involved as a factor to be considered when determining whether hostile environment harassment has occurred, but recommended that the final rule further refine the concept. Specifically, in the homeowner's association context, the commenter drew distinctions between the relationships among the different resident-owners and between a board member and a resident-owner. The commenter also distinguished these relationships from landlord-tenant relationships.

*HUD Response:* HUD appreciates these distinctions and believes the rule already accommodates them by requiring the relationship of the parties involved be taken into account in determining whether a hostile environment has been created. This is one of several factors that HUD identified for evaluating allegations of hostile environment harassment. In a community governed by a homeowner's association, for example, the influence

an owner-board member has over another resident by virtue of his or her authority to make association policy, to approve homeowner requests, and to bring or adjudicate charges of association rule violations may be greater than a non-board member, and thus each person's relationship to the victim should be considered when assessing whether a hostile environment exists. No further refinement to the rule is necessary to address the commenter's concerns; nor is any further refinement desirable, as it would risk inadvertently inserting limiting factors into the otherwise broad and flexible totality of the circumstances test.

*(B) Physiological or Physical Harm: § 100.600(a)(2)(i)(B)*

*Issue:* A commenter stated that § 100.600(a)(2)(i)(B) of the proposed rule, which concerns psychological or physical harm, is confusing. The commenter requested that HUD clarify the meaning of this provision.

*HUD Response:* HUD agrees that § 100.600(a)(2)(i)(B) may be confusing and has revised this provision at the final rule stage; the revision is intended to clarify without altering the meaning of the provision. Proposed § 100.600(a)(2)(i)(B) provided that "Evidence of psychological or physical harm is relevant in determining whether a hostile environment was created, as well as the amount of damages to which an aggrieved person may be entitled. Neither psychological nor physical harm, however, must be demonstrated to prove that a hostile environment exists." Final § 100.600(a)(2)(i)(B) provides that "Neither psychological nor physical harm must be demonstrated to prove that a hostile environment exists. Evidence of psychological or physical harm may, however, be relevant in determining whether a hostile environment was created and, if so, the amount of damages to which an aggrieved person may be entitled." As explained at the proposed rule stage, evidence of such harm is but one of many factors that may be considered in assessing the totality of the circumstances. So long as the unwelcome conduct is sufficiently severe or pervasive as to interfere with or deprive the victim of a right protected by the Act, there is no need to also demonstrate psychological or physical injury in order to prove a hostile environment violation.

*ii. Title VII Affirmative Defense: § 100.600(a)(2)(ii)*

*Issue:* HUD received several comments on § 100.600(a)(2)(ii) of the proposed rule, which provides that the

Title VII affirmative defense to an employer's vicarious liability for hostile environment harassment by a supervisor does not apply to claims brought pursuant to the Fair Housing Act. Several commenters commended HUD's decision not to extend the Title VII affirmative defense to the Fair Housing Act and agreed with HUD that such a defense would be inappropriate in the housing context, in part because of the lack of an exhaustion requirement under the Fair Housing Act, as well as the differences between an agent in the employment context versus an agent in the housing context.

Other commenters recommended that HUD apply the judicially-created Title VII affirmative defense to Fair Housing Act claims. One such commenter stated that HUD, by rule, cannot import a Title VII cause of action onto the Fair Housing Act without the judicially-created limitations on a Title VII employer's liability under that cause of action. Another commenter believed that HUD eliminated an existing affirmative defense for housing providers that is available in the employment context. Given the scope of potential harassment claims, this commenter found unwarranted HUD's position that the Title VII affirmative defense is not relevant to harassment in the housing context because, in HUD's view, a housing agent who harasses residents is inevitably aided by his or her agency relationship with the housing provider. In the commenter's view, a responsible housing provider who exercises reasonable care to prevent harassment, and who provides a complaint mechanism that a resident unreasonably fails to invoke, should be afforded the same affirmative defense available to employers in analogous situations. Another commenter asked HUD to reconsider its decision to reject the affirmative defense as it appears unfair and based on an assertion that agents of housing providers are equivalent to a supervisory employer in terms of their power over applicants and/or tenants.

*HUD Response:* After carefully considering the analysis provided by the commenters on both sides of the issue, HUD has retained its view that the Title VII affirmative defense is not appropriate to include as a defense under the Fair Housing Act. HUD has never found occasion to employ such a defense and remains unaware of any court having extended the Title VII affirmative defense to fair housing claims, and commenters did not identify any such case law. Moreover, unlike Title VII, which requires employees to exhaust their administrative remedies

before filing an action in court, the Fair Housing Act has no exhaustion requirement, and nothing in the text of the Fair Housing Act otherwise indicates that Congress intended to permit a housing provider to avoid vicarious liability for discriminatory harassment perpetrated by its agents by establishing its own complaint process or procedure. To the contrary, the Act authorizes any aggrieved person to directly commence a civil action in federal or state court, whether or not the individual has previously chosen to file an administrative complaint with HUD.[26] Therefore, as explained in the preamble to the proposed rule, the Title VII affirmative defense is not appropriately applied to harassment in the housing context because its adoption would impose burdens on victims of discriminatory harassment that are incompatible with the broad protections and streamlined enforcement mechanisms afforded by the Fair Housing Act.

HUD notes that some comments on this issue demonstrated a misunderstanding of the potential scope of the Title VII affirmative defense. The Title VII affirmative defense does not apply to harassment claims based on direct liability. Thus, contrary to the perceptions of some commenters, the affirmative defense does not apply to cases in which an employer—or housing provider—knew or should have known of an agent or third-party's harassment and failed to stop it, because such cases involve direct rather than vicarious liability.

Therefore, in exercising its power to promulgate rules to interpret and carry out the Act, HUD believes it would be inappropriate to add, for the first time, an affirmative defense that would require victims of hostile environment harassment—who are often housing insecure or otherwise especially vulnerable—to choose between the risk of retaliation by the perpetrator and the risk of losing their right to hold a housing provider liable for the acts of its agents. Instead, the traditional principles of vicarious liability—including those standards that hold a principal liable for an agent's conduct that is taken within the scope of employment, with the apparent authority of the principal, or that is otherwise aided by the agency relationship—will continue to govern a housing provider's liability for harassment. While HUD declines to extend the Title VII affirmative defense to the Fair Housing Act, the development and dissemination of anti-

---

[26] *See* 42 U.S.C. 3614(a).

harassment policies will still assist housing providers to avoid litigation by identifying and quickly addressing improper conduct by employees or other agents.

*Issue:* A commenter requested that HUD create safe harbors from liability for housing providers for harassment by their agents and third-parties. Specifically, the commenter stated that liability for unknown and unintended harassment by an agent or third-party should not be imposed on a housing provider where the housing provider: (1) Provides periodic mandatory fair housing training for its employees and agents (including training related to harassment claims); (2) requires unaffiliated management companies to conduct similar training of their employees, report to the property owner on a regular basis about the steps it is taking to avoid fair housing claims generally, and promptly report any potential fair housing claim to a designated official of the housing provider; and (3) implements and publicizes a hotline or other secure communication mechanism whereby a tenant can confidentially notify the housing provider about possible harassment by employees or other tenants.

Another commenter expressed concern that the rule as proposed would expand a PHA's exposure to liability by making the PHA liable for perceived hostile environment harassment that occurs beyond its knowledge or control and fails to create or incentivize any new remedies to protect tenants against hostile environment harassment. As a result, according to the commenter, the proposed rule raises the possibility that future litigation over alleged harassment might be driven by plaintiff attorneys' fees rather than the merit of the allegations or effective remedies. In light of these concerns, the commenter suggested that HUD revise the proposed rule to adopt defenses similar to those applicable to public agencies under California state law for injuries caused by dangerous conditions on the public agency's property. As described by the commenter, the State law defense provides that liability attaches to the public agency if the plaintiff establishes that: (1) The public employee's negligence or wrongful act or omission created the dangerous condition; or (2) the public entity had actual or constructive notice of the dangerous condition before the injury occurred. The commenter believes that this standard incentivizes the public agency to maintain its property and train its staff in order to limit its exposure to liability and reduce the risk of injuries.

*HUD Response:* As explained in the preamble to the proposed rule, traditional principles of tort liability and agency law apply in fair housing cases. The standards for direct and vicarious liability established in this final rule continue to reflect such principles and do not impose any new legal obligations or create or define new agency relationships or duties of care. For the same reasons that HUD does not interpret the Fair Housing Act to import the Title VII affirmative defense for a claim of hostile environment harassment by the provider's agent, HUD does not believe the requested safe harbor or state law-derived defense from liability is appropriate.

The California State law identified by the commenter essentially imposes a negligence standard for public agency liability, which is akin to the standard of direct liability that governs Fair Housing Act claims under § 100.7(a)(1)(ii). In addition, under traditional principles of agency law, a housing provider may be held vicariously liable for the discriminatory acts of an employee or agent regardless of whether the housing provider knew of or intended the discriminatory conduct where the employee was acting within scope of his or her agency, or where the harassment was aided by the agency relationship. HUD believes that traditional tort and agency law standards for assessing liability under the Act will encourage housing providers to provide appropriate training for their staff and to ensure compliance with the Act.

*Issue:* A commenter asserted that the proposed rule, including HUD's decision not to adopt the Title VII affirmative defense, raises Federalism implications. The commenter stated that the proposed rule creates a cause of action based on Title VII law that could, ostensibly, be brought against a State, even when the actions are performed by a city or other sub-recipient of funds, and obviate the State's sovereign immunity despite its ongoing assertion that it has not waived its sovereign immunity. The commenter said that the rule would do so while removing the judicially-created Title VII affirmative defense. The commenter recommended that HUD withdraw the rule or create a specific carve-out for actions against a State that limits and defines the extent of vicarious liability, including a safe-haven for conduct or policy akin to an affirmative defense.

*HUD Response:* Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either (1) imposes substantial, direct

compliance costs on state and local governments and is not required by statute, or (2) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. Under the Executive Order, Federalism implications are those having substantial direct effects on states or local governments (individually or collectively), on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. This final rule does not have such implications. As discussed elsewhere, the rule creates no new cause of action, liability or obligation on the part of any housing provider, including a State. The rule interprets the Fair Housing Act's prohibition on discriminatory harassment, and in doing so, neither alters the substantive prohibitions against discrimination in the Act nor creates enhanced liability or compliance costs for States or any other entities or individuals. Similarly, the rule does not alter any sovereign immunity protections that a State may have under the Eleventh Amendment. In addition, the rule does not remove a pre-existing affirmative defense, because no court of which HUD is aware has ever applied the Title VII affirmative defense or any other affirmative defense or safe harbor to Fair Housing Act claims; nor has HUD ever applied such a standard. HUD notes further that creating an affirmative defense or safe harbor for States would not be consistent with Congressional intent, for the reasons discussed above.

### b. Type of Conduct: § 100.600(b)

*Issue:* A commenter inquired whether a verbal or written account from an aggrieved tenant would be enough to comprise a showing of hostile environment harassment under the Act.

*HUD Response:* A verbal or written account from an aggrieved tenant may be enough to provide notice to a housing provider that a hostile environment may be occurring, but whether it would be sufficient to establish that the conduct is sufficiently severe or pervasive to create a hostile environment depends on the totality of the circumstances.

### c. Number of Incidents: § 100.600(c)

*Issue:* A commenter expressed concern that the proposed rule includes both a "totality of the circumstances standard" and a "single incident standard" and asked HUD to provide more descriptive language to determine the existence of a hostile environment based on such standards. The

commenter asked HUD to clarify or provide examples of when a single incident of harassment would be sufficient to create a hostile environment. Several other commenters expressed approval of § 100.600(c) of the proposed rule, which provides that a single incident of harassment because of race, color, religion, sex, familial status, national origin, or disability may constitute a discriminatory housing practice, where the incident is severe, or evidences a quid pro quo. Other commenters stated that in some cases a single act can be so severe as to deprive individuals of their right to use and enjoy their housing.

*HUD Response:* HUD did not intend to propose two different standards for determining whether hostile environment harassment has occurred. To avoid confusion and better clarify the relationship between § 100.600(c) and § 100.600(a)(2), HUD is revising § 100.600(c) at this final rule stage. Section 100.600(a)(2) of the rule provides the only standard that must be met to prove a claim of hostile environment harassment under the Act—namely, that A person was subjected to unwelcome spoken, written, or physical conduct; the conduct was because of a protected characteristic; and the conduct was sufficiently severe or pervasive as to interfere with or deprive the victim of his or her right to use and enjoy the housing or to exercise other rights protected by the Act. As provided in § 100.600(a)(2)(i), a determination of whether this standard has been met is to be based on the totality of the circumstances. Section 100.600(c) is included in the rule to make clear that a single incident of harassment because of a protected characteristic, if sufficiently severe, can constitute a hostile environment harassment violation (as defined in § 100.600(a)(2)). Whether a claim of hostile environment harassment is based on a single incident or repeated incidents of unwelcome conduct, an assessment of the totality of the circumstances is still required. For example, the nature of the unwelcome conduct (*e.g.,* whether it was spoken, written and/or physical) and the location of the conduct (*e.g.,* whether it occurred inside the victim's apartment or in a common space), among other potential considerations, would factor into an assessment of whether a single incident of harassment was sufficiently severe to interfere with or deprive the victim of his or her right to use and enjoy the housing or to exercise other rights protected by the Act.

HUD is revising proposed § 100.600(c) at this final rule stage as follows.

Proposed § 100.600(c) provided that: "A single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is severe, or evidences a quid pro quo." Final § 100.600(c) now provides: "A single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment, or evidences a quid pro quo."

*B. Illustrations: §§ 100.60, 100.65, 100.80, 100.90, 100.120, 100.130, and 100.135*

*Issue:* Several commenters supported the illustrations included throughout the proposed rule and asked HUD to provide additional examples of prohibited practices in the final rule. They requested more examples of: Unwelcome conduct; how quid pro quo harassment occurs with respect to protected classes other than sex; single incidents that constitute a hostile environment; and when direct liability exists. Commenters also recommended that HUD add to the final rule examples clarifying the relationship between age and disability and add examples of harassment of pregnant women, Muslims, persons with limited English proficiency, persons with mental health-related disabilities or HIV/AIDS, and persons who assert their rights to organize. Another commenter stated that HUD has provided useful illustrations of what does not violate the Act in other fair housing contexts, and requested that HUD do the same here, citing 24 CFR 100.205(b) (concerning the impracticality of meeting the Act's design and construction standards).

*HUD Response:* HUD retains the illustrations contained in the proposed rule, but otherwise declines to add more illustrations to the final rule. The rule contains numerous illustrations of possible quid pro quo and hostile environment harassment referencing all protected classes. But whether illegal harassment has or has not occurred in a particular situation is fact-specific and must be determined on a case-by-case basis. For this reason, the illustrations provided are simply more specific descriptions of the legal standard, *e.g.*, conditioning the availability of housing on a person's response to sexual harassment illustrates an unlawful refusal to sell or rent. Providing illustrations as to what does not violate the Act would not be appropriate because of the necessarily fact-specific

nature of such an inquiry. HUD notes that § 100.205(b), which the commenter cited, does not describe conduct that does not violate the Act, but rather provides examples of when the impracticality exception to the Act's design and construction requirements is applicable. Lastly, some of the suggested examples are outside the scope of the Act, *e.g.*, the right to organize, but HUD notes that persons would be protected by the Act to the extent the harassment is because of their race, color, religion, sex, familial status, national origin, or disability.

*C. Liability for Discriminatory Housing Practices: § 100.7*

a. Direct Liability for One's Own Discriminatory Conduct: § 100.7(a)(1)(i)

*Issue:* A commenter stated that the language in § 100.7(a)(1)(i), which states that a person is directly liable for the person's own conduct that results in a discriminatory housing practice, may lead to the liability of innocent actors and third-parties who somehow contributed to an illegal discriminatory action. The commenter gave as an example a situation in which a person supplied the pen that a housing provider used to make notes on an application that the housing provider later rejected because of a protected characteristic of the applicant.

*HUD Response:* The rule creates no new or enhanced forms of liability. As discussed in the preamble of the proposed rule, § 100.7(a)(1)(i) does nothing more than restate the most basic form of direct liability, *i.e.*, that a person is directly liable for his or her own discriminatory housing practices, as defined by the Act. Whether a person's conduct constitutes a discriminatory housing practice under sections 804–806 or 818 of the Act depends upon the specific facts.

b. Direct Liability for Negligent Failure To Correct and End Discrimination: § 100.7(a)(1)(ii) and (iii)

*Issue:* Several commenters expressed concern about the "should have known" standard in proposed § 100.7(a)(1)(ii) and (iii), which states that a person is directly liable for "(ii) [f]ailing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person *knew or should have known* of the discriminatory conduct," and "(iii) [f]ailing to fulfill a duty to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person *knew or should have known* of the

discriminatory conduct . . . " (emphasis added).

Some commenters stated that this standard creates almost certain liability for landlords and that requiring actual knowledge would be more fair to property owners because liability would only attach for failing to act on known discrimination. A commenter stated that the final rule should limit liability where a housing provider has limited knowledge of misconduct. In contrast, other commenters stated that the "knew or should have known" standard is reasonable and consistent with the Fair Housing Act, legal negligence principles, and business practices of housing providers. One commenter complained that the proposed rule appears to require actual knowledge, even though the standard only requires that a defendant "should have known" of the harassment.

Commenters asked HUD to clarify how a housing provider "should have known" about harassment, especially in the context of tenant-on-tenant harassment. A commenter questioned what the housing provider needs to know before liability attaches and whether the housing provider needs to know that the harasser's actions violate the Fair Housing Act or only that the harasser took some action toward the victim. Several commenters expressed concern that a PHA might be liable when a housing voucher holder is harassed but neither the apartment owner nor voucher holder informs the housing agency about the harassment. One commenter expressed a similar concern that owners living in another city or state may not learn that harassment is taking place on their property unless the tenant tells the owner, and another commenter asked about a PHA's potential liability when harassment occurs over the internet but is unknown to the housing agency.

*HUD Response:* The "knew or should have known" standard is well established in civil rights and tort law.[27] A housing provider "should have known" of the harassment of one resident by another when the housing provider had knowledge from which a reasonable person would conclude that the harassment was occurring. Such knowledge can come from, for example, the harassed resident, another resident,

---

[27] As the Supreme Court has recognized, fair housing actions are essentially tort actions. *See Meyer* v. *Holley*, 537 U.S. 280, 285 (2003) (citing *Curtis* v. *Loether*, 415 U.S. 189, 195–96 (1974)); *see also Burlington Indus.* v. *Ellerth*, 524 U.S. 742, 759 ("An employer is negligent with respect to sexual harassment if it *knew or should have known* about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII. . . .") (emphasis added).

or a friend of the harassed resident.[28] There is no requirement that the resident contact the housing provider about the harassment, only that the housing provider have knowledge from which a reasonable person would conclude that harassment was occurring. If the housing provider has no information from which a reasonable person would conclude that one resident or a third-party was harassing another resident, the housing provider is not liable for failing to take action to correct and end the harassment. If the knowledge component is not met, a housing provider cannot be held liable for a resident's or third-party's discriminatory conduct. HUD disagrees that this standard will subject landlords to certain liability. Application of this standard to the liability provisions of the rule helps clarify the Act's coverage for residents and housing providers. It is intended to help guide housing providers in their assessment of when to intervene to prevent or end discriminatory conduct. HUD encourages housing providers to create safe, welcoming, and responsive housing environments by regularly training staff, developing and publicizing anti-discrimination policies, and acting quickly to resolve complaints once sufficient information exists that would lead a reasonable person to conclude that harassment was occurring.

*Issue:* A commenter was concerned that § 100.7(a)(1)(ii) is seeking to hold the agent liable for the actions of its principal, contrary to Supreme Court precedent, and asked why this provision is necessary in light of proposed § 100.7(b) (vicarious liability), which states that the housing provider is already liable for the unlawful actions of the agent, whether known or not.

*HUD Response:* Section 100.7(a)(1)(ii) addresses a principal's direct liability for the principal's own negligent conduct in overseeing (or failing to oversee) its agent or employee. Under the negligence theory of direct liability, the principal is liable only if the principal knew or should have known of the agent's discriminatory conduct and failed to take corrective action to end it. Section 100.7(b), by contrast, holds the principal vicariously liable for the discriminatory conduct of its agent,

regardless of whether the principal knew or should have known of the agent's conduct. As the commenter noted, an agent is not vicariously liable for the principal's conduct, but is directly liable for his or her own actions. Section 100.7 does not create liability that does not already exist; it does not hold the agent liable for the conduct of the principal, and it is entirely consistent with traditional agency principles and Supreme Court precedent.

*Issue:* A commenter asked for clarification of the term "third-party" in § 100.7(a)(1)(iii). The commenter was concerned that if left undefined, the term would include everyone. The commenter asked HUD to limit the term to what the commenter perceived to be HUD's primary concern—"liability resulting from a landlord's failure to assist a tenant subject to another tenant's harassment."

*HUD Response:* HUD does not agree that its use of the term "third-party" requires further clarification in the text of the rule. In the context of the rule, liability for discriminatory conduct by a "third-party" is appropriately limited to a non-employee or non-agent who engaged in quid pro quo or hostile environment harassment of which the housing provider knew or should have known and had the power to correct.

*Issue:* A commenter stated that it is unclear from the proposed rule whether the obligation in proposed § 100.7(a)(1)(iii) to take action to end a discriminatory housing practice by a third-party *must* be derived from a contract, lease, or law, or whether it *could* be derived from these sources. The commenter also requested that HUD clarify in the rule whether generic lease provisions related to the use and enjoyment of one's home that are found in almost every lease would be enough to create the obligation and related liability contemplated in § 100.7(a)(1)(iii). Another commenter expressed a concern that housing providers would take steps to minimize their liability for failing to take corrective action by revising their leases and other documents so that they do not create a duty to protect tenants. A commenter expressed concern that the term "duty," incorporated from other laws and contracts, is difficult to fully assess and therefore bound to create unanticipated consequences.

*HUD Response:* HUD recognizes that proposed § 100.7(a)(1)(iii) may have caused some confusion, so HUD has reworded the provision in the final rule. Proposed § 100.7(a)(1)(iii) stated that a person is directly liable for "failing to fulfill a duty to take prompt action to

correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct. The duty to take prompt action to correct and end a discriminatory housing practice by a third-party derives from an obligation to the aggrieved person created by contract or lease (including bylaws or other rules of a homeowner's association, condominium or cooperative), or by federal, state or local law." Revised section 100.7(a)(1)(iii) of this final rule provides that a person is directly liable for "failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct a discriminatory housing practice by a third-party depends upon the extent of control or any other legal responsibility the person may have with respect to the conduct of such third-party." The final rule does not use the term "duty," and no longer identifies specific categories of potential sources for such a duty. A housing provider's obligation to take prompt action to correct and end a discriminatory housing practice by a third-party derives from the Fair Housing Act itself, and its liability for not correcting the discriminatory conduct of which it knew or should have known depends upon the extent of the housing provider's control or any other legal responsibility the provider may have with respect to the conduct of such third-party.[29] For example, when a housing provider enters into a lease agreement with a tenant, the lease typically obligates the housing provider to exercise reasonable care to protect the residents' safety and curtail unlawful conduct in areas under the housing provider's control, whether or not the lease contains specific language creating that responsibility. Even if the lease does not expressly create such obligations, the power to act may derive from other legal responsibilities or the operation of law.[30]

[28] *See, e.g., Neudecker v. Boisclair Corp.,* 351 F.3d at 364 (owner may be liable for acts of tenants and management's children after failing to respond to plaintiff's complaints of harassment); *Bradley v. Carydale Enterprises,* 707 F. Supp. 217 (E.D. Va. 1989) (finding that owners and managers' failure to address one tenant's complaints of racial harassment by another tenant stated a claim under 42 U.S.C. 1981 and 1982).

[29] *See, e.g., Neudecker v. Boisclair Corp.,* 351 F. 3d at 364 (owner may be liable for acts of tenants and management's children after failing to respond to plaintiff's complaints of harassment); *Fahnbulleh v. GFZ Realty, LLC,* 795 F. Supp. 2d 360, 364–65 (D. Md. 2011) (denying landlord's motion to dismiss because the Act imposes no categorical rule against landlord liability for tenant-on-tenant harassment); *Reeves v. Carrollsburg Condo. Unit Owners Ass'n,* 1997 U.S. Dist. LEXIS 21762, *26 (D.D.C. 1997) (condo association that knew of harassment by resident but failed to take corrective actions may violate Act).

[30] *See, e.g., Wilstein v. San Tropai Condo. Master Ass'n,* 1998 U.S. Dist. LEXIS 7031, *28–33 (N.D. Ill. Apr. 21, 1999) (rejecting condo association's
Continued

*Issue:* A commenter expressed concern that proposed § 100.7(a)(1)(iii) creates liability on the part of a community association (homeowner association, condominium or cooperative) for the illegal acts of residents over whom they have no control. The commenter urged HUD to remove or revise the proposed rule's extension of direct liability to community associations for the discriminatory actions of non-agents. The commenter stated that community associations generally lack legal authority to mandate that residents take actions described in the preamble of the proposed rule because the associations cannot evict homeowners or otherwise impose conditions not specifically authorized by the association's covenants, conditions, and restrictions (CC&Rs) or state law. The commenter suggested that if the language in § 100.7(a)(1)(iii) remains, it should be modified to clearly state which terms and conditions in association bylaws and regulations constitute a duty on the part of an association or its agents to investigate and punish residents for illegal discriminatory housing practices.

*HUD Response:* As noted above, HUD has slightly revised § 100.7(a)(1)(iii) to clarify that a housing provider is liable under the Fair Housing Act for third-party conduct if the provider knew or should have known of the discriminatory conduct, has the power to correct it, and failed to do so. HUD also notes that the rule does not add any new forms of liability under the Act or create obligations that do not otherwise exist. The rule does not impose vicarious liability (*see* § 100.7(b)) on a community association for the actions of persons who are not its agents. Section 100.7(a)(1)(ii) describes a community association's liability for its own negligent supervision of its agents, and § 100.7(a)(1)(iii) describes a community association's liability for its own negligence for failing to take prompt action to correct and end a discriminatory housing practice by a third-party. With respect to § 100.7(a)(1)(iii), the rule requires that when a community association has the power to act to correct a discriminatory housing practice by a third party of

which it knows or should have known, the community association must do so.

As the commenter recognizes, a community association generally has the power to respond to third-party harassment by imposing conditions authorized by the association's CC&Rs or by other legal authority.[31] Community associations regularly require residents to comply with CC&Rs and community rules through such mechanisms as notices of violations, threats of fines, and fines. HUD understands that community associations may not always have the ability to deny a unit owner access to his or her dwelling; the rule merely requires the community association to take whatever actions it legally can take to end the harassing conduct.

*Issue:* A few commenters suggested that HUD should reconsider imposing liability on a landlord for tenant-on-tenant harassment because the law in this area is not well-settled. The commenters expressed concern that proposed § 100.7(a)(1)(iii) exceeds the scope of the Act by expanding liability for housing providers to include liability for third-party harassment of a resident when the housing provider did not act with discriminatory intent. One commenter, relying on Title VII case law and an interpretation of the phrase "because of," stated that a landlord must have acted with discriminatory intent in order to be liable under the Fair Housing Act. Another commenter stated that although section 804(a) of the Fair Housing Act does not require a showing of intentional discrimination, claims brought under sections 804(b) and 817 of the Act do, citing *Francis v. King Park Manor, Inc.*, 91 F. Supp. 3d 420 (E.D.N.Y. 2015). Another comment stated that to establish a housing provider's liability for failing to take action to correct third-party harassment, the plaintiff must show not just that the housing provider failed to correct the harassment but also that the housing provider did so because of animus against the victim due to a protected characteristic. A commenter pointed to *Lawrence v. Courtyards of Deerwood*

*Ass'n, Inc.*, 318 F. Supp. 2d 1133 (S.D. Fla. 2004), as an example of a case in which the court dismissed the fair housing claim against the housing provider because the plaintiffs failed to establish that the housing provider's ineffective response to the harassment was due to racial animus. Commenters also pointed to *Ohio Civil Rights Comm'n v. Akron Metro. Hous. Auth.*, 892 NE.2d 415, 420 (Ohio 2008), in which the court declined to impose liability on landlords for failing to take corrective action in response to discriminatory harassment committed by the landlord's tenants. A commenter also suggested that not requiring discriminatory animus on the part of the housing provider would amount to strict liability. The commenters proposed that in light of these contrary federal and state court decisions, HUD should require proof of some degree of animus by the housing provider before subjecting the provider to direct liability for the acts of third parties.

*HUD Response:* HUD does not agree that a housing provider's failure to act to correct third-party harassment must be motivated by a discriminatory intent or animus before the provider can be held liable for a Fair Housing Act violation. In reaching this conclusion, HUD considered its own experience in administering and enforcing the Fair Housing Act, the broad remedial purposes of the Act,[32] relevant case law including the Supreme Court's recent ruling in *Texas Department of Community Affairs v. Inclusive Communities Project, Inc.* holding that the Fair Housing Act is not limited to claims of intentional discrimination, and the views of the EEOC regarding Title VII. The case law cited by the commenters fails to support the proposition that the Fair Housing Act requires discriminatory intent in order to find a housing provider liable for its negligent failure to correct resident-on-resident or other third-party discriminatory conduct. The district court decision in *Francis v. Kings Park Manor* is the sole exception to that principle, and HUD disagrees with its ruling. HUD notes that this decision is on appeal to the Second Circuit.

Section 100.7(a)(1)(iii) sets out a negligence standard of liability, which does not require proof of discriminatory

---

argument that it had no duty to stop harassment of plaintiff by other residents and holding that association could be liable where evidence indicated that association knew of the harassment and bylaws authorized the association to regulate such conduct); *see also Bradley v. Carydale Enterprises,* 707 F. Supp. 217 (E.D. Va. 1989) (finding that owner and managers' failure to address tenant's racial harassment of a neighboring tenant states a claim under 42 U.S.C. 1981, 1982).

[31] *See, e.g., Wilstein v. San Tropai Condo. Master Ass'n,* supra* 28–33; *Reeves v. Carrollsburg Condo. Unit Owners Ass'n,* 1997 U.S. Dist. LEXIS 21762, *26. *See also Freeman v. Dal-Tile Corp.,* 750 F. 3d 413, 422–23 (4th Cir. 2014) (holding that "an employer is liable under Title VII for third parties creating a hostile work environment if the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end [it]." (internal quotation marks and citations omitted); *Galdamez v. Potter,* 415 F. 3d 1015, 1022 (9th Cir. 2005) ("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it.").

[32] *See e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380 (1982) (Congress intended Fair Housing Act to be broadly remedial); *cf. Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 413 (1968) (describing the Fair Housing Act as "a comprehensive open housing law"); 42 U.S.C. 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.").

intent or animus on the part of the provider, but is far from strict liability. Under this standard, a plaintiff or the charging party must prove three elements to establish a housing provider's liability for third-party harassment: (1) The third-party created a hostile environment for the plaintiff or complainant; (2) the housing provider knew or should have known about the conduct creating the hostile environment; and (3) the housing provider failed to take prompt action to correct and end the harassment while having the power to do so. HUD does not agree that a fourth element—that the housing provider's failure to act was more than negligent, and was motivated by discriminatory intent—is necessary or appropriate.

Contrary to one comment, the Supreme Court in *Inclusive Communities Project* has already ruled that the "because of" clause in the Fair Housing Act does not require proof of discriminatory intent. While not addressing every aspect of the cited decisions, HUD notes the following: In *Lawrence* v. *Courtyards of Deerwood Ass'n,* cited by another commenter, the court dismissed the discriminatory harassment claim not for lack of discriminatory intent on the part of the landlord, but because it found, *inter alia,* that the dispute did not involve discriminatory harassment of one tenant by another but instead reflected mutual antagonism between two tenants. The court in *Lawrence* distinguished *Reeves* v. *Carrollsburg Condo. Unit Owners Ass'n,* 1997 U.S. Dist. LEXIS 21762, *22 (D.D.C 1997), which held the landlord liable under the Fair Housing Act for its failure to adequately address sexual harassment of one tenant by another because "the [Carrollsburg Condo] association's by-laws specifically authorized the association to curtail conduct that contravened the law" and provided that a violation of local or federal law was a violation of the association rules.[33]

Finally, the state court decision cited by one commenter did not involve claims under the Fair Housing Act and does not provide reason for HUD to alter § 100.7(a)(1)(iii) at the final rule stage. In *Ohio Civil Rights Commission* v. *Akron Metropolitan Housing Authority,* the Ohio Supreme Court's refusal to hold a landlord liable under a state civil rights law for failing to take corrective action in response to one tenant's racial harassment of another tenant was

premised on an incorrect reading of Title VII jurisprudence. The court misconstrued Title VII case law to require an agency relationship between an employer and a perpetrator of harassment in order to hold the employer liable for negligently failing to stop sexual harassment by the perpetrator.[34] In fact, under Title VII, an agency relationship is *not* required in order to hold employers liable for negligently failing to stop discriminatory harassment of which the employer knew or should have known. Both the EEOC and the federal courts have recognized that an employer may be held liable for negligently failing to stop discriminatory harassment in the workplace by non-employees or non-agents.[35] The principle of liability codified in § 100.7(a)(1)(iii) of this final rule is consistent with these Title VII authorities and, in HUD's view, appropriately serves the Fair Housing Act's parallel antidiscrimination objectives in the housing context. In sum, the proposed rule and this final rule reflect HUD's considered judgment, consistent with prevailing precedent and EEOC regulations, that a housing provider (including a homeowner's association) or property manager is liable under the Act for negligently failing to take corrective action against a third-party harasser when the provider or manager knew or should have known of the harassment and had the power to end it. In light of the above, HUD declines to make the proposed revisions to the final rule.

*Issue:* A commenter stated that the imposition of liability on private landlords for tenant-on-tenant harassment is inappropriate and will have several negative consequences. The commenter stated that private owners do not have the expertise or resources to undertake what is essentially a social services function to mediate disputes between neighbors. In addition, the commenter expressed concern that the proposed rule could make it more difficult and risky for property owners to take affirmative steps to operate racially integrated

housing. The commenter stated that the rule will be an economic disincentive for individuals, companies, and other investors to engage in the business of renting residential real estate and that the Section 8 voucher program depends on the participation of these private entities in order to achieve other fair housing goals. The commenter expressed concern that the effect of the proposed rule will be to reduce the supply of available affordable units, thus disproportionately harming low-income families. Other commenters raised concerns that landlords, when confronted by tenants who mutually accuse each other of harassment, will be unable to take necessary corrective actions because of the rule's prohibition against moving or causing injury to a complaining tenant, or will reprimand the wrong tenant because they lack expertise with investigations.

Numerous other commenters supported the rule's recognition that a housing provider may be directly liable for harassment of a tenant by the housing provider's employee or a third-party. These commenters stated that any suggestion that this rule will unduly burden housing providers is exaggerated, that the rule is wholly consistent with the ordinary responsibilities of housing providers to ensure habitability, and that housing providers are familiar with the tools they have to enforce their own rules—tools they frequently wield.

*HUD Response:* The rule does not create new or enhanced liabilities for housing providers, including those who participate in the Section 8 program. HUD believes that this rule will help clarify the obligations that housing providers already have in offering and maintaining housing environments free from discrimination and that comply with the Fair Housing Act. We are long past the time when racial harassment is a tolerable price for integrated housing; a housing provider is responsible for maintaining its properties free from all discrimination prohibited by the Fair Housing Act. Under the Act, discriminatory practices are those that violate sections 804, 805, 806, or 818. Such practices do not encompass all incivilities, and thus it is important to note that not every quarrel among neighbors amounts to a violation of the Fair Housing Act.[36] Ending harassing or

---

[33] *Lawrence* v. *Courtyards of Deerwood Ass'n,* 318 F. Supp. 2d at 1149 (citing *Reeves* v. *Carrollsburg Condo. Unit Owners Ass'n,* 1997 U.S. Dist. LEXIS 21762 at *22.

[34] 892 NE.2d at 419–20.

[35] *See* 29 CFR 1604.11(e) ("An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where there employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action."); *see also, e.g., Freeman* v. *Dal-Tile Corp.,* 750 F.3d 413, 422–24 (4th Cir. 2014) (employer potentially liable for failing to address discriminatory harassment by a customer); *Lockard* v. *Pizza Hut, Inc.,* 162 F.3d 1062, 1072–75 (10th Cir. 1998) (same; collecting cases recognizing employer liability for failing to correct third-party harassment).

[36] *See, e.g., Bloch* v. *Frischholz,* 587 F.3d at 783 (quoting *Halprin* v. *Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 330 (7th Cir. 2004) (noting that interference under § 818 "is more than a 'quarrel among neighbors' "); *Sporn* v. *Ocean Colony Condominium Assn,* 173 F. Supp. 2d 244, 251–52 (D.N.J. 2001) (noting that section 818 "does
Continued

**63070** **Federal Register** / Vol. 81, No. 178 / Wednesday, September 14, 2016 / Rules and Regulations

otherwise discriminatory conduct may necessitate evicting the tenant who has engaged in the conduct, not the aggrieved tenant.[37] The Act does not, however, prohibit housing providers from offering to move an aggrieved tenant, as long as that tenant may refuse the offer without consequence or retaliation.

*Issue:* Some commenters stated that the proposed rule outlining third-party liability conflicts with HUD's PIH Notice 2015–19, titled Guidance for Public Housing Agencies (PHAs) and Owners of Federally-Assisted Housing on Excluding the Use of Arrest Records in Housing Decisions. One commenter was concerned that PIH Notice 2015–19 makes it harder for PHAs to correct situations that may lead to hostile environment harassment, while the proposed harassment rule would make it easier for PHAs to be held liable for the activities of tenants who take actions against other tenants to create a hostile environment. Another commenter was concerned that PHAs would be forced to choose whether to comply with HUD's harassment rule or with HUD's Notice, which prohibits the use of an arrest record as evidence of criminal activity that can support an adverse admission, termination, or eviction decision. These commenters therefore asked HUD to remove third-party liability from the rule.

*HUD Response:* HUD believes the commenters' concerns are misplaced because there is no conflict between this rule and PIH Notice 2015–19. The rule does not add any new forms of liability under the Fair Housing Act and the formalization of clear and consistent standards for evaluating harassment claims under the Act does not conflict with the requirements of the PIH Notice. Compliance with PIH Notice 2015–19 does not prevent a PHA from considering reliable evidence of relevant criminal activity when considering how to respond to complaints of harassment. Nor does this rule require a PHA to make use of arrest records to determine whether discriminatory harassment has occurred. Consistent with traditional

tort liability principles, as well as current federal Fair Housing Act jurisprudence, this rule codifies HUD's longstanding view that a property owner, including a PHA, may be held liable for failing to take corrective action within its power in response to tenant-on-tenant harassment of which the owner knew or should have known. Where a PHA receives a complaint or otherwise learns of possible discriminatory harassment of one resident by another, the PHA is advised to assess the situation and, if necessary, take appropriate corrective action to end the harassment.

*Issue:* Several commenters expressed concern that application of the rule would conflict with HUD's homeless or permanent supportive housing programs or might have a detrimental effect on persons with mental disabilities. A commenter stated that tenants with severe mental health disabilities may create a hostile environment for neighbors and asked HUD to explain what direct responsibility the housing provider has to correct negative behaviors. A commenter stated that the rule incentivizes evictions over efforts to determine whether a reasonable accommodation might be appropriate for persons with mental disabilities. Another commenter stated that because tenants with mental illness often have difficulty finding housing, the proposed rule might result in an increased rate of homelessness among persons with mental disabilities. A commenter asked HUD to revisit the proposed rule's third-party liability provision to avoid harming this particularly vulnerable population.

Other commenters stated that the rule would help protect many vulnerable persons from eviction. These commenters supported the statement in the proposed rule's preamble that eviction is only one of the many corrective actions housing providers may utilize to address harassment.

*HUD Response:* The rule neither changes a housing provider's responsibilities toward tenants with mental disabilities nor incentivizes evictions of such persons. It is not uncommon for the behavior of one tenant to frustrate, displease, or annoy another tenant. This is true for behavior by tenants with and without psychiatric disabilities. The rule does not require a housing provider to take action whenever one tenant engages in behavior that another tenant finds objectionable. The Act prohibits discrimination against applicants and tenants with disabilities, including evicting individuals with disabilities because other tenants find them

frustrating, displeasing, or annoying. The Act does not, however, require that a dwelling be made available to a person whose tenancy would constitute a direct threat to the health or safety of others or would result in substantial physical damage to the property of others.[38] The housing provider must make an individualized assessment as to whether such a threat exists based on reliable objective evidence that considers: (1) The nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat. In evaluating a recent history of overt acts, a housing provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat. Reasonable accommodations must be made when they may be necessary to afford such persons an equal opportunity to use and enjoy a dwelling. HUD refers the reader to the Joint Statement of HUD and DOJ on Reasonable Accommodations under the Fair Housing Act for further information.[39]

### 1. Corrective Action: § 100.7(a)(2)

*Issue:* A commenter asked HUD to remove the prohibition against causing injury to a complaining party.

*HUD Response:* HUD declines to remove the prohibition on causing additional injury to a person who has already been injured by illegal harassment. Permitting such additional injury would be inconsistent with the Act's purposes to prevent unlawful discrimination and remedy discrimination that has already occurred.

*Issue:* One commenter requested further guidance as to what constitutes appropriate corrective action by a housing provider to stop tenant-on-tenant harassment. The commenter specifically inquired whether a single verbal statement by a landlord to a tenant who allegedly engaged in harassing conduct would be sufficient corrective action to relieve a landlord from liability under the rule. Another commenter asked HUD to impose realistic and reasonable limitations on housing providers' obligation to take corrective action.

*HUD Response:* There is no one way that a housing provider must respond to complaints of third-party harassment,

---

not [] impose a code of civility" on neighbors); *United States* v. *Weisz*, 914 F. Supp. 1050, 1054–55 (S.D.N.Y. 1996) (holding that allegations that Jewish neighbor harassed complainants because of their religion were "nothing more than a series of skirmishes in an unfortunate war between neighbors"). *But see Ohana* v. *180 Prospect Place*, 996 F. Supp. 238, 243 (E.D.N.Y. 1998) (neighbors who intentionally intrude upon quietude of another's home may violate Act).

[37] *See, e.g., Miller* v. *Towne Oaks East Apartments*, 797 F. Supp. 557, 562 (E.D. Tex.1992) (finding landlord liable for violating Act by evicting both harasser and victim of harassment instead of only harasser).

[38] 42 U.S.C. 3604(f)(9).

[39] *See* Joint Statement of HUD and DOJ on Reasonable Accommodations Under the Fair Housing Act (May 17, 2004), posted at *http:// www.hud.gov/offices/fheo/library/ huddojstatement.pdf*.

although the rule makes clear that a provider that fails to effectively respond may be subject to liability under the Act. Section 100.7(a)(2) provides that corrective actions must be effective in ending the discrimination, but may not injure the aggrieved persons. For example, corrective actions appropriate for a housing provider to utilize to stop tenant-on-tenant harassment or other third-party harassment might include verbal and written warnings; enforcing lease provisions to move, evict, or otherwise sanction tenants who harass or permit guests to harass; issuing no-trespass orders against guests; or reporting conduct to the police. What constitutes appropriate and effective corrective action will depend on the nature, frequency, and severity of the harassment. While in some cases a single verbal reprimand by a housing provider may be sufficient to effectively end discriminatory harassment of one tenant by another, the housing provider should notify the victim that such action was taken, and it is advisable for the housing provider to document this action in its records. Additionally, the housing provider should follow up with the victim of the harassment after the corrective action is taken to ensure that it was effective. If the housing provider knows or should have known that the corrective action was ineffective, the provider has a responsibility to take additional corrective actions within its power. If, however, corrective action is effective in ending the discriminatory conduct, a housing provider is not required to take additional action simply because the victim believes further action should have been taken. HUD does not agree that there is a need to add a specific limitation on a housing provider's responsibility to take corrective action within its power to act in response to discriminatory harassment of which the provider knew or should have known.

*Issue:* A commenter stated that because tenants are not agents or employees, landlords cannot simply compel tenants to take or avoid particular action and do not have the ability to shape or alter tenants' behavior beyond threatening and carrying out evictions. Another commenter asked HUD to consider that there are substantial practical differences between the ability of housing providers to take corrective action to end tenant-on-tenant harassment and their ability to control the actions of their employees because there is no agency relationship in the former. Another commenter stated that most homeowners would be very

concerned if association board members, employees, or agents injected themselves into the interpersonal relationships of homeowners and residents to investigate their interactions and relationships for discriminatory elements. This commenter also said that for PHAs, eviction is often unavailable as a remedy for alleged tenant-on-tenant harassment because the U.S. Housing Act of 1937 and federal regulations limit the ability of PHAs to carry out evictions, except for specified causes. In addition, the commenter stated that the result of these restrictions and the proposed rule would be to create significant new liability for PHAs for tenant-on-tenant harassment without creating any new mechanisms for PHAs to mitigate this liability.

In contrast, other commenters stated that the rule does not create any new liability because landlords have an obligation to protect tenants' rights to quiet enjoyment and generally have the right to take actions against renters and occupants who disturb the quiet enjoyment of others.

*HUD Response:* Neither the proposed rule nor this final rule create new liability for housing providers, including PHAs or homeowner's associations, regarding resident-on-resident harassment. Nor does the rule require a housing provider to take action that is beyond the scope of its power to act. HUD recognizes that specific remedies that may be available to employers to stop an employee's illegal practices will be distinct from those that a housing provider may use to stop residents who are engaging in discriminatory conduct. Creating and posting policy statements against harassment and establishing complaint procedures, offering fair housing training to residents and mediating disputes before they escalate, issuing verbal and written warnings and notices of rule violations, enforcing bylaws prohibiting illegal or disruptive conduct, issuing and enforcing notices to quit, issuing threats of eviction and, if necessary, enforcing evictions and involving the police are powerful tools available to a housing provider to control or remedy a tenant's illegal conduct. These tools are also available to PHAs, and, contrary to one commenter's concern, eviction is available to a PHA to correct a tenant's discriminatory conduct as the PHA may terminate a tenancy for "serious or repeated violation of material terms of the lease," 24 CFR 966.4(l)(2)(i), which include the obligation that tenants must "act . . . in a manner which will not disturb other residents' peaceful

enjoyment of their accommodations. . . ." 24 CFR 966.4(f)(11).

*Issue:* A commenter expressed concern that a PHA may be held directly liable for failing to correct actions by third-parties over whom they have little or no control. As an example, the commenter cited harassment of a voucher-holding tenant by neighbors who are not also voucher-holders and not otherwise affiliated with the PHA. Similarly, another commenter stated that the rule could be interpreted to make landlords liable for conduct that occurs off their property or that has nothing to do with a tenant's home.

*HUD Response:* This rule describes the standard for assessing liability under the Fair Housing Act. These fair housing standards apply to private and public landlords alike and do not turn on whether a tenant holds a Housing Choice Voucher or receives other government rental assistance. HUD also reiterates that a housing provider is not responsible for correcting every negative action by any third-party. Rather, the third-party action must constitute a discriminatory housing practice as defined by the Act, and the housing provider must have the power to correct it. As provided in the final rule and discussed elsewhere in this preamble, whether a housing provider has the power to take corrective measures in a specific situation—and what corrective measures are appropriate—is dependent on the facts, including the extent of control or any other legal responsibility the person may have with respect to the conduct of such third-party. There may be instances where the ability to correct the unlawful conduct is beyond a housing provider's control. Thus, when confronted with discriminatory harassment of one of its Housing Choice Voucher-holders or other tenants, the housing agency should explore what corrective actions are within its power and are appropriate to take.

*Issue:* A commenter suggested that an unintended consequence of the proposed rule could be that property owners would remove security devices, such as video cameras and other surveillance mechanisms, for fear that such measures may create a duty on the part of the property owner to correct neighbor-on-neighbor harassment. In contrast, other commenters stated that housing providers may feel the need to provide for more oversight of residences which may interfere with residents' right to peaceful enjoyment of their dwelling.

*HUD Response:* Removing security devices will not relieve a housing provider of its obligation to take the

actions within its power to promptly correct and end a discriminatory housing practice. Elsewhere in the preamble, HUD discusses various options that may be available to housing providers to address neighbor-on-neighbor harassment.

*Issue:* A commenter stated that owners should be encouraged to use positive incentives, such as promoting better communication with—and healthy relationships among—tenants, and educating tenants about their rights to prevent harassment, instead of taking corrective actions that may harm tenants, such as ending a lease or evicting a tenant—.

*HUD Response:* HUD agrees that positive incentives are useful tools for preventing harassment. HUD believes, however, that warnings, threats of evictions, evictions, and lease terminations may also be necessary corrective actions to end harassment. The preamble and rule make clear that there is no one way to prevent or correct harassment, only that the methods need to be effective at ending it.

### c. Vicarious Liability: § 100.7(b)

*Issue:* Several commenters questioned the description of vicarious liability at § 100.7(b) of the proposed rule. One commenter said § 100.7(b) could be interpreted to impose vicarious liability on an organization's directors, officers, or owners and suggested HUD clarify, consistent with *Meyer* v. *Holley*, that it is the organization—not the individual directors, officers, or board members—who are the "principal or employer" subject to vicarious liability under the Fair Housing Act. The commenter asked HUD to issue clarification that the proposed regulations do not contravene or attempt to reverse *Meyer* v. *Holley*, 537 U.S. 280 (2003). In contrast, other commenters applauded the description of vicarious liability in the rule, stated that the description follows well-established common law tort and agency principles, and expressed support for the proposed rule's reliance on *Meyer* v. *Holley*.

*HUD Response:* Subsection 100.7(b) merely describes the well-established concept of vicarious liability, under which principals may be held liable for the discriminatory acts of their agents or employees whether or not they knew of the discriminatory conduct. As articulated in *Meyer* v. *Holley*, and as explained in the preambles to the proposed rule and this final rule, traditional agency principles apply to the Fair Housing Act.[40] Under agency principles, a principal is vicariously

[40] 537 U.S. at 282, 287.

liable for the actions of his or her agents taken within the scope of their relationship or employment, or for actions taken outside the scope of their relationship or employment when the agent is aided in the commission of such acts by the existence of the agency relationship.[41] Determining whether an agency relationship exists is a factual determination that looks to an agent's responsibilities, duties, and functions; whether the discriminatory conduct of the agent was within the scope of the agency relationship or aided by the existence of the agency relationship is also a fact-specific inquiry.

*Issue:* Some commenters questioned the statement in the proposed rule's preamble that a principal is vicariously liable for the actions of an agent or employee taken outside the scope of the agency relationship or employment when the agent or employee is aided in the commission of such acts by the existence of the agency relationship. A commenter agreed that a principal is vicariously liable for the acts of its agents committed within the scope of the agency, regardless of knowledge or intent to violate the Act by the principal, but believes that, in adopting the "aided in agency" standard, the proposed rule goes beyond traditional tort concepts and does not reflect the limited concepts of vicarious liability endorsed in *Meyer* v. *Holley*. The commenter considered it acceptable to hold a real estate company liable for discriminatory acts or statements made

[41] *See, e.g., Glover* v. *Jones,* 522 F. Supp. 2d 496, 507 (W.D.N.Y. 2007) (holding that "a property owner may be vicariously liable under the Fair Housing Act for the actions of an employee even when they are outside the scope of employment . . . if the employee was aided in accomplishing the tort by the existence of the agency relation.") (quoting *Mack* v. *Otis Elevator Co.,* 326 F. 3d 116, 123 (2d Cir. 2003) (internal quotation marks omitted); *see also Boswell* v. *GumBayTay,* No. 2:07–CV–135–WKW[WO], 2009 U.S. Dist. LEXIS 45954, *17 (M.D. Ala. June 1, 2009) (holding that vicarious liability attached to property owner where property manager's "position essentially gave him unfettered access to communicate with and personally visit [the plaintiff]" and he "used his power as property manager as a vehicle through which to perpetrate his unlawful conduct by refusing repairs, raising the rent, and attempting to evict [the plaintiff] as a consequence for [her] refusal to provide sexual favors."); *Glover* at 522 F. Supp. 2d at 507 (rejecting defendant property owner's motion for summary judgment on the issue of vicarious liability where evidence showed that property manager used his "position as the de facto landlord to perpetrate FHA [harassment] violations . . . giving] him the opportunity to visit the apartment when he wanted, and enabl[ing] him to control Plaintiff's rent"); *Richards* v. *Bono,* 2005 U.S. Dist. LEXIS 43585 at *30 (holding that wife/co-owner of property could be vicariously liable for husband's harassment where husband acted as her agent and used his position as owner, property manager, and maintenance supervisor to subject plaintiff to sexual harassment by using a key to enter plaintiff's apartment and threatening plaintiff with eviction).

by its brokers in the scope of their agency, but disagreed that a housing provider should be liable for misconduct of a janitorial employee outside the scope of that employee's duty because he wore a badged uniform or possessed keys or passes to tenants' dwellings. Another commenter asked for clarity on the reasoning behind the assertion in the preamble to the proposed rule that an agent who harasses residents or applicants is necessarily aided by his or her agency relationship with the housing provider.

*HUD Response:* As discussed throughout this preamble, the proposed and final rule do not create new forms of liability. Instead, HUD has decided to adopt well-established principles of agency law, including that a principal may be vicariously liable for the actions of an agent or employee that are taken outside the scope of the employment or agency relationship if the agent or employee is aided in committing the acts by the existence of the employment or agency relationship. Agency law must be applied to the specific facts at issue to determine whether such a situation exists and gives rise to a principal's liability. The statement in the proposed rule that an agent who engages in hostile environment harassment of residents or applicants is aided by the agency relationship with the housing provider was not intended to suggest the agent is necessarily so aided with respect to every discriminatory housing practice. It was intended to explain one of the reasons HUD chose not to import into the Fair Housing Act the Title VII affirmative defense to an employer's vicarious liability for hostile environment harassment. As explained in that context, a housing provider's agent who engages in harassment holds a position of power and authority over the victimized resident or applicant, regardless of the agent's specific duties. This is because a resident or applicant has only an arms-length economic relationship with the housing provider, while an agent-perpetrator is clothed with the authority of the housing provider. Given this inherent imbalance of power and control over the terms or conditions of the housing environment, the distinction between harassment by supervisory and non-supervisory employees that supported the creation of the affirmative defense in the employment context do not extend to the housing context.

### D. Other Issues

*Issue:* A commenter stated that HUD should apply the proposed rule only to its own investigative and administrative

actions and should not purport to preempt court-established rules. The commenter stated that in some instances it may be appropriate for federal courts to defer to agency rules, but that this is not a case where *Chevron* [42] deference is appropriate because HUD is not basing the rule on its own experience, but largely on interpretations of federal court decisions. The commenter stated that HUD has no particular expertise in tort law and no authority to interpret tort laws. Another commenter stated that HUD appears to be using the administrative rule-making process to substitute its views for those of the courts, and that HUD must pursue the change it seeks through Congress and/or the courts.

*HUD Response:* The commenters misconstrue both the rule and HUD's authority under the Act. The Act specifically grants the Secretary of HUD the authority and responsibility to administer and enforce the Act, including promulgating rules to carry out the Act. [43] This rule-making authority is not limited to HUD's investigations or administrative proceedings. Moreover, the rule does not construe tort law, but rather clarifies standards for liability under this part, based on traditional principles of tort liability. It imposes no new legal obligations or duties of care. In addition, the introductory portion of this preamble describes the grounds for *Chevron* deference.

*Issue:* Some commenters disagreed with HUD's statement in the preamble to the proposed rule that the rule does not create additional costs for housing providers and others covered by the Fair Housing Act. They stated that the proposed rule would lead to increased costs for and litigation against housing providers. Among the other costs cited by commenters are costs for compliance and training, increased insurance premiums, and increased liability because many housing providers would not have the ability to remain diligent to address all harassment claims, leaving them vulnerable to litigation. Another commenter said that the proposed rule creates the possibility for substantial judgments for money damages that PHAs have little ability to pay, because they may not use federal funds to pay judgments for damages.

*HUD Response:* As noted throughout this preamble, this final rule does not impose any new or enhanced liabilities. Rather, it clarifies existing law under the Fair Housing Act and well-established common law tort and agency principles as they apply under the Act. The rule does not change substantive obligations, but merely formalizes them in a regulation. Because the standards articulated in the rule are already law, the risks of liability and costs of complying will not increase with issuance of the rule. HUD presumes that the vast majority of housing providers are in compliance with the law. Any costs incurred by housing providers to come into compliance as a result of this rulemaking will simply be the costs of compliance with a preexisting statute, administrative practice, and case law. In fact, by formalizing uniform standards for investigations and adjudications under the Fair Housing Act, the rule serves to reduce costs for housing providers by establishing greater clarity with respect to how a determination of liability is to be made.

## V. Findings and Certifications

### Regulatory Review—Executive Orders 12866 and 13563

Under Executive Order 12866 (Regulatory Planning and Review), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. Executive Order 13563 (Improving Regulations and Regulatory Review) directs executive agencies to analyze regulations that are "outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned." Executive Order 13563 also directs that, where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, agencies are to identify and consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This rule establishes uniform standards for use in investigations and processing cases involving harassment and liability under the Fair Housing Act. In establishing such standards, HUD is exercising its rulemaking authority to bring uniformity, clarity, and certainty to an area of legal practice.

The docket file for this rule is available for public inspection between the hours of 8 a.m. and 5 p.m. weekdays in the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, Room 10276, 451 7th Street SW., Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Persons with hearing or speech impairments may access the above telephone number via TTY by calling the toll-free Federal Relay Service at 800–877–8339.

### Environmental Impact

This rule does not direct, provide for assistance or loan and mortgage insurance for, or otherwise govern or regulate, real property acquisition, disposition, leasing, rehabilitation, alteration, demolition or new construction, or establish, revise, or provide for standards for construction or construction materials, manufactured housing, or occupancy. This rule is limited to the procedures governing fair housing enforcement. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act (42 U.S.C. 4321).

### Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 4321, *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. The rule establishes standards for evaluating claims of harassment and liability under the Fair Housing Act. The scope of the rule is procedural, and the regulatory changes do not establish any substantive regulatory burdens on small entities. Accordingly, the undersigned certifies that this rule will not have a significant economic impact on a substantial number of small entities.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments and the private sector. This rule does not impose any federal mandates on any state, local, or tribal governments or the private sector within the meaning of UMRA.

---

[42] *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

[43] 42 U.S.C. 3608(a), 3610, 3615.

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either (1) imposes substantial, direct compliance costs on state and local governments, and is not required by statute, or (2) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Catalogue of Federal Domestic Assistance*

The Catalogue of Federal Domestic Assistance Number for the equal opportunity in housing program is 14.400.

**List of Subjects in 24 CFR Part 100**

Aged, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

Accordingly, for the reasons stated in the preamble, and in accordance with HUD's authority in 42 U.S.C. 3535(d), HUD amends 24 CFR part 100 as follows:

**PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT**

☒ 1. The authority citation for 24 CFR part 100 continues to read as follows:

Authority: 42 U.S.C. 3535(d), 3600–3620.

■ 2. Add § 100.7 to read as follows:

**§ 100.7  Liability for discriminatory housing practices.**

(a) *Direct liability.* (1) A person is directly liable for:

(i) The person's own conduct that results in a discriminatory housing practice.

(ii) Failing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct.

(iii) Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal

responsibility the person may have with respect to the conduct of such third-party.

(2) For purposes of determining liability under paragraphs (a)(1)(ii) and (iii) of this section, prompt action to correct and end the discriminatory housing practice may not include any action that penalizes or harms the aggrieved person, such as eviction of the aggrieved person.

(b) *Vicarious liability.* A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law.

■ 3. In § 100.60, add paragraphs (b)(6) and (7) to read as follows:

**§ 100.60  Unlawful refusal to sell or rent or to negotiate for the sale or rental.**

\*    \*    \*    \*    \*

(b) \* \* \*

(6) Conditioning the availability of a dwelling, including the price, qualification criteria, or standards or procedures for securing the dwelling, on a person's response to harassment because of race, color, religion, sex, handicap, familial status, or national origin.

(7) Subjecting a person to harassment because of race, color, religion, sex, handicap, familial status, or national origin that causes the person to vacate a dwelling or abandon efforts to secure the dwelling.

■ 4. In § 100.65, add paragraphs (b)(6) and (7) to read as follows:

**§ 100.65  Discrimination in terms, conditions and privileges and in services and facilities.**

\*    \*    \*    \*    \*

(b) \* \* \*

(6) Conditioning the terms, conditions, or privileges relating to the sale or rental of a dwelling, or denying or limiting the services or facilities in connection therewith, on a person's response to harassment because of race, color, religion, sex, handicap, familial status, or national origin.

(7) Subjecting a person to harassment because of race, color, religion, sex, handicap, familial status, or national origin that has the effect of imposing different terms, conditions, or privileges relating to the sale or rental of a dwelling or denying or limiting services or facilities in connection with the sale or rental of a dwelling.

■ 5. In § 100.80, add paragraph (b)(6) to read as follows:

**§ 100.80  Discriminatory representation on the availability of dwellings.**

\*    \*    \*    \*    \*

(b) \* \* \*

(6) Representing to an applicant that a unit is unavailable because of the applicant's response to a request for a sexual favor or other harassment because of race, color, religion, sex, handicap, familial status, or national origin.

■ 6. In § 100.90, add paragraphs (b)(5) and (6) to read as follows:

**§ 100.90  Discrimination in the provision of brokerage services.**

\*    \*    \*    \*    \*

(b) \* \* \*

(5) Conditioning access to brokerage services on a person's response to harassment because of race, color, religion, sex, handicap, familial status, or national origin.

(6) Subjecting a person to harassment because of race, color, religion, sex, handicap, familial status, or national origin that has the effect of discouraging or denying access to brokerage services.

■ 7. In § 100.120, add paragraphs (b)(3) and (4) to read as follows:

**§ 100.120  Discrimination in the making of loans and in the provision of other financial assistance.**

\*    \*    \*    \*    \*

(b) \* \* \*

(3) Conditioning the availability of a loan or other financial assistance on a person's response to harassment because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Subjecting a person to harassment because of race, color, religion, sex, handicap, familial status, or national origin that affects the availability of a loan or other financial assistance.

■ 8. In § 100.130, add paragraphs (b)(4) and (5) to read as follows:

**§ 100.130  Discrimination in the terms and conditions for making available loans or other financial assistance.**

\*    \*    \*    \*    \*

(b) \* \* \*

(4) Conditioning an aspect of a loan or other financial assistance to be provided with respect to a dwelling, or the terms or conditions thereof, on a person's response to harassment because of race, color, religion, sex, handicap, familial status, or national origin.

(5) Subjecting a person to harassment because of race, color, religion, sex, handicap, familial status, or national origin that has the effect of imposing different terms or conditions for the availability of such loans or other financial assistance.

■ 9. In § 100.135, revise paragraph (d) to read as follows:

**§ 100.135  Unlawful practices in the selling, brokering, or appraising of residential real property.**

\*    \*    \*    \*    \*

(d) Practices which are unlawful under this section include, but are not limited to:

(1) Using an appraisal of residential real property in connection with the sale, rental, or financing of any dwelling where the person knows or reasonably should know that the appraisal improperly takes into consideration race, color, religion, sex, handicap, familial status, or national origin.

(2) Conditioning the terms of an appraisal of residential real property in connection with the sale, rental, or financing of a dwelling on a person's response to harassment because of race, color, religion, sex, handicap, familial status, or national origin.

■ 10. In § 100.400, add paragraph (c)(6) to read as follows:

**§ 100.400  Prohibited interference, coercion or intimidation.**

\*    \*    \*    \*    \*

(c) \* \* \*

(6) Retaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority.

■ 11. Add subpart H, consisting of § 100.600, to read as follows:

**Subpart H— Quid Pro Quo and Hostile Environment Harassment**

**§ 100.600  Quid pro quo and hostile environment harassment.**

(a) *General.* Quid pro quo and hostile environment harassment because of race, color, religion, sex, familial status, national origin or handicap may violate sections 804, 805, 806 or 818 of the Act, depending on the conduct. The same conduct may violate one or more of these provisions.

(1) *Quid pro quo harassment.* Quid pro quo harassment refers to an unwelcome request or demand to engage in conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to: The sale, rental or availability of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction. An unwelcome request or demand may constitute quid pro quo harassment even if a person acquiesces in the unwelcome request or demand.

(2) *Hostile environment harassment.* Hostile environment harassment refers to unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction. Hostile environment harassment does not require a change in the economic benefits, terms, or conditions of the dwelling or housing-related services or facilities, or of the residential real-estate transaction.

(i) *Totality of the circumstances.* Whether hostile environment harassment exists depends upon the totality of the circumstances.

(A) Factors to be considered to determine whether hostile environment harassment exists include, but are not limited to, the nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved.

(B) Neither psychological nor physical harm must be demonstrated to prove that a hostile environment exists. Evidence of psychological or physical harm may, however, be relevant in determining whether a hostile environment existed and, if so, the amount of damages to which an aggrieved person may be entitled.

(C) Whether unwelcome conduct is sufficiently severe or pervasive as to create a hostile environment is evaluated from the perspective of a reasonable person in the aggrieved person's position.

(ii) *Title VII affirmative defense.* The affirmative defense to an employer's vicarious liability for hostile environment harassment by a supervisor under Title VII of the Civil Rights Act of 1964 does not apply to cases brought pursuant to the Fair Housing Act.

(b) *Type of conduct.* Harassment can be written, verbal, or other conduct, and does not require physical contact.

(c) *Number of incidents.* A single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment; or evidences a quid pro quo.

Dated: August 18, 2016.

Gustavo Velasquez,

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2016–21868 Filed 9–13–16; 8:45 am]

**BILLING CODE 4210–67–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Parts 100 and 165**

**[Docket Number USCG–2015–0854]**

**RIN 1625–AA00, AA08**

**Special Local Regulations and Safety Zones; Recurring Marine Events and Fireworks Displays Within the Fifth Coast Guard District**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Final rule.

**SUMMARY:** The Coast Guard is issuing a final rule that revises the list of special local regulations and safety zones established for recurring marine events and fireworks displays that take place within the Fifth Coast Guard District area of responsibility. This rule revises the listing of events that informs the public of regularly scheduled marine parades, regattas, other organized water events, and fireworks displays that require additional safety measures provided by regulations. Under this rule, the list of recurring marine events requiring special local regulations or safety zones is updated with revisions, additional events, and removal of events that no longer take place in the Fifth Coast Guard District. When these regulations are enforced, certain restrictions are placed on marine traffic in specified areas. This rulemaking project promotes efficiency by eliminating the need to produce a separate rule for each individual recurring event, and serves to provide notice of the known recurring events requiring a special local regulation or safety zone throughout the year.

**DATES:** This rule is effective October 14, 2016.

**ADDRESSES:** To view documents mentioned in this preamble as being available in the docket, go to *http://www.regulations.gov*, type USCG–2015–0854 in the "SEARCH" box and click "SEARCH". Click on Open Docket Folder on the line associated with this rule.

**FOR FURTHER INFORMATION CONTACT:** If you have questions about this rulemaking, call or email Dennis Sens,

OCT 02 2017 No. _____ 17CV_____
Film No. 17-55
Judgement Book _____ Page No. _____

S
M
A
L
L

C
L
A
I
M
S

Continued To: _____
OCT 13 2017

Continued To: _____

Rev. 4/90

ATTACHMENT C, EX 1



File No. 17CVD04461

# STATE OF NORTH CAROLINA

PITT **County**

In The General Court Of Justice
District Court Division - Small Claims

**COMPLAINT
IN SUMMARY EJECTMENT**

G.S. 7A-216, 7A-232; Ch. 42, Arts. 3 and 7

Name And Address Of Plaintiff
REMCO EAST, INC.
1902-B CHARLES BLVD
GREENVILLE, NC 27858

| County | Telephone No. |
|---|---|
| PITT | 252-355-1313 |

**VERSUS**

Name And Address Of Defendant 1
[X] Individual  [ ] Corporation
WILLIAM HARRIS
559 HUNTINGRIDGE RD. APT B
GREENVILLE, NC 27834

| County | Telephone No. |
|---|---|
| PITT | 252-341-6432 |

Name And Address Of Defendant 2
[X] Individual  [ ] Corporation
PHYLLIS HARRIS
559 HUNTINGRIDGE RD. APT B
GREENVILLE, NC 27834

| County | Telephone No. |
|---|---|
| PITT | 252-341-6432 |

Name And Address Of Plaintiff's Attorney Or Agent

Attorney Bar No.

1. The defendant is a resident of the county named above.
2. The defendant entered into possession of premises described below as a lessee of plaintiff.

Description Of Premises (include location and address)
559 HUNTINGRIDGE RD APT B

[X] Conventional
[ ] Public Housing
[ ] Section 8

| Rate Of Rent (Tenant's Share) | | Date Rent Due | Date Lease Ended | Type of Lease |
|---|---|---|---|---|
| $ 550.00 per [X] Month [ ] Week | | 09/01/2017 | | [ ] Oral [X] Written |

3. [ ] The defendant failed to pay the rent due on the above date and the plaintiff made demand for the rent and waited the 10-day grace period before filing the complaint.

[ ] The lease period ended on the above date and the defendant is holding over after the end of the lease period.

[X] The defendant breached the condition of the lease described below for which re-entry is specified.

[ ] Criminal activity or other activity has occurred in violation of G.S. 42-63 as specified below.

Description Of Breach/Criminal Activity (give names, dates, places and illegal activity)
Tenant's failure to maintain a peaceful environment so as not to disturb other tenants' peaceful enjoyment of the Premises.
(Per their Residential Rental Contract Section 5 item (j).

4. The plaintiff has demanded possession of the premises from the defendant, who has refused to surrender it, and the plaintiff is entitled to immediate possession.

5. The defendant owes the plaintiff the following:

Description Of Any Property Damage

PITT COUNTY
FILED
SEP 2 9 2017
AT 11:41 O'CLOCK A M
CLERK OF SUPERIOR COURT

| Amount Of Damage (if known) | Amount Of Rent Past Due | Total Amount Due |
|---|---|---|
| $ 0.00 | $ 0.00 | $ 0.00 |

6. I demand to be put in possession of the premises and to recover the total amount listed above and daily rental until entry of judgment plus interest and reimbursement for court costs.

| Date 9/26/17 | Name Of Plaintiff/Attorney/Agent (type or print) Grace Bishop | Signature Of Plaintiff/Attorney/Agent Grace Bishop |
|---|---|---|

**CERTIFICATION WHEN COMPLAINT SIGNED BY AGENT OF PLAINTIFF**

I certify that I am an agent of the plaintiff and have actual knowledge of the facts alleged in this Complaint.

| Date 9/26/17 | Name Of Agent (type or print) Grace Bishop | Signature Of Agent Grace Bishop |
|---|---|---|

(Over)

AOC-CVM-201, Rev. 8/17
© 2017 Administrative Office of the Courts

Case 4:19-cv-00111-D   Document 165   Filed 08/08/22   Page 48 of 52

431746
431747

17CV004461

# STATE OF NORTH CAROLINA

PITT _____ County

In The General Court Of Justice
District Court Division - Small Claims

Plaintiff(s)
REMCO EAST, INC.

**MAGISTRATE SUMMONS**

☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

**VERSUS**

SUMMARY EJECTMENT     G.S. 1A-1, Rule 4; 7A-217, -232

Defendant(s)
WILLIAM AND PHYLLIS HARRIS

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

**TO** *William Harris*

Name And Address Of Defendant 1
WILLIAM HARRIS
559 HUNTINGRIDGE RD APT B
GREENVILLE, NC 27834

**TO** *Phyllis Harris*

Name And Address Of Defendant 2
PHYLLIS HARRIS
559 HUNTINGRIDGE RD APT B
GREENVILLE, NC 27834

Telephone No. Of Defendant 1

Telephone No. Of Defendant 2

## A Small Claim Action Has Been Commenced Against You!

You are notified to appear before the magistrate at the specified date, time, and location of trial listed below. You will have the opportunity at the trial to defend yourself against the claim stated in the attached complaint.

You may file a written answer, making defense to the claim, in the office of the Clerk of Superior Court at any time before the time set for trial. Whether or not you file an answer, the plaintiff must prove the claim before the magistrate.

If you fail to appear and defend against the proof offered, the magistrate may enter a judgment against you.

Date Of Trial
OCT 1 0 2017

Time Of Trial
9:00 ☒AM ☐PM

Location Of Court
Small Claims Court, Washington St., Greenville, NC

Name And Address Of Plaintiff Or Plaintiff's Attorney

Date Issued
9-29-17

Signature
*Donna C. Coltrain*

☐ Deputy CSC     ☒ Assistant CSC     ☐ Clerk Of Superior Court

2017 SEP 32 AM 7:06
PITT CO. SHERIFF'S OFFICE RECEIVED

(Over)

AOC-CVM-100, Rev. 8/17
© 2017 Administrative Office of the Courts

CK 2012 $30

RETURN OF SERVICE

I certify that this summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | Name Of Defendant |
|---|---|---|
| 10-3-17 | 4:53 ☐ AM ☑ PM | William Harris |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☑ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copy Left (if corporation, give title of person copy left with)

*Phyliss Harris - 559-B Hunting Ridge Rd Greenville*

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | Name Of Defendant |
|---|---|---|
| 10-3-17 | 4:53 ☐ AM ☑ PM | Phyllis Harris |

☑ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copy Left (if corporation, give title of person copy left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

PITT COUNTY, C.S.C.
2017 OCT -4 PM 12: 35
FILED

| FOR USE IN SUMMARY EJECTMENT CASES ONLY: | ☐ Service was made by mailing by first class mail a copy of the summons and complaint to the defendant(s) and by posting a copy of the summons and complaint at the following premises; |
|---|---|
| | Date Served | Name(s) Of The Defendant(s) Served By Posting |
| | Address Of Premises Where Posted |

| Service Fee | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | GR Tull |
| Date Received | Name Of Deputy Sheriff Making Return (type or print) |
| 10-2-17 | GR Tull -8922 |
| Date Of Return | County Of Deputy Sheriff Making Return |
| 10-3-17 | Pitt |

AOC-CVM-100, Side Two, Rev. 8/17
© 2017 Administrative Office of the Courts

17CV004461

STATE OF NORTH CAROLINA

_Pitt_ **County**

In The General Court Of Justice

**File No.**

**NOTICE OF ASSIGNMENT/SERVICE**

| Plaintiff | | Defendant |
|---|---|---|
| Rimco East | **VS** | William Harris |

**For Small Claims Only**

☒ The above captioned small claim is assigned to the Magistrate presiding at the place, date and time indicated below.

Location Of Court SMALL CLAIMS COURT
WASHINGTON STREET, GREENVILLE, NC

Trial Date OCT 10 2017

Trial Time 9:00 ☒ AM ☐ PM

Signature Norine C. Cobbain

☐ Deputy CSC ☒ Assistant CSC ☐ CSC

**Summons Service**

☐ The summons in the above captioned action
   ☐ was served.

☐ was NOT served.

Date Served

Reason
☐ Unable to locate ☐ Moved out of county

☐ Other *(specify)*

AOC-CVM-300, Rev. 6/09
© 2009 Administrative Office of the Courts

| File No. | Abstract No. |
|---|---|
| 17 CVM 4461 | |

Film No.

**17-55**

Judgment Docket Book And Page No.

## STATE OF NORTH CAROLINA

PITT _____ County

In The General Court Of Justice
District Court Division-Small Claims

This action was tried before the undersigned on the cause stated in the complaint. The record shows that the defendant was given proper notice of the nature of the action and the date, time and location of trial.

## JUDGMENT
## IN ACTION FOR
## SUMMARY EJECTMENT

G.S. 7A-210(2), 7A-224; 42-30

Name And Address Of Plaintiff

REMCO EAST INC

1902-B CHARLES BLVD

GREENVILEE          NC      27858

| County | Telephone No. |
|---|---|

### VERSUS

Name And Address Of Defendant 1
HARRIS, WILLIAM

559 HUNTINGRIDGE RD APT B

GREENVILLE         NC      27834

| County | Telephone No. |
|---|---|
| PITT | |

Name And Address Of Defendant 2
HARRIS, PHYLLIS

559 HUNTINGRIDGE RD APT B

GREENVILLE         NC      27834

| County | Telephone No. |
|---|---|
| PITT | |

Name And Address Of Plaintiff's Attorney

| | FINDINGS |
|---|---|

The Court finds that:
1. ☐ a. the plaintiff has proved the case by the greater weight of the evidence.
   ☒ b. the plaintiff has failed to prove the case by the greater weight of the evidence.
   ☐ c. the plaintiff requested and was entitled to a judgment for possession based on the pleading.
2. the defendant(s) ☒ was ☐ was not present. ☐ The defendant was served by postings.
3. ☐ a. there is no dispute as to the amount of rent in arrears, and the amount is $ _____
   ☐ b. there is an actual dispute as to the amount of rent in arrears. The defendant(s) claims the amount of rent in arrears is $ _____ , and this amount is the undisputed amount of rent in arrears.
4. other:

| | ORDER |
|---|---|

It is ORDERED that:
☐ 1. the defendant(s) be removed from and the plaintiff be put in possession of the premises described in the complaint.
☒ 2. this action be dismissed with prejudice.
☐ 3. this action be dismissed with prejudice because the defendant tendered the rent due and the court costs of this action.
☐ 4. the plaintiff recover rent of the defendant(s) in the amount and at the rate listed below, plus other damages in the amount indicated. The plaintiff is also entitled to interest on the total principal sum from this date until the judgment is paid.
☐ 5. other: (specify)

☒ 6. costs of this action are taxed to the ☒ plaintiff. ☐ defendant.

| Rate Of Rent | | Amt. Of Rent In Arrears (Owed To Date) |
|---|---|---|
| $ | ☐ Mo.<br>per ☐ Wk. | $ |
| Amount Of Other Damages $ | | |
| **TOTAL AMOUNT** | | $ |

☒ Judgment Announced And Signed In Open Court

| Date | Signature Of Magistrate |
|---|---|
| 10 10 17 | |

Name Of Party Announcing Appeal In Open Court

PITT COUNTY, C..
OCT 10 PM 12
FILED

| | CERTIFICATION |
|---|---|

(NOTE: To be used when magistrate does not announce and sign this Judgment in open court at the conclusion of the trial.)
I certify that this Judgment has been served on each party named by depositing a copy in a post-paid properly addressed envelope in a post office or official depository under the exclusive care and custody of the United States Postal Service.

| Date | Signature Of Magistrate |
|---|---|

AOC-CVM-401, Rev. 2/06
© 2006 Administrative Office of the Courts